IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LIONEL GUSTAFSON et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| V. | ) CIVIL ACTION NO. |
| | )  1:05-cv-00352-CG-L |
| ADRIAN JOHNS, et al., | ) (Three-judge court) |
| | ) |
| Defendants, | ) |
| | ) |
| SETH HAMMETT, LOWELL BARRON | ) |
| and HANK SANDERS, | ) |
| | ) |
| Defendants-Intervenors. | ) |

## DEFENDANT-INTERVENOR HAMMETT'S BRIEF
## IN SUPPORT OF MOTION TO DISMISS

Edward Still
Edward Still Bar No. ASB-4786-I 47W
2112 11th Avenue South
Suite 201
Birmingham, AL 35205
205-320-2882
fax toll free 877-264-5513
E-mail: still@votelaw.com

James U. Blacksher
James U. Blacksher Bar No. ASB-2381-S82J
P.O. Box 636
Birmingham AL 35201
205-591-7238
Fax: 866-845-4395
E-mail: jblacksher@ns.sympatico.ca

Attorneys for defendant-intervenor
Hammett

# TABLE OF CONTENTS

I.   THIS ACTION IS BARRED UNDER THE DOCTRINES OF ISSUE AND
     CLAIM PRECLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.   THE HOLDING OF *MONTIEL V. DAVIS*. . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.   THE HOLDING OF *RICE V. ENGLISH*. . . . . . . . . . . . . . . . . . . . . . . . . . 6
     C.   THE LEGAL STANDARDS OF CLAIM PRECLUSION AND THEIR
          APPLICATION TO THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          1.   *The Parties Are Substantially Identical.* . . . . . . . . . . . . . . . 8
          2.   *Count One, One Person, One Vote: The Same Cause of Action
               Was Presented in* Montiel v. Davis. . . . . . . . . . . . . . . . . . . . 11
          3.   *Count Two, Partisan Gerrymandering: The Same Cause of
               Action Was Presented in* Montiel v. Davis. . . . . . . . . . . . . . 13
          4.   *Count Three, Partisan Gerrymandering Under the First
               Amendment: The Same Cause of Action Was Presented or
               Could Have Been Presented in* Montiel v. Davis. . . . . . . . . 17
     D.   Principles of Res Judicata Prevent Consideration of Alleged Changes
          in Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON
     WHICH RELIEF CAN BE GRANTED. . . . . . . . . . . . . . . . . . . . . . . . . . 20
     A.   Count One, Alleging a One-Person, One-Vote Violation, Fails to
          State a Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          1.   *The Amended Complaint Cannot Stand on Conclusory
               Allegations of an Available Better Plan.* . . . . . . . . . . . . . . . 21
          2.   Larios *Did Not Change the Law This Court Applied in* Montiel
               v. Davis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          3.   *The Privileges and Immunities Clause Does Not Guarantee the
               Right To Vote.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     B.   Count Two, Alleging a Partisan Gerrymander That Violates the
          Fourteenth Amendment, Fails to State a Claim. . . . . . . . . . . . . . . . 28
          1.   *The Binding Precedent of* Vieth v. Jubelirer. . . . . . . . . . . . 28
          2.   *The Partisan Gerrymander Standards Alleged in the Amended
               Complaint Fail To State a Claim Upon Which Relief Can Be
               Granted.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
     B.   Count Three, Alleging a Partisan Gerrymander That Violates the First
          Amendment, Fails to State a Claim. . . . . . . . . . . . . . . . . . . . . . . . . 53

i

III.    THIS ACTION IS BARRED BY LACHES.  . . . . . . . . . . . . . . . . . . . . . . . 54

IV.    CONCLUSION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LIONEL GUSTAFSON et al.,            )
                                    )
            Plaintiffs,             )
                                    )
V.                                  ) CIVIL ACTION NO.
                                    )  1:05-cv-00352-CG-L
ADRIAN JOHNS, et al.,               ) (Three-judge court)
                                    )
            Defendants,             )
                                    )
SETH HAMMETT, LOWELL BARRON         )
and HANK SANDERS,                   )
                                    )
            Defendants-Intervenors. )

**DEFENDANT-INTERVENOR HAMMETT'S BRIEF
IN SUPPORT OF MOTION TO DISMISS**

Defendant-intervenor Seth Hammett, through undersigned counsel, submits

the following authorities and argument in support of his motion to dismiss this

action.

## I.    THIS ACTION IS BARRED UNDER THE DOCTRINES OF ISSUE AND CLAIM PRECLUSION.

For the first time since adoption of the Alabama Constitution of 1901, the

1

Alabama Legislature in 2001 fulfilled its duty under the Constitutions of Alabama and the United States to enact statutes redrawing the districts from which members of the Alabama House and Senate are elected.  Ala. Acts No. 2001-727 and 2001-729.  All previous redistricting plans in the last half of the twentieth century were drawn either by a federal court or by the Legislature under federal court order.  Immediately, these 2001 statutory redistricting plans were challenged in federal and state court by plaintiffs represented by counsel in the instant action.  The claims asserted in the amended complaint in this action have already been adjudicated in at least two prior cases, *Montiel v. Davis*, 215 F.Supp.2d 1279 (S.D. Ala. 2002) (3-judge court), and *Rice v. English*, 835 So.2d 157 (Ala. 2002), and are barred by res judicata and collateral estoppel.

### A.    THE HOLDING OF *MONTIEL V. DAVIS*.

In *Montiel v. Davis*, 215 F.Supp.2d 1279 (S.D. Ala. 2002) (3-judge court), this Court addressed constitutional challenges to the same Alabama House and Senate plans under attack in the instant action and held that the plans meet constitutional requirements.  The third amended complaint in *Montiel v. Davis* in separate counts asserted statewide one-person, one-vote and racial vote dilution claims against the House and Senate plans and alleged unconstitutional racial

2

gerrymanders in three House and two Senate districts.  01-447 Doc. No. 43.  This

action is barred by the doctrines of claim and issue preclusion, because the

Gustafson amended complaint presents claims and issues that were raised, or

could have been raised, in *Montiel v. Davis*, and because the parties in the instant

action are in privity with and were adequately represented by the parties in

*Montiel v. Davis*.

First, in *Montiel v. Davis*, this Court made findings of fact about the

redistricting guidelines utilized by the Legislature:

> The Alabama Legislature established Guidelines for
> Reapportionment and Redistricting through the work of its Permanent
> Legislative Committee on Reapportionment ("PLCR") which provide,
> in pertinent part:
>> In accordance with the Equal Protection Clause of the
>> Fourteenth Amendment to the United States
>> Constitution, legislative and State Board of Education
>> districts will be drawn to achieve "substantial equality of
>> population among the various districts."
>>     a. As a general proposition, deviations from the
>> "ideal district" population should be justifiable either as
>> a result of limitations of census geography, or as a result
>> of the promotion of a rational state policy.
>>     b.  In keeping with subpart a, above, proponents of
>> legislative and State Board of Education
>> reapportionment plans should establish as a high priority
>> minimizing population deviations among the districts.  In
>> any case, the relative population deviation for any
>> legislative or state board of education district should not
>> exceed plus or minus five percent (5%). Adherence to
>> this rule will insure that the overall deviation in the plan

3

>> does not exceed ten percent (10%), which is generally
considered by controlling federal judicial decisions as a
permissible overall deviation.
>>
>>> c. Any proponent submitting a proposal to the
Reapportionment Committee or the Legislature shall
submit a detailed explanation of how the deviations in
the proposed plan further the rational state policies
described in Section IV of these Guidelines, or are
necessitated by census geography.

> The Guidelines, at Section IV, also favor the use of traditional
race-neutral districting criteria such as compactness, contiguity,
respect for communities of interest, preservation of the cores of
existing districts and avoidance of conflicts between incumbents.

215 F.Supp.2d at 1282-83 (citation and footnote omitted).

Second, this Court made findings of fact about the partisan designs of the

plans:

> Plaintiffs have proffered no evidence to refute the abundant
evidence submitted by the defendants and defendant-intervenors
which establishes that black voters and Democratic voters in Alabama
are highly correlated; that the Legislature utilized recent election
returns to ascertain actual voter behavior; and that Acts 2001-727 and
2001-729 were the product of the Democratic Legislators' partisan
political objective to design Senate and House plans that would
preserve their respective Democratic majorities.

215 F.Supp.2d at 1283.

Third, this Court rejected claims that the population deviations in the plans

are unconstitutional:

> To survive summary judgment, the plaintiff would have to produce
further evidence to show that the apportionment process had a "taint

4

of arbitrariness or discrimination." *Roman v. Sincock,* 377 U.S. [695,] 710 [(1964)]. In other words, for deviations below 10%, the state is entitled to a presumption that the apportionment plan was the result of an "honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. [533,] 577 [(1964)]. However, this is a rebuttable presumption. *Daly [v. Hunt,],* 93 F.3d [1212,] 1220 [(4th Cir. 1996)] (emphasis added). It is undisputed that Alabama is here entitled to this critical presumption. In order to rebut this presumption, plaintiffs had "the burden of showing that the 'minor' deviation in the plan results *solely* from the promotion of an unconstitutional or irrational state policy." *Marylanders [for Fair Representation v. Schaefer,* 849 F.Supp. [1022,] 1032 [(D. Md. 1994)] (emphasis added). The plaintiffs were further required to "demonstrate ... that the asserted unconstitutional or irrational state policy is the actual *reason* for the deviation." *Id.* (emphasis in original), *citing, Karcher [v. Daggett],* 462 U.S. 725, 740-44 (1983). "In addition, the plaintiff[s] must prove that the minor population deviation is *not* caused by promotion of legitimate state policies." *Marylanders,* 849 F.Supp. at 1032 (emphasis in original). The "use of a plus or minus five percent population window" is not an illegitimate state purpose or objective. *Id.* at 1034, *citing, Voinovich [v. Quilter],* 507 U.S. [146,] 160 (1993) ("requirement is not an inflexible one."); *Reynolds v. Sims,* 377 U.S. at 577-81, 84 S.Ct. at 1389-92 ("more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting."). Plaintiffs have simply failed to carry their burden.

215 F.Supp.2d at 1286.

Fourth, this Court held that neither plan was racially gerrymandered to under-populate districts with substantial black populations, which it found to be correlated with Democratic voters, and to over-populate heavily white districts, which it found were correlated with Republican voters:

> Plaintiffs, despite their contentions to the contrary, have failed
> to proffer evidence, either direct or circumstantial, which establishes
> to any degree that the Alabama Legislature subordinated traditional
> race-neutral districting principles such as those set forth in Section IV
> of the Guidelines to racial considerations in violation of the
> Fourteenth Amendment. ...

