IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LIONEL GUSTAFSON et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| V. | ) CIVIL ACTION NO. |
| | )  1:05-cv-00352-CG-L |
| ADRIAN JOHNS, et al., | ) |
| | ) |
| Defendants, | ) |

**DEFENDANT-INTERVENORS BARRON AND SANDER'S BRIEF
RESPONDING TO THE MOTIONS TO DISMISS OF
STATE DEFENDANTS AND HAMMETT**

Defendant-intervenors Lowell Barron and Hank Sanders, through undersigned counsel,

submit the following brief in response to the motions to dismiss filed by the State Defendants

and Defendant Hammett as scheduled by the Court's Orders of September 30, 2005 (Doc 119)

and October 4, 2005 (Doc 125).  Defendant-intervenors believe the motions are due to be

granted and this case dismissed.  We offer the following argument in support of the motions and

respond to the questions posed by the Court in its Order of September 30, 2005.  We respectfully

suggest that oral argument would be helpful.

A.  Background -Alabama Redistricting 2001

In March, 2001 the U.S. Census Bureau released the 2000 census data for Alabama.  At

that time the Alabama Legislature was mid-way through its regular session.  It adjourned in late

May without addressing redistricting.  Alabama was obligated to redistrict the two houses of the

Legislature, the seven Congressional seats, and the seven member State Board of Education.  In

special session called in late June, 2001 redistricting plans for the Legislature were passed and

subsequently pre-cleared by the Department of Justice under Section 5 of the Voting Rights Act.

Early in the 2002 Regular session the Legislature passed Congressional and State Board of

Education redistricting plans and they were similarly precleared by the Department of Justice.

   Numerous lawsuits were filed by both Democrats and Republicans challenging initially

the failure to redistrict or, subsequently, the districting plans.  On June 15, 2001, Republican

plaintiffs and counsel filed *Les Barnett, et al v. State of Alabama,* et.al. C. A, No: 01-433-BH-S in

this court.  *Barnett,* in two separate actions, challenged both Legislative and Congressional

districts.[1]  On June 21, 2001, *Montiel v. Davis*, C. A, No: 01-447-BH-S was filed that challenged

in three separate counts in the same civil action, Legislative, Congressional, and Board of

Education districts.  The Congressional claims of *Montiel* and *Barnett* were transferred to a three

judge court in Montgomery.  The Board of Education claim in *Montiel* was directed to a single

---

[1]The plaintiffs in *Barnett* were Les Barnett, Terry Lathan, and Percy Johnson, all
residents of Mobile County.  The plaintiffs were represented by, among others, Benjamin L.
Ginsberg and Matthew F. Stowe of Patton Boggs, LLP Washington, D.C. and by Algert S.
Agricola, who now represents Governor Riley in this action.  *Barnett* had a companion action by
the same name, C. A, No: 01-434-BH-S, that challenged Congressional districts.  About July 5,
2001, plaintiff Willie Douglas filed an action in the Circuit Court of Montgomery County
challenging the malapportioned Congressional districts.  *Douglas* was removed to federal court
in the Middle District and a three judge panel was named for that action.  The federal court in
Mobile, by then a three-judge court, by Order dated November 20, 2001, directed *Barnett*, No.
01-434 and Count II of *Montiel* dealing with Congressional districts, transferred to the Middle
District.  That Order transferring the claims noted, "Although a plaintiff's choice of forum
generally should not be lightly disturbed, the weight accorded to Mr. Montiel's choice of forum
is considerably reduced by virtue of the fact that he brought this challenge as a class action."  pp.
7-8.  That Order also notes the arguable forum shopping by *Barnett* and *Montiel*. *Id.* footnote 8 at
page 11.

judge in Mobile.[2]  The Legislative claims from both *Montiel* and *Barnett* remained with the three-judge court in Mobile.   *Barnett*,  C. A, No: 01-433-BH-S was eventually dismissed as moot.