215 F.Supp.2d at 1283.

### B.   THE HOLDING OF *RICE V. ENGLISH*.

Three different plaintiffs, represented by counsel for the *Montiel* plaintiffs

in this Court, unsuccessfully attacked the population deviations in the Senate plan,

Act No. 2001-727, in state court, claiming they violated the Alabama Constitution.

*Rice v. English*, 835 So.2d 157, 160 (Ala. 2002) ("The Rice plaintiffs contended

that the new senate districts failed to satisfy Art. I, § 33, and Art. IX, § 200, Ala.

Const.1901, in that the population of the new districts was not "as nearly equal to

each other ... as may be."  Art. IX, § 200.").  The Alabama Supreme Court upheld

the trial court's award of summary judgment in favor of the defendants, relying on

federal Fourteenth Amendment case law, not as binding precedent on the state

constitutional question, but as "as illustrations or analogies...."  835 So.2d at 167.

The Alabama Supreme Court's construction of state constitutional requirements

closely tracks the principles of federal constitutional law:

> The trial court afforded the Legislature appropriate deference
> in its solution to the difficult question of dividing the State into 35

senate districts with approximately equal population.  The districts created by the Legislature are within plus or minus five percent of the ideal population of a senate district.   While various members of this Court, had we been privileged to participate in the legislative deliberations and then to cast votes according to our respective consciences, might have opted for different district boundaries, less disregard of county lines, or greater concern for more uniformity of population within districts, we recognize that the people elected us to cast our votes as judges and not as legislators. As judges, we cannot overturn the redistricting plan on the grounds asserted by the Rice plaintiffs in the appeal before us.  The Rice plaintiffs have failed to overcome the presumption of constitutionality that precedent requires us to attach to the redistricting plan.

835 So.2d at 167-68 (footnote omitted).


### C.   THE LEGAL STANDARDS OF CLAIM PRECLUSION AND THEIR APPLICATION TO THIS CASE.

The principles of res judicata as they apply to challenges of state legislative redistricting plans were explored in *Thompson v. Smith*, 52 F.Supp.2d 1364, (M.D. Ala. 1999) (3-judge court), which, pursuant to federal rule, applied the Alabama case law governing res judicata.

> Under Alabama law, the essential elements of res judicata are: "(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits."  If all of these elements are met, *any claim that was or could have been adjudicated in the previous action is precluded.*  If even one element of the four is not met, however, res judicata is not applicable.

52 F.Supp.2d at 1368-69 (*quoting N.A.A.C.P. v. Hunt*, 891 F.2d  1555, 1560 (11th

Cir.1990) (citations omitted) (emphasis added).  There can be no dispute that

*Montiel v. Davis*, 215 F.Supp.2d 1279 (S.D. Ala. 2002), and *Rice v. English*, 835

So.2d 157 (Ala. 2002), are prior judgments on the merits by courts of competent

jurisdiction.  An inspection of the record will show that elements (3) and (4) of res

judicata are also satisfied here.

      1.    *The Parties Are Substantially Identical.*

    Lionel Gustafson and the other plaintiffs in the instant case were not parties

to *Montiel v. Davis* or to *Rice v. English*.  But, for the same reasons cited in

*Thompson v. Smith*, *supra*, they share substantial identity with the Montiel and

Rice plaintiffs.

> Alabama law defines 'identity of the parties' broadly--as broadly as due process allows.  *See Century 21 Preferred Properties, Inc. v. Alabama Real Estate Comm'n*, 401 So.2d 764, 770 (Ala.1981). The key inquiry is whether the interests of the party against whom res judicata is asserted were adequately represented by a party to the prior lawsuit.  *See id.*  When the party against whom res judicata is asserted was not itself a party to the prior lawsuit, however, the court must undertake a further inquiry to determine whether the application of res judicata would offend the due process guarantees of the fourteenth amendment to the United States Constitution.  *See Richards v. Jefferson County*, 517 U.S. 793, 797 n. 4 (1996).

*Thompson v. Smith*, 52 F.Supp.2d at 1369.

    Here, as in *Thompson v. Smith*, the *Montiel* plaintiffs, the *Rice* plaintiffs and

the *Gustafson* plaintiffs were and still are represented by the same lawyer, Mark Montiel.  The plaintiffs in all three actions challenged the same State House and/or Senate redistricting plans, asking this Court and the state court to declare the plans unconstitutional, and asking for the same relief, namely, the adoption of entirely new statewide plans drawn by the court.

Like the plaintiffs in *Thompson v. Smith*, the *Montiel* plaintiffs "sought to be designated as representatives of all [similarly situated] Alabama voters."  *Id*.  See *Montiel* plaintiffs' third amended complaint, 01-447 Doc. No. 63, ¶¶ 37-39.  The putative *Montiel* class included all Alabama citizens residing in districts whose populations allegedly violated the mandate of one person, one vote and all citizens of the state residing in racially gerrymandered districts.  *Id*.  Thus "all of the [Gustafson] plaintiffs are members of this putative class."  *Thompson v. Smith*, 52 F.Supp.2d at 1369.  In affirmative defenses 2 and 3, the Guin intervenors' answer to the *Montiel* plaintiffs' third amended complaint alleged that plaintiffs' claims were mere pretexts for the partisan political objectives of certain supporters of the Republican Party, allegations that the *Montiel* plaintiffs never tried to deny.

By the reasoning of *Thompson v. Smith*, the Gustafson plaintiffs "cannot be characterized as strangers to the [*Montiel v. Davis*] action and are more properly characterized as alter-egos of the [*Montiel v. Davis*] plaintiffs with identical or

closely-aligned interests." *Thompson v. Smith*, 52 F.Supp.2d at 1369.  The

Gustafson plaintiffs were adequately represented by the *Montiel* plaintiffs.  *Id.*

(citing *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied,*

423 U.S. 908 (1975) (subsequent suit by a non-party may be precluded "if one of

the parties to the suit is so closely aligned with [the non-party's] interests as to be

his virtual representative")).

The application in *Thompson v. Smith* of the due process principles of

*Richards v. Jefferson County* also closely tracks the circumstances of the instant

case.

> *Richards* suggests that some of the concerns that should inform a
> court in its due-process analysis include whether the plaintiffs in the
> prior litigation purported to sue on behalf of a class that includes the
> plaintiff against whom res judicata is asserted, whether there was "full
> and fair consideration of the common issue," [517 U.S.] at 801,
> whether the non-party had been informed that the original lawsuit is
> pending, *id.* at 799; and whether the non-party could "choose for
> himself whether to appear or default, acquiesce or contest."  *Id.*

52 F.Supp.2d at 1370.  Here, as in *Thompson v. Smith*, the Gustafson plaintiffs had

notice of the pending *Montiel v. Davis* action and had ample opportunity to be

heard in it.  *Id.*

"The [*Montiel*] plaintiffs, moreover, expressly sought to represent a class

that clearly includes [the Gustafson plaintiffs], and there is every reason to

conclude that [this] court took care to protect the interests of non-party class members." *Id.* The *Montiel* plaintiffs sought to represent a plaintiff class of all citizens of Alabama and asked the federal court to certify a defendant class of all probate judges in Alabama. As in *Thompson v. Smith*, "[the Gustafson plaintiffs] were fully aware of these class claims and yet did nothing. Under these circumstances, the court cannot conclude that it would offend due process to bind [the Gustafson plaintiffs] to the prior litigation, and we turn next to the issue of whether the same causes of actions were present." *Id.*

> 2.     *Count One, One Person, One Vote: The Same Cause of Action Was Presented in* Montiel v. Davis.

The operative paragraphs of Count One in the Gustafson amended complaint are:

> 129.  Plaintiffs' constitutional right to such equality in voting strength has been diluted and debased through the enactment and continued use of the state legislative redistricting plans by which members of the Alabama Legislature are to be elected as the state legislative redistricting plans contain such malapportioned districts as to cause Plaintiffs and other voters living in those districts to be underrepresented and therefore deny them the right to equal protection.
>
> 130.  There is no consistently-applied, legitimate state policy which justifies the population deviations in the current state legislative redistricting plans. Instead, the population deviations are designed to maximize the electoral effectiveness of voters in underpopulated regions and to minimize or dissipate the voting

strength of voters in overpopulated districts. Thus, the state
legislative redistricting plans, which intentionally and invidiously
discriminate against voters in overpopulated districts, are tainted with
arbitrariness or discrimination, in violation of the United States
Constitutional guarantees of the Fourteenth Amendment.

As noted above, this Court rejected these one-person, one-vote claims in *Montiel
v. Davis*, 215 F.Supp.2d at 1286.  The *Montiel* plaintiffs failed to prove that the
minor deviations in the House and Senate plans violated the Equal Protection
Clause of the Fourteenth Amendment.  They could not demonstrate that the
population deviations less than plus or minus 5% were not "the result of an
'honest and good faith effort to construct districts ... as nearly of equal population
as is practicable.'" *Id*. (*quoting Reynolds v. Sims,* 377 U.S. [533,] 577 [(1964)]) .
They could not "show that the apportionment process had a 'taint of arbitrariness
or discrimination.'" *Id.* (*quoting Roman v. Sincock,* 377 U.S. [695,] 710 [(1964)]).
They could not "prove that the minor population deviation is *not* caused by
promotion of legitimate state policies."  *Id.*  They "failed to proffer evidence,
either direct or circumstantial, which establishes to any degree that the Alabama
Legislature subordinated traditional race-neutral districting principles such as
those set forth in Section IV of the Guidelines to racial considerations in violation
of the Fourteenth Amendment."  *Montiel v. Davis*, 215 F.Supp.2d at 1283.

No matter how the Gustafson amended complaint tries to rephrase the one-

person, one-vote claim, it does not and cannot state a cause of action different

from the claim that was adjudicated on the merits in *Montiel v. Davis*.  Count One

is barred by res judicata.

> 3.  *Count Two, Partisan Gerrymandering: The Same Cause of Action Was Presented in* Montiel v. Davis.

On this point, as well, *Thompson v. Smith* referred to Alabama law:

> To determine whether two lawsuits present the same causes of action, Alabama courts apply a test "that in certain respects is similar to, but which is not the same as, the 'same transaction' test" in the Restatement (Second) of Judgments.  *Equity Resources Management, Inc. v. Vinson*, 723 So.2d 634, 637 (Ala.1998).  Because there is no mathematically precise definition for when there is an identity of causes of action, the test for making such determination has many formulations, but the principal inquiries are essentially two: (1) whether the claims arise out of' the same evidence, wrongful acts or disputes, *see id.* at 637, 638, or present the same issues (in particular, factual ones), *see, e.g., Selma Foundry & Supply Co. v. Peoples Bank & Trust Co.*, 598 So.2d 844, 848 (Ala.1992); and (2) whether the claims would be subject to proof by the same evidence, *Vinson*, 723 So.2d at 637.  Also probative, but not determinative, is "the identity [of] or differences in the forms of the two actions."  *Id.* at 638.