On July 2, 2001, *Webb v State*, CV01-1964 was filed in Montgomery County Circuit Court attacking the Legislative redistricting.  On August 9, 2001, *Rice v. English*, 835 So.2d 157 (Ala. 2002) was filed in the Circuit Court of Montgomery County attacking only the Senate redistricting.  Mr. Montiel was counsel in Rice.  *Webb* and *Rice* were assigned to the same circuit judge.[3]  Webb was subsequently dismissed without opinion.  *Rice* was dismissed on summary judgment and affirmed by the Alabama Supreme Court. *Id.*

There were various intervenors, both plaintiffs and defendants, in the Legislative, Congressional, and Board of Education actions. The last half of 2001 and early 2002 was a very busy time for redistricting litigation in Alabama.  The issues were well known, widely reported, and covered in the media.  No plaintiffs in any action were successful, whether Democrat,

---

[2] The *Montiel* Complaint was amended three times.  The Third Amended Complaint filed December 20, 2001 asserted claims only against the Legislative districts, as directed by court order.  The named plaintiffs were Gonzalo Fitch Montiel of Mobile County and father of Mark Montiel, Sheldon Day of Clarke County, John Lang of Tuscaloosa County, Camilla Rice of Lee County, Bobby G Humphryes of Jefferson County, and John Rice of Lee County.  Plaintiffs requested the court to certify a plaintiff "class of all citizens of the State of Alabama."  See paragraphs 37 -39 of the Third Amended Complaint.  Plaintiffs also requested a defendant class of all Probate Judges of the state.

[3] The *Rice* named plaintiffs were John W. Rice of Lee County, William McCall Harris, Jr. Of Elmore County, and Patricia Christine N. Wood of Elmore County.  This action should not be confused with other prior actions such as *Rice v. Sinkfield*, 732 So.2d 993 (Ala. 1998) or *Sinkfield v. Bennett* CV-93-689-PR.  The named plaintiff, John Rice (and sometimes his mother Camilla) are the same and counsel, Mr. Montiel, are the same, but this prior litigation concerned Legislative redistricting prior to release of the 2000 Census.  On October 9, 2001, Mr. Montiel and Mr. Agricola, together as co-counsel, filed a "Petition for Writ of Prohibition, Mandamus, or Other Extraordinary Writ of Petitioners John Rice and Camilla Rice" with the Alabama Supreme Court seeking to prevent the Circuit Court trial judge from conducting any further proceedings in either *Webb* or *Rice*.  That Petition was denied.

Republican, black, or white.

      B.   This action is barred by the doctrines of issue and claim preclusion.

   1.  *Montiel v. Davis*, 215 F.Supp.2d 1279 (S.D. Ala. 2002) (3-judge court).

     The dispositive holding of this court in *Montiel* was that the Alabama Legislature used

traditional districting principles.

> Plaintiffs,..., have failed to ...(establish) to any degree that the Alabama
> Legislature subordinated traditional race-neutral districting principles such as
> those set forth in Section IV of the Guidelines...

215 F.Supp.2d at 1283.

> The traditional districting principles referred to in *Montiel* were:

> "...compactness, contiguity, respect for communities of interest, preservation of
> the cores of existing districts and avoidance of conflicts between incumbents."

*Id.* at 1283, quoting from the redistricting guidelines used by the Legislature.

     The court said that these traditional principles were not subordinated "...to any degree...".

As the *Montiel* court discussed, there are many factors that are present in redistricting beyond

the "traditional" ones.  That the Legislature utilized recent election returns to ascertain actual

voter behavior and that the plans were the product of a partisan political objective to preserve

Democratic majorities was considered by this court and held to be a permissible practice.  *Id.*

The plaintiffs now ask the same court, four years later, to revisit the redistricting process and

find that "traditional principles" were not of any significance in designing the legislative

districts.  Because this Court previously has found to the contrary, plaintiffs are precluded from

pursuing this contention.

   2.   Another equal population based attack:  *Rice v. English*, 835 So.2d 157 (Ala. 2002)

     Another attempt to attack the Senate plan for having malapportioned districts failed in

*Rice*.  This claim was based on Art. I, § 33, and Art. IX, § 200, Ala. Const.1901.   Plaintiffs

chose not to assert any federal constitutional or statutory claims.  The Circuit Court ruled against

the plaintiffs' claims and the Alabama Supreme Court affirmed.  Noteworthy about *Rice* is that,

yet again,  plaintiffs asserting claims for a plaintiff "class of all citizens of the State of

Alabama..."[4]  challenged the redistricting plan for the population inequality of the districts and

again, like *Montiel,* the court held that the deviations were permissible.  Also like *Montiel, Rice*

was decided on summary judgment.  The same attorney, Mark Montiel, represented the *Rice*

plaintiffs, the *Montiel* plaintiffs, and now represents these *Gustafson* plaintiffs.