52 F.Supp.2d at 1370.

The operative paragraphs of Count Two in the Gustafson amended

complaint are:

> 133.  The state legislative redistricting plans and the individual districts contained therein are the result of gross partisan gerrymanders against Republicans, including Plaintiffs.  In drawing

the legislative districts, the Democratic-controlled Alabama Legislature used classification by political party in an invidious manner or in a way unrelated to any legitimate legislative objective.

134.   Therefore, the partisan gerrymanders which are the state legislative redistricting plans and the individual districts contained therein violate Article 4, Section 2 of the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment and thus 42 U.S.C. § 1983, by fragmenting cohesive communities of interest and political subdivisions between purported districts while no legitimate, consistently-applied state policy is supported or furthered by the needless division of these communities.

. . .

136.   The state legislative redistricting plans and the individual districts contained therein constitute intentional discrimination against the Republican Party, its members and other citizens who it may support as candidates.

. . .

138.   The plans and districts contained therein provide for the unjustified entrenchment of the Democratic Party's power in the Alabama Legislature.  No legitimate redistricting criteria of any sort were used by the Alabama Legislature in crafting the state legislative redistricting plans.  To the extent that Defendants claim any such criteria were used, such criteria depart radically from traditional and historical legitimate criteria.  That departure is unexplainable in any way other than as an effort on the part of the Democratic-controlled Alabama Legislature and then-Governor Siegelman to maintain or obtain more partisan political advantage for the Democratic voters; politics and a goal of $\pm$ 5% population deviation trumped any legitimate, consistently applied state interest.  Due to the gerrymandering, the Republican Party – the party receiving majority of total votes in a relevant election including presidential and gubernatorial, among others – has failed to obtain a majority of the relevant seats in an election under the state legislative redistricting plans and will be prevented from doing so in the foreseeable future.

139.   The impermissible partisan gerrymanders that are the state legislative redistricting plans are visible to the judicial eye and subject to judicially manageable standards.

This partisan gerrymandering claim was adjudicated in *Montiel v. Davis* when this Court held that the House and Senate plans did not violate the Fourteenth Amendment notwithstanding its finding "that Acts 2001-727 and 2001-729 were the product of the Democratic Legislators' partisan political objective to design Senate and House plans that would preserve their respective Democratic majorities."  215 F.Supp.2d at 1283.  The *Montiel* plaintiffs alleged that the districts were gerrymandered for a predominantly racial purpose, and the partisan motive this Court found was asserted as a defense to the racial gerrymandering claim.  The *Montiel* plaintiffs did not appeal the holding that the objective of preserving Democratic majorities failed to provide evidence that the population deviations less than plus or minus 5% were not "the result of an honest and good faith effort to construct districts ... as nearly of equal population as is practicable" or "that the apportionment process had a taint of arbitrariness or discrimination."  215 F.Supp.2d at 1286 (internal quotation marks omitted).  The Gustafson plaintiffs' Count Two is nothing but a blatant attempt to relitigate this holding.

Actually, even though their several amended complaints did not explicitly allege it, the *Montiel* plaintiffs *did* present a partisan gerrymandering contention in support of their motion for summary judgment.  Their brief in support of summary

15

judgment argued: "A population deviation in state legislative districts that is less than 10% is not acceptable under the Fourteenth Amendment if it was the product of racial gerrymandering *or other political considerations*." 01-447 Doc. No. 95 at 15 (citations and internal quotation marks omitted) (emphasis added). Defendant-intervenors Guin and Hayden squarely confronted this partisan gerrymander argument in their brief opposing Montiel's motion for summary judgment:

> When the Fourth Circuit addressed the question whether the *Daly* plaintiffs had met their burden of proof for challenging population deviations under 10%, it considered and rejected the very same contentions Mr. Montiel is urging on this Court. "To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a 'taint of arbitrariness or discrimination.' 93 F.3d at 1220 (*citing Roman v. Sincock*, 377 U.S. at 710). First, **it rejected the contention that political motives can produce the requisite "taint," an argument raised at page 15 of Mr. Montiel's brief**. 93 F.3d at 1220-21 (*citing Gaffney v. Cummings, supra*). This ruling was recently reaffirmed in *Easley v. Cromartie*, 532 U.S. 234, 121 S.Ct. 1452, 1456-57 (2001) ( recognizing "a constitutional political objective, **namely, the creation of . . . safe Democratic seat[s]**"").

01-447 Doc. No. 102 at 5-6 (emphasis added).

Thus the partisan gerrymandering claim in Count Two "arise[s] out of" the same evidence, wrongful acts or disputes" presented in *Montiel v. Davis* and "would be subject to proof by the same evidence" as the evidence previously

presented to this Court.  *Thompson v. Smith*, 52 F.Supp.2d at 1370.  Nor can the

Gustafson plaintiffs resurrect this issue by pleading another alleged constitutional

basis (Article IV, § 2)[1] for the same substantive inquiry.

As the U.S. Supreme Court has said, in the context of federal court deferral

to state court consideration of state legislative redistricting, a state "can have only

one set of legislative districts," and the duty to defer to a court that has already

begun to address redistricting issues "does not require that the federal and state-

court complaints be identical; it instead focuses on the nature of the relief

requested: reapportionment of election districts."  *Growe v. Emison*, 507 U.S. 25,

35 (1993) (*citing Scott v. Germano*, 381 U.S. 407 (1965) (per curiam )).  This

principle applies with even greater force where both federal and state courts have

already upheld Alabama's one set of legislative districts against a myriad of

claims.  Count Two of the Gustafson amended complaint is barred by the doctrine

of claim preclusion or res judicata.

      4.    *Count Three, Partisan Gerrymandering Under the First Amendment: The Same Cause of Action Was Presented or Could Have Been Presented in* Montiel v. Davis.

---

[1] Paragraph 134 of the amended complaint also asserts a violation of 42 U.S.C. § 1983.  But § 1983 provides no substantive rights; it is simply statutory authority for granting judicial relief when a violation of substantive rights under the Constitution and laws of the United States is established.

Count Three of the amended complaint realleges the same partisan gerrymandering claim set out in Count Two.  The only significant difference between Counts II and III is that the former count bases its claim on Article IV, § 2, of the Constitution and the Fourteenth Amendment, while the latter count bases its claim on the First Amendment.  The operative allegations of Count Three are:

> 142.  The First Amendment to the United States Constitution provides the right of freedom of speech and of association. The state legislative redistricting plans impinge upon the freedom of association rights guaranteed by the First Amendment of the United States Constitution by packing and gerrymandering Republican-leaning districts, thereby penalizing and burdening Republican representatives and voters, including Plaintiffs, solely by reason of political ideology, beliefs, affiliation or association.  Public debates on issues of public importance are also chilled in violation of the First Amendment.
>
> 143.  There is no consistently-applied, legitimate state policy which justified the population deviations or gerrymandering in these Republican-leaning districts in the state legislative redistricting plans.  Instead,  the population deviations and gerrymandered districts are tainted by arbitrariness and discrimination, resulting in a violation of Plaintiffs' First Amendment rights and 42 U.S.C. § 1983.

Thus the alleged evidentiary basis for Count Three is identical to that for Count Two, and it is barred for the same reasons Count Two is barred by the doctrine of claim preclusion.

Even if either Count Two or Count Three, or both of them, actually alleged causes of action distinct from those presented in *Montiel v. Davis* (they do not),

they would be barred nevertheless, because they could have been raised in the

prior action.

> The traditional *res judicata* case (frequently referred to as a claim preclusion) involves prior litigation between a plaintiff and a defendant, which is decided on the merits by a court of competent jurisdiction, and then a subsequent attempt by the prior plaintiff to relitigate the same cause of action against the same defendant, **or perhaps to relitigate a different claim not previously litigated but which arises out of the same evidence**.  Alabama law is well settled that this will not be allowed.   A valid, final judgment on the merits of the claim extinguishes the claim.  If the plaintiff won, the claim is merged into the judgment; if the defendant won, the plaintiff is barred from relitigating any matter which *could have* been litigated in the prior action.

*Whisman v. Alabama Power Co.*, 512 So.2d 78, 81 (Ala. 1987) (citations omitted)

(bold emphasis added) (italics emphasis in original); *accord, e.g.*, *San Remo Hotel*

*v. City and County of San Francisco*, 125 S.Ct. 2491, 2500 n.16 (2005); *Ex parte*

*Chapman Nursing Home v. McDonald*, __ So.2d __, 2004 WL 2914930 (Ala.,

Dec. 17, 2004) at *4.

### D.    PRINCIPLES OF RES JUDICATA PREVENT CONSIDERATION OF ALLEGED CHANGES IN LAW.

For nearly two years before this action was commenced the press has been

full of assertions by Republican Party officials that a new lawsuit challenging

Alabama's House and Senate redistricting plans would be filed because a Georgia case had changed the law. *Larios v. Cox*, 300 F.Supp.2d 1320 (N.D. Ga.), *aff'd summarily*, 124 S.Ct. 2806 (2004). In subsequent sections of this brief we will show that *Larios* did not change the law governing the redistricting issues presented to this Court in *Montiel v. Davis* and now in the instant action.

However, even if there had been a change in law, it would provide no basis for avoiding the application of res judicata in this action. It is well established that even retroactive application of a change in decisional law does not apply to claims that have been litigated and are barred by res judicata. *Glazner v. Glazner*, 347 F.3d 1212, 1221 n.5 (11th Cir. 2003) ("[R]es judicata and procedural barriers such as statutes of limitations necessarily circumscribe the retroactive application of the rule we announce today.") (*citing James Beam Distilling Co. v. Georgia,* 501 U.S. 529, 535 (1991) (internal quotation marks omitted).

## II.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

It will not be necessary for this Court to consider whether the amended complaint states claims upon which relief can be granted if it rules that this action is barred by principles of claim and/or issue preclusion. Nevertheless, in the interests of judicial economy, we believe the Court should rule, in the alternative,

that dismissal is warranted under Rule 12(b)(6), Fed.R.Civ.P.