Whether this current *Gustafson* litigation is based on a theory of one person, one vote or

political gerrymandering or First Amendment, it is not possible, after reading the Amended

Complaint, to conclude anything except that the core of the Plaintiffs' case is the allegation that

the small variation in the population of the legislative districts cannot have resulted from any

traditional or legitimate districting principles.  Plaintiffs claim that people were grouped in

districts of slightly varying populations without any legitimate reason.  Both *Montiel* and *Rice*

considered these same arguments and found that the Legislature had acted with legitimate

reasons when designing the plans.  These plaintiffs now ask this court to find facts different than

those found in *Montiel* and *Rice*.

C.  This action is due to be dismissed pursuant Rule 12(b)(6), Fed.R.Civ.P.

Alternatively, defendant intervenors urge that this complaint be dismissed for failure to

---

[4] *Rice v English*, Complaint for Declaratory and Injunctive Relief, at page 9 paragraph
23.  Similar class action allegations are made at page 4 paragraph 5, page 5 paragraphs 6 and 7,
page 10 paragraphs 24 and 25, page 15 paragraph 42 claiming relief that "will benefit all
Alabama citizens...", page 17 paragraph A. requesting that the court "Certify a plaintiff class of
all citizens of the State of Alabama..."  and in paragraph B. "Certify a defendant class of all
Probate Judges in the State of Alabama...".

state a claim upon which relief may be granted.  The discussion of the law in this area are ably

explained by Hammett's counsel.  We offer following additional argument.

The Amended Complaint should also be dismissed because it is totally bereft of any

supporting facts.  While liberality of pleading both legal theories and the supporting factual

allegations is a hallmark of the Federal Rules, the plaintiff must still allege facts that satisfy each

element of each actionable legal theory so that will give the defendant and the court "...fair

notice of what the plaintiff's claim is and the grounds upon which it rests."  *Roe v. Aware*

*Woman Center for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) (quoting *Conley v. Gibson*,

78 S. Ct. 99, 103 (1957))   The pleading requirement is real, it is "not entirely a toothless tiger".

*Doyle v. Hasbro, Inc.*, 103 F.3d 186,190 (1st Cir.1996)  This court is not obligated "to swallow

the plaintiff's invective hook, line, and sinker; bald assertions, unsupportable conclusions,

periphrastic circumlocutions, and the like need not be credited".  *Aulson v. Blanchard*, 83 F.3d

1, 3 (1st Cir.1996)  "In addition, unsupported conclusions of law or of mixed law and fact are not

sufficient to withstand a dismissal under Rule 12(b)(6)."  *Wagner v. Daewoo Heavy Indus. Am.*

289 F.3d 1268, 1271(11th Cir. 2002), *rev'd on other grounds,* 314 F.3d 541 (en banc) citing

*Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc); and *South Florida*

*Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 408 n.10 (11th Cir. 1996)  Conclusory allegations

"will not survive a motion to dismiss if not supported by the facts constituting a legitimate claim

for relief."  *Quality Foods v. Latin American Agribusiness Development Corp.*, 711 F.2d 989,

995 (11th Cir. 1983), see also, *Lombard's Inc. v. Prince Manufacturing Inc.*, 753 F.2d 974 (11th

Cir.1985)

Terms in the Amended Complaint such as urban, suburban, black belt, rural, fast

growing, and region, are without any generally understood definition that would allow any

reader to understand the areas of the state to which they refer.  For example, a simple search of

"black belt" disclosed more than twenty different authors describing more than two dozen

different county configurations, soil types, and populations that define that term.  Yet "black

belt" may be the most specific term used in the complaint.  No geographic political subdivision

is identified as having been the object of the alleged wrongs.   No reader of the fifty-five pages in

the Amended Complaint can identify the partisan interest of any defined geographic area that

was favored or disfavored by the alleged wrongs.  No town, no city, no precinct, no county, no

legislative district nor any other geographic area is identified where a political interest is

allegedly harmed.   No specific actions and no specific people are identified who took illegal

action against the plaintiffs.  The Amended Complaint is replete only with conclusory terms such

as diluted, debased, invidious, favoritism, systematic, intentional, irrational and fragmenting

cohesive communities of interest without any specific factual support.  There are one hundred

and forty electoral districts in the two legislative plans, yet one can read the entire complaint and

not know a single district where the plaintiffs claim to have been harmed.  Not a single jot,

curve, or bend of any district line is identified as offending these plaintiffs.