### A.    COUNT ONE, ALLEGING A ONE-PERSON, ONE-VOTE VIOLATION, FAILS TO STATE A CLAIM.

#### 1.    *The Amended Complaint Cannot Stand on Conclusory Allegations of an Available Better Plan.*

In *Montiel v. Davis* this Court correctly interpreted controlling precedent to place on the plaintiffs attacking population deviations under ± 5% the burden of rebutting the presumption that the Legislature made an "honest and good faith effort to construct districts ... as nearly of equal population as is practicable." 215 F.Supp.2d at 1286 (*quoting Reynolds v. Sims,* 377 U.S. 533, 577 (1964) ). "In order to rebut this presumption, plaintiffs had the burden of showing that the minor deviation in the plan results *solely* from the promotion of an unconstitutional or irrational state policy." 215 F.Supp.2d at 1286 (*quoting Marylanders for Fair Representation v. Schaefer,* 849 F.Supp. 1022, 1032 (D. Md. 1994) (emphasis added) (internal quotation marks omitted). The Gustafson plaintiffs' merely conclusory allegations, fail to state a claim upon which relief can be granted.

The crucial conclusory allegation of the amended complaint is paragraph 110:

Alternative plans can be drawn which demonstrate that districts which have lower population deviations (and which applied legitimate, consistently-applied state interests) were not only possible but easily attainable and therefore practicable. In addition, alternative plans can be drawn that distribute state legislative seats geographically according to population figures.  Alternative plans with lower deviations (and which applied legitimate, consistently applied state policies) and which distributed state legislative seats geographically according to population figures were available to the Alabama Legislature during the 2001 redistricting process.

The amended complaint does not identify any such "alternative" plans that even allegedly produce smaller population deviations than those in Acts No. 2001-727 and 2001-729 and that better satisfy the legitimate redistricting criteria adopted by the Legislature's written guidelines.  The allegation that such better alternative plans were available to the Legislature during the redistricting process was demonstrably false in *Montiel v. Davis* and remains false today.  The *Montiel* plaintiffs neither alleged nor produced evidence that the minor population deviations about which they complained were **not** necessary to comply with the Voting Rights Act and to effectuate the legitimate state interests identified in the Guidelines adopted by the Permanent Legislative Committee on Reapportionment: compactness and contiguity; the wishes of constituents; avoidance of contests between incumbents; preservation of communities of interests, "including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural,

partisan, or historic interests; county municipal, or voting precinct boundaries; and commonality of communications;" and preservation of the cores of existing districts.  215 F.Supp.2d at 1282-83.

To the contrary, the zero deviation plans introduced in the 2001 Legislature by Republican legislators and identified by the *Montiel* plaintiffs demonstrate why the Supreme Court has allowed state legislatures leeway with respect to population equality in order to serve the other legitimate state redistricting interests.  The zero deviation French Senate Plan splits 10 more counties and 77 more precincts than does Act 2001-727.  Compare Exhibits S and T submitted with Guin motion for summary judgment, 01-447 Doc. No. 83.  The zero deviation Pringle House Plan splits 22 more counties and 79 more precincts than does Act 2001-729.  Compare Exhibits U and V submitted with Guin motion for summary judgment, 01-447 Doc. No. 83.

The zero deviation plans sponsored by the Republican leadership in the Legislature would have created even more majority-black districts than exist in Acts 2001-727 and 2001-727.  The French Senate Plan had nine majority-black districts, compared with eight in Act 2001-727, and the size of the black majorities in the French Plan were significantly larger.  Compare Exhibits F and W submitted with Guin motion for summary judgment, 01-447 Doc. No. 83.  The Pringle House

Plan had 28 majority-black districts, compared with 27 in Act 2001-729, and the size of the black majorities in the Pringle Plan were on average significantly larger.  Compare Exhibits H and X submitted with Guin motion for summary judgment, 01-447 Doc. No. 83.  Thus, unlike the plans enacted by the Legislature, which carefully balanced the competing federal mandates to avoid retrogression of black voting strength, required by § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and to avoid "segregating" voters by race, prohibited by the Fourteenth Amendment *Shaw v. Reno*, 509 U.S. 630 (1993), cases, these Republican plans would have minimized the number of seats black voters could influence by packing as many African Americans into as many districts as possible, arguably violating both the Voting Rights Act and *Shaw*.

In short, like the *Montiel* plaintiffs, the Gustafson plaintiffs can point to no alternative plan that would have done a better job of reconciling the complex mix of federal, state, regional and political interests the Guidelines sought to protect. Their strictly conclusory allegation that better plans could be drawn by this Court is insufficient to rebut the presumption of validity to which the Legislature's plans are entitled.

2.    Larios *Did Not Change the Law This Court Applied in* Montiel v. Davis.

*Larios v. Cox*, 300 F.Supp.2d 1320 (N.D. Ga.), *aff'd summarily*, 124 S.Ct. 2806 (2004), did not change the law applied by this Court in *Montiel v. Davis* regarding plaintiffs' burden of alleging facts that rebut the presumption that the Legislature made a good faith effort to minimize population deviations.  To the contrary, the three-judge district court's opinion cites *Montiel v. Davis* and the precedents this Court relied on.  *Larios*, 300 F.Supp.2d at 1340.  Indeed, *Larios* applied the *Montiel v. Davis* constitutional standards to reject the contention of the Georgia Assembly that the rule of ± 5% is an irrebuttable safe harbor.  300 F.Supp.2d at 1325 ("legislators and plan drawers for both houses believed there was a 'safe harbor' of +- 5% in the reapportionment of state legislative districts and, therefore, that population deviations not rising to that level did not have to be supported by *any* legitimate state interest") (emphasis added).

Indeed, the sole precedential value of the Supreme Court's summary affirmance of *Larios* is reaffirmation of the previously settled principle that ± 5% is not an irrebuttable safe harbor.  "Summary actions . . .  should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved."  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).

> Because a summary affirmance is an affirmance of the judgment only,
> the rationale of the affirmance may not be gleaned solely from the
> opinion below.  ...

Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.

*Id*. (citations omitted); *accord, e.g., Lucas v. Townsend*, 908 F.2d 851, 854 (11th Cir. 1990).

The holding of *Larios*, and thus the issue necessarily decided, is a narrow one, fully consistent with longstanding law, that the Georgia House and Senate plans violated the one-person, one-vote requirement of the Fourteenth Amendment when admittedly *no* effort was made to minimize population deviations.  The *only* justifications proffered by the Assembly were (1) systematically to overpopulate certain historically under-represented regions of the state and (2) to defeat as many Republican incumbents as possible.  300 F.Supp.2d at 1325.   The district court found that the plans "were not driven by any traditional redistricting criteria such as compactness, contiguity, and preserving county lines."  *Id*. at 1341-42.

In the instant case, the Gustafson plaintiffs, like the *Montiel* plaintiffs, have not alleged in Count One that the Alabama Legislature ignored *all* of the legitimate redistricting criteria announced in its guidelines and that the minor population deviations were driven *solely* by a systematic design to overpopulate

particular regions of the state and to underpopulate others, and no such design appears on the face of the House and Senate plans.  Nor does the Gustafson amended complaint allege that House and Senate Democrats set out to disadvantage as many Republican incumbents as possible, because they know that the incumbent protection criterion was applied fairly.  *Larios* did not purport to establish a new rule that prohibits partisan considerations as one of the justifications for minor population deviations under ± 5%.  The district court explicitly disavowed such a rule:

> a redistricting process need not be free of politics in order to be constitutional.  Politics and political considerations are, after all, "inseparable from districting and apportionment."  *Gaffney [v. Cummings],* 412 U.S. [735, 753 [(1973)].  As long as the population deviations are supported by a legitimate state interest, the court will not strike down a plan simply because political considerations played a role in its creation.

300 F.Supp.2d at 1354.  In fact, *Larios* did not even decide the question whether partisan factors standing alone could be sufficient to justify minor population deviations.  *Id*. at 1351.  Of course, the Supreme Court's summary affirmance did not decide this question either.  *See* 124 S.Ct. at 2809-10 (Scalia, J., dissenting).  Thus Gustafson cannot cite *Larios* in support of an argument that the principles this Court applied in *Montiel v. Davis* have been modified in the least.

3.     *The Privileges and Immunities Clause Does Not Guarantee the Right To Vote*.

Count One of the amended complaint alleges in paragraph 123 that the Privileges and Immunities Clause in Article IV, § 2 of the Constitution[2], along with "other provisions of the United States Constitution," guarantees a fundamental right to vote to U.S. citizens.  This allegation was squarely rejected in 1874.  *Minor v. Happersett*, 88 U.S. 162 (1874), which held that neither the Privileges and Immunities Clause in § 1 of the newly ratified Fourteenth Amendment nor the Privileges and Immunities Clause in Article IV, § 2, provides a federal right to vote, has never been overruled.  *Ipso facto*, the Privileges and Immunities Clause provides no authority for the Supreme Court's one-person, one-vote rule, which is grounded on the Equal Protection Clause of the Fourteenth Amendment.  *Reynolds v. Sims*, *supra*.

**B.     COUNT TWO, ALLEGING A PARTISAN GERRYMANDER THAT VIOLATES THE FOURTEENTH AMENDMENT, FAILS TO STATE A CLAIM.**

1.     *The Binding Precedent of* Vieth v. Jubelirer.

---

[2] Article IV, § 2, also contains the Interstate Rendition and Fugitive Slave Clauses, neither of which provides a right to vote.

For the first time since *Davis v. Bandemer*, 478 U.S. 109 (1986), the

Supreme Court revisited the availability of a constitutional cause of action for

partisan gerrymandering in *Vieth v. Jubelirer*, 541 U.S. 267 (2004).[3]  In *Vieth* the

Supreme Court affirmed the order of a three-judge district court granting the

state's Rule 12(b)(6) motion to dismiss for failure of the complaint to state a claim

upon which relief could be granted.  Four members of the Court, in Justice

Scalia's plurality opinion, based their decision on the ground that all claims of

partisan gerrymandering inject the courts inappropriately in political controversies,

are not susceptible of principled and manageable judicial standards, and so are

nonjusticiable.  Four dissenters, in three separate opinions, concluded that partisan

gerrymander claims are justiciable, and they proposed three different judicial

standards for assessing when partisan considerations, though not of themselves

unconstitutional, go too far and violate the equal protection rights and/or First

Amendment rights of voters.  Justice Kennedy in a concurring opinion provided

the fifth vote for affirming dismissal of the complaint.  He agreed with the

plurality that neither the *Bandemer* plurality standard, Justice Powell's proposed

---

[3] *Vieth* involved a challenge to congressional districts drawn by a state
legislature, but as regards the question of partisan gerrymandering there is no
distinction in the applicable principles as applied to state or local legislative
districts.  *Bandemer*, for example, addressed a partisan gerrymander claim against
state house and senate districts.

standard in *Bandemer*, the standard proposed by the *Vieth* plaintiffs nor any of the standards proposed by the dissenters in *Vieth* was judicially manageable. However, he declined to endorse the plurality's conclusion that all partisan gerrymander claims necessarily are nonjusticiable. Justice Kennedy "would not foreclose all possibility of judicial relief if some limited and precise rationale were found to correct an established violation of the Constitution in some redistricting cases." 541 U.S. at 306. "If workable standards do emerge to measure these burdens, however, courts should be prepared to order relief." *Id.* at 317.