        This case with these parties and these lawyers at this time does not warrant special

allowance of great liberality in pleading.  This action is filed by plaintiffs seeking to gain

partisan advantage in the legislative elections which will open for candidate qualifying on

January 3, 2006.[5]  This lawsuit is part of an overall Republican strategy announced many months

ago to take control of the legislature.  The plaintiffs have experienced lawyers who have publicly

discussed plans to file this litigation for more than a year.  They ask this federal court to draw

---

[5] http://www.algop.org/Candidates/Default.aspx?SectionId=5

new districts in spite of traditional comity concerns of federal-state relations and in spite of our

government's separation of powers.  Furthermore, plaintiffs ask this court to do all this in an

expedited fashion so their remedy will be in place for next election; requiring this court and these

defendants to have a trial on these vague and conclusory allegations, issue a ruling on the merits

and design and order a new districting plan in less than four months.

Whether an expedited schedule is adopted or not, the mere pendency of this litigation

clouds the political process leading to next Spring's primary elections.  The uncertainty of

pending litigation influences candidate recruitment, campaign planning, fund-raising, and voter

mobilization.  The mere pendency of this case makes the court a "player" in this political process

regardless of the final ruling.[6]   All of the concerns about comity and separation of powers are set

aside.  The image of the court as a political instrument are raised, to the great detriment of the

judiciary.  With the significant time these plaintiffs and their attorneys have had to prepare, the

resources at their disposal, and the fundamental breadth of the relief they request, this court and

these defendants are entitled to pleadings that state clearly the legal theories they rely upon and

true facts, not the broad conclusory allegations in their Amended Complaint.

D.    Discussion of the issues in the Court's Order of September 30, 2005

1.  Doctrine of virtual representation and public law.

The doctrine of virtual representation has been described as "a term of art that we have

defined as applying 'when the respective interests are closely aligned *and* the party to the prior

---

[6]See two newspaper articles attached to the Reply Brief of Barron and Sanders on
Intervention filed August 19, 2005.  One article from the Birmingham News, April 19, 2005
quotes Republican Representative Scott Beason as calling the plans for this lawsuit as  "a 350-
pound lineman and star tailback to win the game in 2006," referring to the Republican plans of
winning control of the Legislature.

litigation adequately represented those interests.'" *EEOC v. Pemco Aeroplex, Inc*., 383 F.3d

1280, 1287(11th Cir. 2004)  (citing) *Delta Air Lines, Inc. v. McCoy Rests., Inc.,* 708 F.2d 582,

587 (11th Cir.1983) (citing) *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.,* 546 F.2d 84, 100

(5th Cir.1977)   Public law cases, litigation where the named parties have no personal interest

greater or different than most or all other citizens, are particularly appropriate for application of

virtual representation.

> "Although virtual representation may be used in the private law context, its use is
> particularly appropriate for public law issues.   As the Supreme Court recently
> noted, when a case challenges a "public action that has only an indirect impact on
> [a party's] interests," due process concerns are lessened.   In this situation, courts
> have "wide latitude to establish procedures ... to limit the number of judicial
> proceedings...."

*Tyus v Schoemehl*, 93 F.3d 449, 456 (8th Cir. 1996) (citing)  *Richards v. Jefferson County, Ala.,*
517 U.S. 793, ----, 116 S.Ct. 1761, 1768, 135 L.Ed.2d 76 (1996).

> One commentator described the doctrine as follows:
>
> Many of the cases applying this virtual representation doctrine fall into two
> categories. One category involves an initial action brought by a state agency or
> other government entity, and a subsequent action brought by a citizen. On the
> theory that the citizen was adequately represented by the government entity,
> courts have held the citizen bound by the prior judgment. [FN285] The other
> category involves private litigants pursuing classic public law litigation, [FN286]
> such as matters of statutory constitutionality or challenges to government
> affirmative action plans, where an initial plaintiff pursues the litigation
> unsuccessfully, and then a new plaintiff brings an identical challenge. Courts have
> held the new plaintiff bound by the prior judgment, on the theory that the earlier
> plaintiff represented her interests. [FN287] (footnotes omitted)

Howard M. Erichson, *Informal Aggregation: Procedural and Ethical Implications of
Coordination among Counsel in Related Lawsuits,* 50 Duke L.J. 381, 450 (2000).

The courts have struggled to list factors to consider in reaching a determination of virtual

representation.  Frequently listed factors are alignment of interests between party and nonparty,

whether the party had incentive to litigate vigorously (sometimes called "adequacy of

representation"), involvement in the prior litigation, or control over the prior litigation etc.  But

the determination of virtual representation is a question of fact for the trial court.  See Erichson

p. 452-53,  *Aerojet-Gen. Corp. v. Askew,* 511 F.2d 710, 719 (5th Cir.1975), *EEOC v. Pemco*

*Aeroplex, Inc.*, 383 F.3d 1280, 1287 (11th Cir. 2004) "Courts have been especially willing to

bind nonparties represented by the same lawyer who represented the parties to the prior action.