The two questions this Court must address when deciding whether or not Count Two (and Count Three) of the Gustafson amended complaint states a claim upon which relief can be granted are (1) does it allege a judicial standard that is different from those already rejected by a majority of the Supreme Court in *Vieth*, and, if so, (2) is the new proposed standard judicially manageable, that is, does it provide a principled way to sort the "good" politics that a vibrant democracy depends on from the allegedly "bad" politics that somehow violates rights guaranteed citizens, individually or collectively, by the Constitution? Defendant-intervenor Hammett contends that the answer to question (1) is no, and so the amended complaint fails to state a claim upon which relief can be granted. Put differently, this Court may not proceed with the inquiry in (2) with respect to

30

proposed standards the Supreme Court has now rejected.

To engage these issues, this Court first must undertake the (frankly tedious) task of reading and making some sense of the five opinions in *Vieth*. While much of the High Court's discourse focuses on disagreements among the justices, a few points of agreement emerge with certainty.

First, as the Justice who cast the fifth vote for the judgment in *Vieth*, Justice Kennedy's concurring opinion provides the narrowest rationale for the Court's decision. That is, the four-member plurality concluded that all partisan gerrymander claims are inherently nonjusticiable, so there can be no judicially manageable standard. Justice Kennedy, however, was willing to "adjudicate only what is in the papers before us." 541 U.S. at 313 (Kennedy, J., concurring). He agreed that all standards past and present before the Court are unmanageable, but he held open the possibility that future litigants and courts might discover a standard that is judicially manageable.

Second, this Court is bound to dismiss for failure to state any allegations in the Gustafson amended complaint that were *rejected* in *Vieth*. The three-judge court in *Henderson v. Session* proceeded to consider the merits of all the partisan gerrymander standards proposed by the named parties and amicus parties on

31

remand from the Supreme Court[4] and concluded that the *Vieth* plurality is correct: partisan gerrymander claims are inherently nonjusticiable.  But this Court, like other lower federal courts, is not free to reconsider judicial standards that a *Vieth* majority has ruled are unmanageable and thus insufficient to state a claim.  "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation and internal quotation marks omitted).  Lower courts "are bound by both the Supreme Court's choice of legal standard or test and by the result it reaches under that standard or test."  *Planned Parenthood v. Casey*, 947 F.2d 682, 691-92 (3d Cir. 1991), *aff'd in relevant part*, 505 U.S. 833 (1992).

> Occasionally, the Supreme Court's decision in a case reveals that a standard established in an earlier case no longer commands the allegiance of a majority of the Justices, but also reveals that no single substitute is endorsed by that majority of the Justices.  Thereafter, the lower courts must determine whether to apply the old standard or, if not, what standard to apply.  Fortunately, the Supreme Court has instructed the lower courts on how to resolve these issues.

---

[4] *Henderson v. Session*, __ F.Supp.2d __, CA No. 2:03-cv-00354-TJW (E.D. Tex., June 5, 2005), Doc. No. 266 at 11, *on remand from* 125 S.Ct. 351 (2004) ("We can only fairly read the remand to suggest that the Justice providing the fifth vote sees the possibility of a workable standard emerging *from this case*, the rejected allegations of the complaint in *Vieth* aside.") (emphasis added).

. . .

In splintered Supreme Court decisions where there has been *a common denominator standard* that would necessarily produce results with which a majority of the Justices from the controlling case would agree, the Supreme Court and the lower courts have consistently identified as binding precedent the opinion setting forth that standard.

*Id.* at 692-94 (citations omitted) (emphasis added).  In *Vieth* there is no "common denominator standard" for lower courts to apply to determine whether an alleged partisan gerrymander *is* unconstitutional,[5] but there is "common denominator" agreement between the plurality and Justice Kennedy about what standards do *not* establish unconstitutional political gerrymanders.

All members of the Court agreed with Justice Kennedy that "[a] determination that a gerrymander violates the law must rest on something more than the conclusion that political classifications were applied."  541 U.S. at 307 (Kennedy, J., concurring); *accord*, 541 U.S. at 332 (Stevens, J., dissenting); 541 U.S. at 343 (Souter, J., dissenting)541 U.S. at 357 (Breyer, J., dissenting).  Nor is

_____

[5] See *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1261 n.10 (11th Cir. 2005)  ("the Court has indicated that there may be situations where even the *Marks* inquiry does not yield any rule to be treated as binding in future cases.) (*quoting Johnson v. Bd. of Regents of Univ. of Ga.,* 263 F.3d 1234, 1248 n. 12 (11th Cir.2001) (*citing Nichols v. United States,* 511 U.S. 738 (1994)).  "As the Third Circuit explained, 'the plurality and the concurrence took such markedly different approaches to the San Diego ordinance that there is no common denominator between them.'" *Solantic*, 410 F.3d at 1261 n.10 (*quoting Rappa v. New Castle County,* 18 F.3d 1043, 1058 (3d Cir.1994)).

33

partisan proportional representation required.  541 U.S. at 288 (plurality opinion);

*accord*, 541 U.S. at 338 (Stevens, J., dissenting); 541 U.S. at 352 n.7 (Souter, J.,

dissenting); 541 U.S. at 357-58 (Breyer, J., dissenting).  And, disagreeing with the

Scalia plurality, Justice Kennedy and the four dissenters generally agree that a

judicially manageable political gerrymander standard "must rest instead on a

conclusion that the classifications, though generally permissible, were applied in

an invidious manner or in a way unrelated to any legitimate legislative objective."

541 U.S. at 307 (Kennedy, J., concurring).  But, since Justice Kennedy concluded

"that the standards proposed in *Davis v. Bandemer,* 478 U.S. 109 (1986), by the

parties before us, and by our dissenting colleagues are either unmanageable or

inconsistent with precedent, or both," 541 U.S. at 308 (Kennedy, J., concurring)[6],

it is possible to identify the proposed partisan gerrymander standards that were

*rejected* by a majority of Justices in *Vieth* as either unmanageable or

nonjusticiable:

    1.  The *Vieth* plaintiffs' standard, rejected by five justices, was summarized

---

    [6] Nor was Justice Kennedy "able to discover, helpful discussions on the principles of fair districting discussed in the annals of parliamentary or legislative bodies.  Our attention has not been drawn to statements of principled, well-accepted rules of fairness that should govern districting, or to helpful formulations of the legislator's duty in drawing district lines."  541 U.S. at 308 (Kennedy, J., concurring).

by the plurality as follows:

> a plaintiff must "show that the mapmakers acted with a *predominant intent* to achieve partisan advantage," which can be shown "by direct evidence or by circumstantial **evidence that other neutral and legitimate redistricting criteria were subordinated to the goal of achieving partisan advantage**." . . .
>
> "Predominant intent" to disadvantage the plaintiff's political group refers to the relative importance of that goal as compared with all the other goals that the map seeks to pursue--contiguity of districts, compactness of districts, observance of the lines of political subdivision, protection of incumbents of all parties, cohesion of natural racial and ethnic neighborhoods, compliance with requirements of the Voting Rights Act of 1965 regarding racial distribution, etc.

541 U.S. at 307 (plurality opinion) (emphasis in original) (bold emphasis added).

Justice Kennedy explained why he agreed that the *Vieth* plaintiffs' standard was

insufficient:

> Failing to show that the alleged classifications are unrelated to the aims of apportionment, appellants' evidence at best demonstrates only that the legislature adopted political classifications. That describes no constitutional flaw, at least under the governing Fourteenth Amendment standard. As a consequence, appellants' complaint alleges no impermissible use of political classifications and so states no valid claim on which relief may be granted. It must be dismissed as a result. See Fed. Rule Civ. Proc. 12(b)(6) . . . .

541 U.S. at 313 (Kennedy, J., concurring) (other citations omitted).

2. Even neutral, objective redistricting standards themselves cannot be

relied on as providing a judicially manageable standard, because they

35

are not altogether sound as independent judicial standards for measuring a burden on representational rights.  They cannot promise political neutrality when used as the basis for relief.  Instead, it seems, a decision under these standards would unavoidably have significant political effect, whether intended or not.  For example, if we were to demand that congressional districts take a particular shape, we could not ensure the parties that this criterion, neutral enough on its face, would not in fact benefit one political party over another.

541 U.S. at 308-09 (Kennedy, J., concurring).

3.  The *Bandemer* plurality standard, as summarized by the *Vieth* plurality

was overruled:

[I]t would have to be shown that, taking into account a variety of historic factors and projected election results, the group had been denied its chance to effectively influence the political process as a whole, which could be achieved even without electing a candidate  It would not be enough to establish, for example, that Democrats had been placed in a district with a supermajority of other Democratic voters or that the district departs from pre-existing political boundaries.  Rather, in a challenge to an individual district the inquiry would focus on the opportunity of members of the group to participate in party deliberations in the slating and nomination of candidates, their opportunity to register and vote, and hence their chance to directly influence the election returns and to secure the attention of the winning candidate.  A statewide challenge, by contrast, would involve an analysis of the voters' direct *or indirect* influence on the elections of the state legislature as a whole.  With what has proved to be a gross understatement, the plurality acknowledged this was of necessity a difficult inquiry.

541 U.S. at 282 (plurality opinion) (citations and internal quotation marks omitted)

(emphasis added by *Vieth* plurlaity opinion).

36

4.  Justice Powell's proposed standard in *Bandemer*, as summarized by the

*Vieth* plurality, was also rejected:

> He agreed with the plurality that a plaintiff should show intent and
> effect, but believed that the ultimate inquiry ought to focus on
> whether district boundaries had been drawn solely for partisan ends to
> the exclusion of all other neutral factors relevant to the fairness of
> redistricting.  Under that inquiry, the courts should consider
> numerous factors, though no one factor should be dispositive.  The
> most important would be the shapes of voting districts and adherence
> to established political subdivision boundaries.  Other relevant
> considerations include the nature of the legislative procedures by
> which the apportionment law was adopted and legislative history
> reflecting contemporaneous legislative goals.   These factors, which
> bear directly on the fairness of a redistricting plan, combined with
> evidence concerning population disparities and statistics tending to
> show vote dilution, make out a claim of unconstitutional partisan
> gerrymandering.