[FN295]" (footnote omitted) Erichson, *supra.* at 453.

We suggest that reviewing the factors mentioned by the courts and the commentators

ultimately leads to a balancing of interests test between the plaintiff's due process rights versus

the strong policy reasons for preclusion.  If the plaintiff's claim is not in the nature of a personal

property interest, a "chose in action", then the due process concerns are lessened.  Was the initial

case a fair and adequate presentation of the interests of the current plaintiffs?  If it was fair and

adequate due process concerns are lessened.  What are the risks of multiple lawsuits and

achieving some stability of law?  If those risks are high then the need for preclusion is increased.

> It is evident, however, that because virtual representation rests on the notion that
> it is fair to deprive a nonparty of his day in court, "virtual representation has a
> pronounced equitable dimension." *Gonzalez v. Banco Cent. Corp.,* 27 F.3d 751,
> 761 (1st Cir.1994).   A nonparty will be barred from bringing his claim only when
> "the balance of the relevant equities tips in favor of preclusion." *Id.*

*Tyus, supra*. at 454.

*Tyus* is a redistricting case like *Gustafson*.  Repeated challenges to a redistricting plan are

particularly appropriate for application of virtual representation.  The plaintiffs here are Alabama

voters, just like the plaintiffs in the three versions of *Montiel*, the two versions of *Barnett*, as

well as *Rice*, *Webb*, and *Douglas*.  Easily eight separate actions were filed involving redistricting

plans.  With more than 2.5 million registered voters in Alabama the potential litigation is

interminable.  But redistricting litigation does not have the potential due process risk that

-10-

conveying a title to property does, *Aerojet-Gen. Corp. v. Askew,* 511 F.2d 710, 717 (5th

Cir.1975) or school desegregation litigation *Los Angeles Branch NAACP v. Los Angeles Unified

Sch. Dist.,* 750 F.2d 731 (9th Cir.1984).  Redistricting plans are time limited to ten yeas. The life

span of redistricting plan is at most until the next decennial census.  These *Gustafson* plaintiffs,

because of their delay in bringing this action, can at most complain about a five year burden on

their right to vote.  Given the financial resources of the political parties and their partisan zeal,

repeated attacks on districting plans present a limitless opportunity to advance their political

goals through the courts rather than through the electoral process where the parties' efforts

should be directed.  The judicial branch should avoid that entanglement and limit the challenges.

     2.  *Montiel v Davis* as an implied class and the relevance of *Doe v. Bush*, 261 F.3d 1037

(11th Cir. 2001)

     We urge the court to consider not just *Montiel v. Davis* but all of the litigation filed in

2001 attacking the redistricting legislation as described above in section A.   Both *Montiel* and

*Rice* were filed with extensive class action allegations for a state wide class of registered voters.

Both cases requested relief that would be state wide.  At no time did the Plaintiffs in either case

move for class certification.  The three-judge court considered *Montiel* a class action by the

reliance on that fact in its Order of November 20, 2001.  See footnotes 1 and 3 above.

     Neither of the other cases, *Webb* or *Barnett*, alleged a class action though the relief they

requested was state wide.  The reality of this type litigation is that formal class certification

offers nothing to plaintiffs except to preclude a second bite of the apple if they lose.  We note

that there are no class allegations in this *Gustafson* Amended Complaint yet they seek state wide

relief identical to *Montiel* and *Rice* that would effect every citizen in the state.

     Like *Doe*, any class certification in *Montiel* or *Rice* would have been a Rule 23(b)(2)

-11-

class and would not have required notice to class members.  The press coverage of the cases filed in 2001was far more extensive notice-in-fact to the citizens of the state than any 23 (b)(2) notice that a court might have ordered on class certification.

We respectfully suggest that *Montiel* and *Rice,* because of the relief they sought and the way they were conducted, should be construed as implied class actions and bind the *Gustafson* plaintiffs.  It is clear from *Doe* that a class action may be implied in a prior action for preclusive effect on current plaintiffs when the relief sought is for injunctive and declaratory relief under Rule 23(b)(2) and the prior action had class allegations and the district court in the prior litigation treated the action as a class action.  The allegations of class action initially in *Montiel* and *Rice* and the treatment of *Montiel* as a class action **by this court** make implying a class in *Montiel* and *Rice* that precludes *Gustasfson* plaintiffs appropriate.