541 U.S. at 290-91 (plurality opinion) (citations and internal quotation marks
omitted).

5.  Justice Stevens' proposed standard in his *Vieth* dissent (and which

Justice Kennedy thought was unmanageable) would have rejected any claim

attacking the redistricting plan on a statewide basis.  541 U.S. at 323, 328

(Stevens, J., dissenting) ("the plaintiffs-appellants lack standing to challenge the

districting plan on a statewide basis").  Instead, Justice Stevens would apply strict

scrutiny to obvious partisan gerrymanders.  "[W]hen partisanship is the

legislature's sole motivation--when any pretense of neutrality is forsaken

37

unabashedly and all traditional districting criteria are subverted for partisan

advantage--the governing body cannot be said to have acted impartially."  541

U.S. at 318 (Stevens, J., dissenting).  To detect obvious gerrymanders, he would

adopt the district-by-district approach developed in *Shaw v. Reno*, 509 U.S. 630

(1993), and its progeny:

> The *Shaw* line of cases has emphasized that  reapportionment is one
> area in which appearances do matter and has focused both on the
> shape of the challenged districts and the purpose behind the
> line-drawing in assessing the constitutionality of majority-minority
> districts under the Equal Protection Clause.  These decisions, like
> Justice Powell's opinion in *Bandemer*, have also considered the
> process by which the districting schemes were enacted, looked to
> other evidence demonstrating that purely improper considerations
> motivated the decision, and included maps illustrating outlandish
> district shapes.

541 U.S. at 323 (Stevens, J., dissenting) (citations and internal quotation marks

omitted).  Justice Stevens focused, for example, on Justice Powell's observation

"that the party in power had excluded the opposition from its deliberations and had

placed excessive weight on data concerning party voting trends."  *Id*. at 322

(citation omitted).  To which Justice Kennedy responded, "courts must be cautious

about adopting a standard that turns on whether the partisan interests in the

redistricting process were excessive. Excessiveness is not easily determined."  541

U.S. at 316 (Kennedy, J., concurring).  It should also be noted that Justice Stevens'

standard apparently would have required that the party supporters victimized by an

unlawful gerrymander be a voter minority.  541 U.S. at 333 (Stevens, J.,

dissenting).

> In sum, in evaluating a challenge to a specific district, I would
> apply the standard set forth in the *Shaw* cases and ask whether the
> legislature allowed partisan considerations to dominate and control
> the lines drawn, forsaking all neutral principles.  Under my analysis,
> if no neutral criterion can be identified to justify the lines drawn, and
> if the only possible explanation for a district's bizarre shape is a
> naked desire to increase partisan strength, then no rational basis exists
> to save the district from an equal protection challenge.

541 U.S. at 339 (Stevens, J., dissenting).  Justice Stevens concluded that the claim

of only one of the *Vieth* plaintiffs met his district-specific proposed standard:

> Plaintiff-appellant Furey plainly has stated a claim that District
> 6 constitutes an unconstitutional partisan gerrymander.  According to
> the complaint, Pennsylvania's 2002 redistricting plan splits
> "Montgomery County alone ... into six different congressional
> districts."  The new District 6 "looms like a dragon descending on
> Philadelphia from the west, splitting up towns and communities
> throughout Montgomery and Berks Counties."  Furey alleges that the
> districting plan was created "solely to effectuate the interests" of
> Republicans, and that the General Assembly relied "exclusively on a
> principle of maximum partisan advantage" when drawing the plan,
> "to the exclusion of all other criteria."  The 2002 plan "is so irregular
> on its face that it rationally can be viewed only as an effort ... to
> advance the interests of one political party, without regard for
> traditional redistricting principles and without any legitimate or
> compelling justification."  "The problem," Furey claims, is that the
> legislature "subordinated--indeed ignored--all traditional redistricting
> principles and all legitimate bases for governmental decisionmaking,
> in order to favor those with one political viewpoint over another."

> The plan "ignores all other traditional redistricting criteria," she
> alleges, "thus demonstrating that partisanship--and nothing else--was
> the rationale behind the plan."

541 U.S. at 339-40 (Stevens, J., dissenting).  Again, a majority of the Court found

that these allegations failed to state a claim upon which relief could be granted.

6.  Justice Souter, joined by Justice Ginsburg, thought that a partisan

gerrymander would be unconstitutional "if unfairness is sufficiently demonstrable.

. . ."  541 U.S. at 343 (Souter, J., dissenting).  Justice Souter disagreed with the

notion that a judicially manageable standard must be clear and precise.  "[W]e can

be no more exact in stating a verbal test for too much partisanship than we can be

in defining too much race consciousness when some is inevitable and legitimate."

*Id*. at 344.  Apparently siding on one point with Justice Stevens, he expressed his

opinion that "we would have better luck at devising a workable prima facie case if

we concentrated as much as possible on suspect characteristics of individual

districts instead of statewide patterns."  *Id*. at 346.  Justice Souter then set out five

elements for establishing a *prima facie* case of partisan gerrymandering:

> First, the resident plaintiff would identify a cohesive political group
> to which he belonged, which would normally be a major party.  . . .
> Second, a plaintiff would need to show that the district of his
> residence paid little or no heed to those traditional districting
> principles whose disregard can be shown straightforwardly:
> contiguity, compactness, respect for political subdivisions, and
> conformity with geographic features like rivers and mountains.  . . .

Third, the plaintiff would need to establish specific correlations between the district's deviations from traditional districting principles and the distribution of the population of his group. For example, one of the districts to which appellants object most strongly in this case is District 6, which they say "looms like a dragon descending on Philadelphia from the west, splitting up towns and communities throughout Montgomery and Berks Counties." To make their claim stick, they would need to point to specific protuberances on the Draconian shape that reach out to include Democrats, or fissures in it that squirm away from Republicans. They would need to show that when towns and communities were split, Democrats tended to fall on one side and Republicans on the other. . . .

Fourth, a plaintiff would need to present the court with a hypothetical district including his residence, one in which the proportion of the plaintiff's group was lower (in a packing claim) or higher (in a cracking one) and which at the same time deviated less from traditional districting principles than the actual district. . . . Drawing the hypothetical district would, of course, necessarily involve redrawing at least one contiguous district, and a plaintiff would have to show that this could be done subject to traditional districting principles without packing or cracking his group (or another) worse than in the district being challenged.

Fifth, and finally, the plaintiff would have to show that the defendants acted intentionally to manipulate the shape of the district in order to pack or crack his group.

541 U.S. at 347-50 (Souter, J., dissenting) (citations and footnotes omitted). This would not be an easy test to satisfy. "As for Furey's own claim, her allegations fall short, for example, on the feasibility of an alternative district superior to her own, as I would require. But she might well be able to allege what I would require, if given leave to amend." *Id*. at 355. If all five elements of prima facie proof were met, Justice Souter

41

> would then shift the burden to the defendants to justify their decision
> by reference to objectives other than naked partisan advantage.  They
> might show by rebuttal evidence that districting objectives could not
> be served by the plaintiff's hypothetical district better than by the
> district as drawn, or they might affirmatively establish legitimate
> objectives better served by the lines drawn than by the plaintiff's
> hypothetical.

*Id*. at 351.  Thus Justice Souter and Justice Ginsburg would have adopted a

partisan gerrymander standard which demanded the same allegation of a

satisfactory alternative plan this Court found was required in *Montiel v. Davis*.

7.  Justice Breyer began his dissent by pointing out that "pure politics often

helps to secure constitutionally important democratic objectives.  But sometimes it

does not.  Sometimes purely political 'gerrymandering' will fail to advance any

plausible democratic objective while simultaneously threatening serious

democratic harm."  541 U.S. at 355 (Breyer, J., dissenting).  He found it "not

surprising that 'traditional' districting principles have rarely, if ever, been

politically neutral.  Rather, because, in recent political memory, Democrats have

often been concentrated in cities while Republicans have often been concentrated

in suburbs and sometimes rural areas, geographically drawn boundaries have

tended to 'pac[k]' the former."  *Id.* at 359 (citations omitted).

> As I have said, reference back to these underlying
> considerations helps to explain why the legislature's use of political
> boundary drawing considerations ordinarily does *not* violate the

42

Constitution's Equal Protection Clause.  The reason lies not simply in the difficulty of identifying abuse or finding an appropriate judicial remedy.  The reason is more fundamental: Ordinarily, there simply is no abuse.  The use of purely political boundary-drawing factors, even where harmful to the members of one party, will often nonetheless find justification in other desirable democratic ends, such as maintaining relatively stable legislatures in which a minority party retains significant representation.

*Id*. at 360.  So Justice Breyer's proposed standard would have dismissed allegations like those in the amended complaint in the instant action that attempt to tie claims of unconstitutional partisan gerrymandering to alleged disparate treatment of districts in urban, suburban and rural regions.  He would have outlawed only redistricting plans that unjustifiably entrench one party in power:

At the same time, these considerations can help identify at least one circumstance where use of purely political boundary-drawing factors can amount to a serious, and remediable, abuse, namely, the *unjustified* use of political factors to entrench a minority in power.  By entrenchment I mean a situation in which a party that enjoys only minority support among the populace has nonetheless contrived to take, and hold, legislative power.  By *unjustified* entrenchment I mean that the minority's hold on power is purely the result of partisan manipulation and not other factors.  These "other" factors that could lead to "justified" (albeit temporary) minority entrenchment include sheer happenstance, the existence of more than two major parties, the unique constitutional requirements of certain representational bodies such as the Senate, or reliance on traditional (geographic, communities of interest, etc.) districting criteria.

*Id*. at 350-61.  Unjustified entrenchment, in Justice Breyer's view, would be unlikely where the party complaining about a gerrymander claimed a statewide

43

majority of voters:

> Courts need not intervene often to prevent the kind of abuse I
> have described, because those harmed constitute a political majority,
> and a majority normally can work its political will.  Where a State has
> improperly gerrymandered legislative or congressional districts to the
> majority's disadvantage, the majority should be able to elect officials
> in statewide races--particularly the Governor--who may help to undo
> the harm that districting has caused the majority's party, in the next
> round of districting if not sooner.

*Id.* at 362.  Getting down to specific examples of his proposed "unjustified

entrenchment" standard, Justice Breyer cites circumstances where, among other

things, "a majority party (as measured by the votes actually cast for all candidates

who identify themselves as members of that party in the relevant set of elections;

*i.e.,* in congressional elections if a congressional map is being challenged) has

*twice* failed to obtain a majority of the relevant legislative seats in elections. . . ."

*Id.* at 366.