3.  The identity of interests between the present parties and the parties in *Montiel*.

We understand this question to be similar to that addressed in *Tyus, supra.* at 455  "First, identity of interests between the two parties is necessary, though not alone sufficient."  It is difficult to imagine that two lawsuits filed four years apart could be more closely aligned.  The relief requested in this action is almost verbatim with the relief requested in *Montiel.*  The Amended Complaint in this action requests "a declaratory judgment that the present apportionment of the current Alabama" Legislature violates Article IV, Sec. 2 of the Constitution, the Equal Protection Clause of the Fourteenth Amendment, the First Amendment,  and 42 U.S.C. 1983.  Similarly, *Montiel's* Third Amended Complaint sought "declaratory relief that the present apportionment of the Alabama" Legislature violates the Fourteenth Amendment to the Constitution, 42 U.S.C. 1983, and Section 2 of the Voting Rights Act.  Both cases also sought an injunction against all future Legislative elections, and an award of attorney's fees.

-12-

Had plaintiffs in *Montiel* prevailed there would not have been any remedy left for any *Gustafson* plaintiff to pursue.  There can be no closer alignment of interests.  Indeed, with hindsight, defendants in *Montiel* may have been better served if they had moved for dismissal of *Montiel* on *res judicata* grounds based upon the May 24, 2002, decision of the Alabama Supreme Court in *Rice v. English, supra*.   *Montiel* was decided six weeks later on July 8, 2002.  John Rice was a common party in both cases and counsel was the same in both cases.  All claims in *Montiel* came from the same nucleus of facts and could have been raised in *Rice*.  This illustrates the extent to which *Gustafson* is a third, fourth, or fifth bite at the apple, depending on how one counts.

4.  Factors showing a close relationship between the parties in *Gustafson* and those in *Montiel*.

There are no parties in *Gustafson* that were also in *Montiel*.  However, there are other factors that demonstrate a very close relationship:

a.  Attorneys in common.  Mr. Montiel was an attorney for plaintiffs in *Montiel* and *Rice*, and appears now for *Gustafson*.  Mr. Agricola, now representing Gov. Riley, represented *Les Barnett et. al.* in 2001.[7]  We suggest that these cases are largely driven by counsel and partisan interests.  An attorney filing virtually identical lawsuits in sequential fashion is considered a strong indication for preclusion based on virtual representation.  See  Erichson, *supra.* at footnote 295.  Mr. Montiel was Legal Advisor to former Republican Governor Guy Hunt and was appointed by Governor Hunt to two judicial posts.  Mr. Montiel has run at least twice for public

---

[7] Mr. Ginsberg, counsel in *Barnett* from Washington, D.C., was counsel to the Republican National Committee for redistricting matters.  He and his associates represented the Republican Party throughout the country.

office as a Republican candidate.

b.  A close relationship of the parties.  Each of the *Gustafson* plaintiffs identify themselves as Republicans.  The press has widely reported that this action is part of the Alabama Republican Party's effort to gain control of the Legislature.  Based on general public knowledge available through an Internet search the plaintiffs in *Montiel, Rice*, and *Barnett* were, like the plaintiffs in *Gustafson*, active Republicans pursuing their partisan interests.  Many of them have been elected public officials or were candidates for public office as Republicans.[8]  Many of the parties have sought or held office in the Republican Party as state or county party officials or elected delegates to the party's national convention.[9]  Public records from the Secretary of State and the Federal Election Commission further indicate that all nineteen of the *Gustafson* plaintiffs made numerous financial contributions to the Republican Party and/or candidates and none to the Democratic Party or Democratic candidates.   Financial contributions to Republicans were found for four of the five plaintiffs in *Montiel* and for two of the three plaintiffs in both *Rice* and *Barnett*.

Public records on the Internet also show that Terry Lathan, plaintiff in *Barnett*, is wife of Jerry Lathan.  Jerry Lathan is Vice Chairman of the Alabama Republican Party with particular responsibility to lead the Republican effort to capture to the Legislature in the 2006 election cycle and apparently a principal organizer of this *Gustafson* litigation.