Two things should be kept in mind about the foregoing summary of the

*Vieth* opinions.  First, every one of the past and present proposed standards for

detecting an unconstitutional partisan gerrymander was held by a majority of the

Court to be judicially unmanageable, and a complaint relying on any of these

standards is due to be dismissed.  Second, even the standards proposed by the four

dissenters are very difficult to satisfy, arguably more difficult than the *Bandemer*

44

standard that was overruled, and the Gustafson plaintiffs' amended complaint

would fail to satisfy them.  Under these circumstances, this Court would be fully

justified in adopting the bottom line of the Supreme Court's *Vieth* decision found

at the end of the plurality opinion:

> Reduced to its essence, Justice Kennedy's opinion boils down to this:
> "As presently advised, I know of no discernible and manageable
> standard that can render this claim justiciable.  I am unhappy about
> that, and hope that I will be able to change my opinion in the future."
> What are the lower courts to make of this pronouncement?  We
> suggest that they must treat it as a reluctant fifth vote against
> justiciability at district and statewide levels--a vote that may change
> in some future case but that holds, for the time being, that this matter
> is nonjusticiable.

541 U.S. at 305 (plurality opinion).

> 2.    *The Partisan Gerrymander Standards Alleged in the Amended
>       Complaint Fail To State a Claim Upon Which Relief Can Be
>       Granted.*

It is not necessary to do a close reading of Count Two of the instant

amended complaint to see that it tries to cherry-pick bits and pieces of the many

rejected attempts to state a partisan gerrymandering claim, so that, as was the case

for the *Vieth* plaintiffs, the Gustafson plaintiffs' complaint must be dismissed

pursuant to Rule 12(b)(6):

> Paragraph 133 contains the conclusory allegation that "the

45

Democratic-controlled Alabama Legislature used classification by political party in an invidious manner or in a way unrelated to any legitimate legislative objective."  This quotes the ultimate conclusion Justice Kennedy thinks a manageable standard "must rest . . . on," 541 U.S. at 307 (Kennedy, J., concurring), but it articulates no such standard.

Paragraph 134 alleges that the House and Senate plans are unconstitutional, on a statewide basis, because they "fragment[] cohesive communities of interest and political subdivisions between purported districts while no legitimate, consistently-applied state policy is supported or furthered by the needless division of these communities."  The fragmenting or cracking of communities of interest and political subdivisions were among the many more evidentiary factors proposed by the three dissenting opinions in *Vieth*, see pp. __ *supra*, but they were rejected by a majority of the Supreme Court, either standing alone or in conjunction with other factors.  Indeed, these Gustafson allegations would have been rejected by Justices Stevens, Souter and Ginsburg to the extent they are not district-specific.

Apparently, the novelty Gustafson tries to add is a proposal that fragmenting must be "consistently-applied" to be constitutional.  The consistently applied nuance is not found in the *Vieth* dissents; rather, it comes from the district court

46

opinion in *Larios*, where it is used to condemn regional discrimination and protection of only one party's incumbents as the sole reasons justifying Georgia's minor population deviations. *Larios*, 300 F.Supp.2d at 1322, 1331, 1338, 1347, 1349, 1351-55. But *Larios* held that plaintiffs' partisan gerrymander allegations failed to state a claim, and they were dismissed. 300 F.Supp.2d at 1322. As noted in an earlier section of this brief, the Supreme Court's summary affirmance of *Larios* provides precedent only for the narrow one-person, one-vote holding and does not disturb the principles decided in *Vieth*.

Paragraph 135 contains boilerplate vote dilution allegations, albeit vote dilution allegations limited to "fragmentation of cultural, ethnic, geographic[,] economic and political communities. . . ." Vote dilution principles such as these are featured in most of the partisan gerrymander standards rejected in *Vieth*, including those of the *Vieth* plaintiffs, Justice Powell and Justice Stevens (although Justices Stevens, Souter and Ginsburg would dismiss this allegation because it is not district-specific). We cannot locate the conclusory adjective "wanton" in any of the *Vieth* or *Larios* opinions, but it adds nothing substantive to save this allegation from dismissal.

Paragraph 136 alleges intentional discrimination against "the Republican Party, its members and other citizens who [sic] it may support as

47

candidates." This allegation makes clear that the real party in interest in this action is the Republican Party. In Alabama there is no party registration of voters and there are no formal "members" of the Republican Party. The Republican Party is itself a legal entity, a political organization with officers and paid staff. And the candidates it supports (which may or may not include all candidates running as Republicans) are identifiable persons. But most voters in Alabama are accustomed to splitting their tickets, and none of the named plaintiffs in this action alleges that he or she is one of the persons referred to in this paragraph. In any case, as shown in the summary of *Vieth* above, all members of the Supreme Court have rejected the notion that intentional discrimination alone can sustain a constitutional partisan gerrymander claim (or even a racial gerrymander claim). In legislative redistricting, intentional partisan discrimination is always easy to prove. The problem is a lack of any judicially manageable standards for determining what constitutes unconstitutional (or undemocratic) discriminatory effects.

Paragraph 137 alleges discriminatory effect "on Republicans" in unadorned conclusory fashion. As such, read together with the preceding paragraph, it adds nothing to the problems of nonjusticiability and absence of judicially manageable standards.

48

Paragraph 138 adopts the "unjustified entrenchment" standard of one member of the Supreme Court, Justice Breyer.  But Justice Kennedy and the four members of the *Vieth* plurality flatly rejected this standard, and it should be dismissed.  Strictly as an aside, it should be noted that the Gustafson amended complaint fails even Justice Breyer's proposed standard, which is designed to prevent a situation where "a majority party (as measured by the votes actually cast for all candidates who identify themselves as members of that party in the relevant set of elections;  *i.e.,* in congressional elections if a congressional map is being challenged) has *twice* failed to obtain a majority of the relevant legislative seats in elections. . . ."  *Id*. at 366.  By this standard, the relevant set of elections for the instant action would be Alabama House and Senate elections, and in 2002 the Democratic Party was the majority party: 52.35% of the statewide electorate voted for Democratic candidates in Senate races, and 51.37% voted for Democratic candidates in House races.  This Court can take judicial notice of the official election returns on the Secretary of State's web site, http://www.sos.state.al.us/downloads/dl3.cfm?trgturl=election/2002/2002General ElectionTotals.XLS&trgtfile=2002GeneralElectionTotals.XLS.  The Court rejected the *Vieth* plaintiffs' contention that election returns for other statewide offices were relevant.  Even so, in Alabama, while Republican candidates won

49

most of the nonjudicial statewide offices, they did not win them all, because of

obvious ticket-splitting:

| Office | Statewide total vote | Repub total vote | Repub % vote | Dem total vote | Dem % vote | Dem seats | Dem o % seats |
|---|---|---|---|---|---|---|---|
| State Senate | 1,236,306 | 549,943 | 44.48 | 647,267 | 52.35 | 25 | 71.4 |
| State House | 1,199,583 | 558,087 | 46.52 | 616,224 | 51.37 | 63 | 60.0 |
| US House | 1,268,802 | 694,606 | 54.75 | 507,117 | 39.97 | 2 | 28.6 |
| US Senate | 1,353,023 | 792,561 | 58.58 | 538,878 | 39.83 | 0 | 0 |
| Governor | 1,367,053 | 672,225 | 49.17 | 669,105 | 48.95 | 0 | 0 |
| Attorney General | 1,326,304 | 780,524 | 58.85 | 515,123 | 38.84 | 0 | 0 |
| Lieutenant Governor | 1,349,038 | 630,839 | 46.76 | 694,442 | 51.48 | 1 | 100 |
| Secretary of State | 1,290,010 | 630,863 | 48.90 | 632,852 | 49.06 | 1 | 100 |
| Treasurer | 1,301,716 | 660,873 | 50.77 | 609,544 | 46.83 | 0 | 0 |
| Commissioner of Ag | 1,270,033 | 590,350 | 46.16 | 656,382 | 51.32 | 1 | 100 |
| Auditor | 1,277,663 | 655,189 | 51.28 | 579,899 | 45.39 | 0 | 0 |
| PSC Place 1 | 1,293,644 | 581,168 | 44.92 | 674,888 | 52.17 | 1 | 0 |
| PSC Place 2 | 1,299,967 | 734,720 | 56.52 | 526,721 | 40.52 | 0 | 0 |

The amended complaint does allege that, notwithstanding the election returns for

state legislative races, it is supported by a majority of Alabama voters.  But, as

noted above, Justice Breyer's "unjustified entrenchment" theory rules out judicial

intervention when the complaining party has a voter majority.  "Where a State has

improperly gerrymandered legislative or congressional districts to the majority's

50

disadvantage, the majority should be able to elect officials in statewide

races--particularly the Governor--who may help to undo the harm that districting

has caused the majority's party, in the next round of districting if not sooner."  So,

according to the amended complaint, the Republican Party should need no judicial

help.  Indeed, Rep. Scott Beason, who heads the Republican Legislative

Committee, has stated publicly that the instant lawsuit is only one part of the

Republican Party's strategy for winning majorities in both houses of the

Legislature and that they expect to succeed in 2006 with the existing districts.

"'We're mounting our (takeover) effort based on the present districts, but ... that

lawsuit

would give us a 350-pound lineman and star tailback to win the game in 2006,'

Beason

said."  Tom Gordon, "Republicans Working for Majorities in 2006," *The

Birmingham News* (online edition), April 19, 2005.

Finally, paragraph 139 alleges in conclusory terms that

"impermissible partisan gerrymanders contained in the state legislative

redistricting plans are visible to the judicial eye and subject to judicially

manageable standards."  This is language lifted from Justice Stevens' opinion,

joined by Justice Breyer, concurring in the summary affirmance of *Larios*, 124

51

S.Ct. at 2808.  But it is taken out of context.  Justice Stevens was not referring to what **was** binding precedent, but what **might have been** binding precedent had the Court decided *Vieth* differently.  He acknowledges that the *Larios* summary affirmance amounts to nothing more than rejection of Georgia's invitation "to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than ten percent, within which districting decisions could be made for any reason whatsoever."  *Id*.  Then he laments what might have been:

> It bears emphasis, however, that **had the Court in *Vieth* adopted a standard for adjudicating partisan gerrymandering claims**, the standard likely **would have been** satisfied in this case.  Appellees alleged that the House and Senate plans were the result of an unconstitutional partisan gerrymander.  The District Court rejected that claim because it considered itself bound by the plurality opinion in *Davis v. Bandemer,* 478 U.S. 109 (1986), and appellees could not show that they had been "'essentially shut out of the political process.'"  App. to Juris. Statement 86a (quoting *Bandemer,* 478 U.S., at 139).  Appellees do not challenge that ruling, and it is not before us.  But the District Court's detailed factual findings regarding appellees' equal protection claim confirm that an impermissible partisan gerrymander is visible to the judicial eye and subject to judicially manageable standards.  Indeed, the District Court's findings make clear that appellees could satisfy either the standard endorsed by the Court in its racial gerrymandering cases or that advocated in Justice Powell's dissent in *Bandemer,* 478 U.S., at 173-185.