Alabama does not require voters to register by political party affiliation, so what constitutes "membership" in a political party is purely a private matter for the party.  *Gustafson*

---

[8] From *Montiel*: Sheldon Day, Bobby G. Humphryes, and John Rice.  From *Gustafson*: Keith Ward, David Hammonds, and Joe Sanders.  From *Rice*: John Rice

[9]  From *Gustafson*: Lionel Gustafson, Martha Hosey, Bob Clemons, Elaine Little, William D. Meiers, Lowell Moore, Pat Moore, Rick Renshaw, Ray Stiles, Jason Upton, Bill R. Wood.  From *Barnett*: Les Barnett, Terry Lathan.

plaintiffs self-identify as Republicans and that is no different that the plaintiffs in the prior

litigation would identify themselves.  They are all pursuing their joint partisan interest.  All of the

plaintiffs are very active members of their chosen party.   They are generally recognized in their

communities as leaders and activists in Republican interests, and that is to their credit as citizens

in a democracy.  However, they cannot now claim that they have no relationship or interest in

common with one another and are mere strangers to one another.  Given the Republican Party's

reputation for organization and resources it must provide a closer relationship between the

original plaintiffs in 2001 and the *Gustafson* plaintiffs today than the NAACP through Alvin

Holmes provided for the plaintiffs in the thirteen years that lapsed between the cases in *NAACP v.*

*Hunt,* 891 F.2d 1555 (11th Cir.1990).  In *NAACP* the challenge to flying the Confederate flag on

top of the Alabama Capitol was precluded by a similar action filed thirteen years earlier.  One

individual, Alvin Holmes, was common to both actions.  His membership in the NAACP along

with the other named plaintiffs was sufficient to find privity in that case.

     c.  Publicity attending the Montiel litigation.  There was extensive newspaper coverage of

*Montiel*, the other 2001 litigation, and the redistricting process.  It is hard to imagine that any

politically interested person in the state was not aware that redistricting was being addressed and

that litigation had been filed.  We understand that Hammet will provide further discussion on this

point.

     5.  Adequacy of the legal representation of plaintiffs in *Montiel*.  We believe the best

description of this question is in *Tyus*:

> Another factor to consider is adequacy of representation, *Gonzalez,* 27 F.3d at 762,
> which is best viewed in terms of incentive to litigate.  [FN7]  That is, one party
> "adequately represents" the interests of another when the interests of the two
> parties are very closely aligned and the first party had a strong incentive to protect
> the interests of the second party.

FN7. In concluding that adequacy of representation refers to incentive to litigate rather than to actual trial strategy and possible trial errors, as some commentators have argued, *see, e.g.,* 18 Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction § 4457, we are influenced by two observations.  First, in applying virtual representation, courts must perform a preliminary relationship inquiry: whether one party's interests are so aligned with those of another that one party can be considered a proxy for the other party.  While incentive to litigate may have some bearing on whether the two parties' interests are aligned, considerations of trial strategy and possible trial errors, because they have little bearing on the *relationship* between the parties, are external to this inquiry.  Second, we note that "in civil litigation, the sins of the lawyer routinely are visited upon the client." *Gonzalez,* 27 F.3d at 762 n. 12.  As such, [w]e do not understand why a nonparty who comes within the doctrinal framework for virtual representation--a framework in which party and nonparty share identical interests, and that provides for notice and a weighing of equitable considerations--should be treated differently from a party in this regard. *Id.*  If party A is a proxy for party B, then we should hold party B to the same standards as we would hold party A.  To not apply virtual representation when counsel is deficient would encourage fence-sitting: the nonparty will benefit if the party plaintiff wins, but if the party plaintiff loses due to counsel's deficient performance, the nonparty could refile suit, thereby tactically maneuvering around counsel's deficient performance.  Thus, applying preclusion in this situation not only reinforces the goal of judicial economy, but it also prevents an end-run around the rule that parties are responsible for the acts of their counsel.

*Id.* at pp. 455-456.

Mr. Montiel, Mr. Agricola, Mr. Ginsberg, and Mr. Stowe are all excellent lawyers with all of the resources, professional, and, probably, personal incentive to vigorously litigate any or all of the cases that they filed in 2001.  The Republican Party of Alabama has again turned to Mr. Montiel and Mr. Agricola to represent their interests.  A further expression by knowledgeable persons about what counsel to retain and apparently affirming the quality of services rendered in 2001.

6.  Evidence of tactical maneuvering to avoid preclusion.

The serial filing of the same claims by the same lawyer but recruiting different named plaintiffs is the prototype of maneuvering to avoid preclusion.  We note that all previous litigation

over the past eight years filed by Mr. Montiel on such redistricting matters has always had named

plaintiffs who were either relatives (e.g. father, brother, mother-in-law) or were John and Camilla

Rice of Lee County.  Given the number of *Gustafson* plaintiffs (19) the absence of any of the

former plaintiffs shows an attempt to avoid the preclusive effect of the prior litigation.