124 S.Ct. at 2808 (bold emphasis added).  In short, an actionable partisan gerrymander in *Larios* was apparent to only two sets of judicial eyes, who revisited their failed effort to locate judicially manageable standards in the racial

gerrymandering cases and in Justice Powell's *Bandemer* dissent. The *Vieth* majority rejected each of these standards, as well as the suggestion that, like unconstitutional pornography, judges can know an unconstitutional partisan gerrymander when they see it.

Whether the allegations of Count Two are viewed separately or together, they offer no standard upon which judicial relief could be granted that has not already been held insufficient by a majority of the Supreme Court. Even had one of the *Vieth* dissenters' proposed standards won a majority, the Gustafson amended complaint could not survive it. Three of the dissenters would have required much more district specificity than is alleged here. And all of them, Justices Souter and Ginsburg in particular, would have required plaintiffs to allege "the feasibility of an alternative district superior to [their] own. . . ." *Vieth*, 541 U.S. at 355 (Souter, J., dissenting).

### B.   COUNT THREE, ALLEGING A PARTISAN GERRYMANDER THAT VIOLATES THE FIRST AMENDMENT, FAILS TO STATE A CLAIM.

Count Three alleges in conclusory fashion that the partisan gerrymander challenged in Count Two under the Fourteenth Amendment also violates the Freedom of Association Clause of the First Amendment. In *Vieth* Justice Kennedy

opined that "[w]here it is alleged that a gerrymander had the purpose and effect of imposing burdens on a disfavored party and its voters, the First Amendment may offer a sounder and more prudential basis for intervention than does the Equal Protection Clause."  541 U.S. at 315 (Kennedy, J., concurring).  The Gustafson plaintiffs suggest in Count Three that this offers a different cause of action for partisan gerrymandering.  It does not.  Justice Kennedy qualified his ruminations on possible applicability of the First Amendment with this caveat: "Of course, all this depends first on courts' having available a manageable standard by which to measure the effect of the apportionment and so to conclude that the State did impose a burden or restriction on the rights of a party's voters."  *Id*.  Count Three of the Gustafson plaintiffs' amended complaint adds nothing to their failure in Count Two to articulate a manageable standard, and this Count should be dismissed as well.

## III.    THIS ACTION IS BARRED BY LACHES.

The original complaint in this action was filed June 16, 2005.  The district court's decision in *Larios* came down February 10, 2004.  Less than two weeks later, counsel for the Gustafson plaintiffs announced in the press that "he plans to file a federal court suit within a couple of weeks based on the Georgia decision."

Phillip Rawls, "Republican lawyer readies challenge of legislative districts," *The Montgomery Advertiser* (online edition), Feb. 23, 2004.  The Chairman of the Alabama Republican Party said at the same time that "the party is reviewing the Georgia decision and is seriously considering a lawsuit because of the similarities between Alabama's and Georgia's districts." *Id.*  However, no lawsuit was filed before the 2004 Regular Session of the Alabama Legislature adjourned.

The Supreme Court summarily affirmed *Larios* on June 30, 2004.  On July 17, 2004, the press reported:

> Marty Connors, chairman of the Alabama Republican Party, said he is talking with some business groups about helping the party fund a similar legal challenge to Alabama's legislative districts.  "The Republican Party can't do it alone," Connors said.  "I'd love to see it pursued, but people who've got something to gain by seeing that we have a more business-oriented Legislature would have to agree to it."  No matter what the state GOP does, former Republican judge Mark Montiel says he will definitely file a suit contending that Alabama's legislative districts are improperly drawn.  Montiel wants them redesigned before Alabama's next legislative election in 2006.

Phillip Rawls, "Republicans eye challenge to Alabama legislative districts," *The Associated Press* (online edition), July 17, 2004.  But the year 2004 came and went, and no such lawsuit was filed.  Then came this announcement in February 2005:

> Emboldened by a U.S. Supreme Court victory for their Georgia brethren, Alabama Republicans announced Saturday that they will

55

soon file a federal lawsuit in Mobile challenging the district lines of
the state Legislature.  Party Vice Chairman Jerry Lathan of Theodore
explained the suit to members of the Alabama Republican Executive
Committee as a key in the GOP's effort to win control of the
Democratic-controlled Legislature in 2006.  The suit will assert that
existing lines pack Republican voters into fewer districts, while
creating sparsely populated districts that favor Democrats. The
alleged pattern, Republicans argue, dilutes GOP voters' influence in
the Legislature and violates the principle of "one man, one vote."  . . .
Lathan said the suit would be filed later this month, after more
plaintiffs are recruited from the affected Republican districts. GOP
attorney Mark Montiel of Montgomery will work with the Georgia
attorneys who handled the case in their state, Lathan said.

Bill Barrow, "Republicans to challenge district lines," *The Mobile Register* (online

edition), Feb. 13, 2005.  But this lawsuit was not filed later in February 2005.  In

fact, no such lawsuit was filed during the Regular Session of the Legislature,

which convened on February 1, 2005, and adjourned on May 16, 2005.

http://www.legislature.state.al.us/.  It was exactly one month after the Regular

Session adjourned that this action commenced.  The next Regular Session of the

Legislature does not convene until January 10, 2006, and April 7, 2006, is the

qualifying deadline for primary elections.

http://www.sos.state.al.us/downloads/dl3.cfm?trgturl=election/2006/2006fcpafilin

gcalendar.pdf&trgtfile=2006fcpafilingcalendar.pdf.

It is apparent that the commencement of this action was delayed

purposefully to ensure that the Legislature would have as little opportunity as

possible to correct any constitutional violations plaintiffs are asking this Court to find.  Nothing in the original or amended complaint suggests a reason why the suit could not have been filed in early 2004, when all the grounds for relief now asserted were apparent.  It should be dismissed on grounds of laches.  *Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Commission*, 366 F.Supp.2d 887, 908-09 (D. Ariz. 2005) (challenge to state legislative districts two years after they were drawn barred by laches); *Fouts v. Harris*, 88 F.Supp.2d 1351 (S.D. Fla. 1999) (challenge to state's congressional districts filed four years after relevant precedent barred by laches).  *But see Kelley v. Bennett*, 96 F.Supp.2d 1301, (M.D. Ala.) (3-judge court), *rev'd on other grnds, sub nom. Sinkfield v. Kelley*, 531 U.S. 28 (2000) (laches defense overruled even though the Alabama Supreme Court had dismissed a state court challenge to legislative districts because of impending 1998 elections: "Nowhere in the supreme court papers that we have did the possibility of court-ordered special elections in 2000, or of enjoining future use of these districts, either in special elections or in 2002.") (*citing Rice v. Sinkfield,* 732 So.2d 993, 993 (Ala.1998)).

In *Sanders v. Dooly County*, 245 F.3d 1289, 1291-92 (11th Cir. 2001), the Eleventh Circuit upheld the district court's ruling that a *Shaw* challenge to county commission districts was barred by laches insofar as it sought injunctive relief late

in the decade.  But it held that laches did not bar a declaratory judgment action, because a ruling of unconstitutionality would prevent the challenged plan from being used as a retrogression baseline in § 5 preclearance proceedings.  However, the Alabama legislative districts have already survived a *Shaw* challenge in *Montiel v. Davis*, so there is no similar justification for not invoking laches in the instant case.

## IV.    CONCLUSION.

The Gustafson plaintiffs' claims are barred by res judicata principles from relitigating the same issues presented to the three-judge court in *Montiel v. Davis* and *Rice v. English*.  That includes the partisan gerrymandering claims, which could have been raised by the *Montiel* plaintiffs and were actually adjudicated as a result of the defenses asserted in that case.  This is what the U.S. Supreme Court meant when it reminded us that the state "can have only one set of legislative districts."  *Growe v. Emison*, 507 U.S. at 35.  There has been no change of law that creates new causes of action that plaintiffs like these can use to promote their purely partisan interests, and even if the relevant law had changed, the parties in *Montiel v. Davis* and their privies could not rely on it to avoid preclusion of their claims.

Alternatively, the amended complaint fails to state a claim upon which can

be granted, and all the claims are barred by laches.

Respectfully submitted this 30th day of September, 2005,


Edward Still
Edward Still Bar No. ASB-4786-I 47W
2112 11th Avenue South
Suite 201
Birmingham, AL 35205
    205-320-2882
    fax toll free 877-264-5513
E-mail: still@votelaw.com

s/James U. Blacksher
James U. Blacksher Bar No. ASB-2381-S82J
P.O. Box 636
Birmingham AL 35201
    205-591-7238
    Fax: 866-845-4395
E-mail: jblacksher@ns.sympatico.ca

Attorneys for defendant-intervenor Hammett

59

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LIONEL GUSTAFSON et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| V. | ) CIVIL ACTION NO. |
| | ) 1:05-cv-00352-CG-L |
| ADRIAN JOHNS, et al., | ) |
| | ) |
| Defendants, | ) |

CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Mark Montiel
6752 Taylor Circle
Montgomery, AL 36117
Email: mgmontielpc@aol.com

Anne Ware Lewis
1170 Peachtree Street
Suite 2000
Atlanta, GA 30309
Email: awl@sbllaw.net

LARRY T. MENEFEE
407 S. McDonough Street
Montgomery, AL 36104
Email: lmenefee@knology.net

Frank B. Strickland
1170 Peachtree Street
Suite 2000
Atlanta, GA 30309
Email: FBS@sbllaw.net

Troy R. King
John J. Park, Jr.
Charles B. Campbell
Attorney General's Office
Alabama State House
11 South Union Street
Montgomery, AL 36130-0152
Email: jpark@ago.state.al.us
        ccampbell@ago.state.al.us

60

Jeffrey M. Sewell
Asst. County Attorney
280 Jefferson County Courthouse
716 Richard Arrington, Jr., Blvd.
North
Birmingham, AL. 35203
Email: sewellj@jccal.org

Algert S. Agricola, Jr.
Winter Loeb Building
105 Tallapoosa Street, Suite 101
Montgomery, AL 36104
Email: aagricola@slatenlaw.com

ROBERT D. SEGALL
SHANNON L. HOLLIDAY
444 South Perry Street
P. O. Box 347
Montgomery, AL 36101-0347
Email: segall@copelandfranco.com
        holliday@copelandfranco.com

Respectfully submitted,

s/James U. Blacksher
James U. Blacksher Bar No. ASB-2381-
S82J
P.O. Box 636
Birmingham AL 35201
        205-591-7238
        Fax: 866-845-4395
E-mail: jblacksher@ns.sympatico.ca