Additionally, we know that the *Barnett* litigation included named plaintiff Terry Lathan,

wife of the Vice Chairman of the Republican Party who is a principal in organizing this effort.

The failure of the *Barnett* plaintiffs to pursue their claims in 2001, waiting for a second bite at the

apple if *Montiel* failed, is further evidence of tactical maneuvering.  Certainly claims of political

gerrymandering were legally available in 2001 to *Montiel, Barnett*, or *Rice* if they chose to bring

them, or were they just trying to hold back to see if more favorable precedent developed?

CONCLUSION

This quintessential public law case is due to be dismissed.  Four cases filed in 2001,

*Montiel, Rice, Barnett*, and *Webb*, attacking the Legislative districts precludes *Gustafson* from

further litigation.  We suggest that the doctrine of virtual representation best resolves this public

law litigation.  We also believe that an alternative finding of an implied class action is supported

by the facts before the Court.  We also have argued that this case is due to be dismissed for failure

to state a claim as advanced by Hammett.

The four actions filed in 2001 are illustrative of why the factor examining the "closeness

of relationship" between the parties may have less relevance in the public law context.  Of these

four civil actions three were filed by lawyers and plaintiffs identified with the Republican Party

and one was identified with the Democratic Party.  There is no obvious end to the number of

different plaintiffs, financial resources, and partisan zeal that political parties can muster to

serially file such litigation.  The reputation of the courts, the lack of finality of judgment, the

clogged dockets, the encouragement of fence sitting and forum shopping are all serious consequences of indulging such repeated public law litigation.  Arguably redistricting litigation may best apply to a bright line rule that if you delay joining litigation you are precluded from future litigation.  We suggest that the "closeness of the parties" becomes less important to the doctrine of virtual representation when one contemplates the serial filing of such public law cases.  The importance of the "identity of interests" represented in the litigation increases in significance.  The serial filing of public law litigation leaves us with the question; When is enough enough?  How many more lawsuits by politically active citizens need be filed complaining about the nucleus of facts surrounding the passage of Acts 2001-727 and 729 before the courts say enough?

Both of the challenged redistricting acts are presumed lawful.  Not only were they passed by the legislature and signed by the Governor, they were precleared by the Department of Justice and challenged and approved in both state and federal courts.  Significant deference to the Legislature is appropriate and necessary.  The Alabama Legislature has the responsibility to redistrict itself.  One hundred and forty individuals from different regions, races, political parties, ages, genders, religions, education, and life experiences elected by the people are expected to convene in Montgomery about three days a week over about four months and design and approve redistricting plans once every ten years.  Multi-member courts and twelve member juries, with less diversity and a narrower range of purpose, often find consensus difficult to achieve.  But further deference is due from the federal government to the state government on a matter that is so inherently a matter of state government.

At its core Plaintiffs' grievance is that the minimal deviation in population among the districts has an impermissible purpose and effect.  Both *Montiel* and *Rice* upheld these population

-18-

variations and rejected any showing of that factual contention.  The Amended Complaint should

be dismissed.

Respectfully submitted this  18th day of   October, 2005.

**/s/ Larry Menefee**
LARRY T. MENEFEE

LARRY T. MENEFEE
407 S. McDonough Street
Montgomery, AL 36104
(334) 265-6002
Fax: (334) 832-9476
Bar No: ASB-0745-F35L
lmenefee@knology.net


ROBERT D. SEGALL  (SEG003)
SHANNON L. HOLLIDAY (HOL088)
COPELAND, FRANCO, SCREWS & GILL, P.A.
444 South Perry Street
P. O. Box 347
Montgomery, AL 36101-0347
Phone: 334/834-1180
Fax: 334/834-3172
segall@copelandfranco.com
holliday@copelandfranco.com

Attorneys  for Defendant Intervenors Lowell Barron and Hank Sanders.

CERTIFICATE OF SERVICE

I certify that on this   18th   day of   October, 2005. I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

Mark Montiel
Email: mgmontielpc@aol.com

Anne Ware Lewis
Email: awl@sbllaw.net

Frank B. Strickland
Email: FBS@sbllaw.net

John J. Park, Jr.
Charles B. Campbell
Email: jpark@ago.state.al.us
Email: ccampbell@ago.state.al.us

Jeffrey M. Sewell
Email: sewellj@jccal.org

Algert S. Agricola, Jr.
Email: aagricola@slatenlaw.com

James U. Blacksher
Email: jblacksher@ns.sympatico.ca

Edward Still
Email: still@votelaw.com

**/s/ Larry Menefee**
LARRY T. MENEFEE