IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LIONEL GUSTAFSON et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| V. | ) CIVIL ACTION NO. |
| | )  1:05-cv-00352-CG-L |
| ADRIAN JOHNS, et al., | ) (Three-judge court) |
| | ) |
| Defendants, | ) |
| | ) |
| SETH HAMMETT, LOWELL BARRON and | ) |
| HANK SANDERS, | ) |
| | ) |
| Defendants-Intervenors. | ) |

**DEFENDANT-INTERVENOR HAMMETT'S SUPPLEMENTAL BRIEF
IN SUPPORT OF ATTORNEY GENERAL'S MOTION
FOR JUDGMENT ON THE PLEADINGS**

Defendant-intervenor Seth Hammett, through undersigned counsel, pursuant to this

Court's orders of September 30 and October 4, 2005 (Docs. 119 and 125), submits the following

supplemental authorities and arguments in support of the Attorney General's motion on behalf of

the original defendants for judgment on the pleadings.  Hammett indicated his support of the

motion for judgment on the pleadings in his reply to the responses of the original parties to his

motion to intervene.  Doc. 104 at 15.  Hammett's own motion to dismiss and supporting brief,

Docs. 121 and 122, provide additional reasons for granting the Attorney General's motion for

judgment on the pleadings.

This brief primarily will respond to this Court's request in its September 30 order that the

parties address the preclusive effect of *Montiel v. Davis*, 215 F.Supp.2d 1279 (S.D. Ala. 2002)

(3-judge court), under the doctrine of virtual representation and related principles.  Hammett will reserve discussion of other grounds for preclusion[1] and grounds for dismissal of this action for failure to state a claim upon which relief can be granted until after plaintiffs have filed a response to Hammett's motion to dismiss.

1.      **The doctrine of virtual representation, and the relevance of the public law aspect of this case**.

The doctrine of virtual representation provides one of the three ways to establish privity between parties in separate actions.[2]  "'Privity' is a flexible legal term, comprising several

---

[1] There is a split among the panel decisions of the Eleventh Circuit with respect to whether preclusion issues are governed by state or federal law.  *Compare CSX Transportation, Inc. v. Brotherhood of Maintenance of Way Employees*, 327 F.3d 1309, 1316-17 (11th Cir. 2003) ("We now hold that federal preclusion principles apply to prior federal decisions, whether previously decided in diversity or federal question jurisdiction."); *accord, Schafler v. Indian Spring Maintenance Assn*., 2005 WL 1274477 (11th Cir., May 31, 2005) at *3 (cited for persuasive authority only; see 11th Cir. Rule 36-2); *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1285 (11th Cir.2004), *cert. denied*, 2005 WL 699798, 73 USLW 3595 (U.S. Oct. 03, 2005)), *with NAACP v. Hunt*, 891 F.2d 1555, 1560  (11th Cir. 1990) ("Federal courts apply the law of the state in which they sit with respect to the doctrine of *res judicata*."); *accord*, *Thompson v. Smith*, 52 F.Supp.2d 1364, 1368-69 (M.D. Ala. 1999) (3-judge court).  In refusing to find preclusion in that case, the *Pemco* panel said:

> There are several powerful differences between this case and *Hunt,* however.  First, *Hunt* applied Alabama's law of preclusion rather than federal preclusion law.  *Id.* at 1560.  And federal privity principles, as detailed above, employ a discernibly higher standard than the Alabama law applied in *Hunt.*  Moreover, the Supreme Court's post-*Hunt* decisions in *Richards [v. Jefferson County*, 517 U.S. 793 (1996),] and *South Central Bell* [*Tel. Co. v. Alabama*, 526 U.S. 160 (1999),] both narrowed Alabama's preclusion law, reversing Alabama Supreme Court holdings that preclusion applied.

*Pemco*, 383 F.3d at 1289.  However, for purposes of the issues in the instant case, we have discovered no discernible difference between the principles of preclusion in federal and Alabama law.  All of the authorities cited in this brief, however, are federal authorities.

[2] Hammett's brief in support of his motion to dismiss makes brief reference to virtual representation in the section discussing the identity of parties in *Montiel v. Davis* and the instant action.  Doc. 122 at 10 ("The Gustafson plaintiffs were adequately represented by the *Montiel*

different types of relationships and generally applying when a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286 (11ᵗʰ Cir.2004), *cert. denied*, __ U.S. __, 2005 WL 699798 (U.S. Oct. 03, 2005)) (*citing Hansberry v. Lee,* 311 U.S. 32, 41-43 (1940)).

*Pemco* says one type of privity is the relationship between named plaintiffs in a class action and absent members of the class. 383 F.3d at 1286. But this may not be a proper application of the privity principle, because, where the requirements of Rule 23, Fed.R.Civ.P., have been met, absent class members are in a formal procedural way just as much parties as are the representative plaintiffs, at least with respect to issues decided that have classwide application. *E.g., Cameron-Grant v. Maxim Healthcare Services, Inc.*, 347 F.3d 1240, 1248 (11ᵗʰ Cir. 2003) ("The existence of a class under Rule 23, therefore, does not depend in theory on the participation of other class members. Irrespective of whether other class members take any or no role in the action, they are bound by the judgment whether favorable or unfavorable . . . .").[3]

Rather, privity is a relationship between parties and non-parties. This Court did not certify the class the Montiel plaintiffs sought to represent, and none of the Gustafson plaintiffs was a party in *Montiel v. Davis*. In this circumstance, federal courts have recognized three general categories of relationships that will establish privity between parties in the first and succeeding actions:

plaintiffs. [*Thompson v. Smith*, 52 F.Supp.2d 1364, 1369 (M.D. Ala. 1999) (3-judge court)] (*citing Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied,* 423 U.S. 908 (1975) (subsequent suit by a non-party may be precluded "if one of the parties to the suit is so closely aligned with [the non-party's] interests as to be his virtual representative"))).

[3] We discuss in the next section of this brief the question whether there can be an implied class action, even though no class was formally certified by the court.

      (1)     where the non-party shares or legally succeeds to the interest of a party,

              particularly an interest in property;

      (2)     where the non-party effectively controlled the prior litigation; and

      (3)     where the non-party's interests were adequately represented by the party to

              the prior action.

*Pemco*, 383 F.3d at 1286-87; *accord, e.g.*, *Richards v. Jefferson County*, 517 U.S. 793, 798-99

(1996); *Tyus v. Schoemehl*, 93 F.3d 449, 454 (8th Cir. 1996), *cert. denied*, 520 U.S. 1166 (1997);

*Robertson v. Bartels*, 149 F.Supp.2d 443, 449 (D. N.J. 2001), *aff'd summarily*, 534 U.S. 1110

(2002) (*citing Latham v. Wells Fargo Bank, N.A.,* 896 F.2d 979, 983 (5th Cir.1990)); *American*

*Forest Research Council v. Shea*, 172 F.Supp.2d 24, 31 (D. D.C. 2001).  "At issue here is the

third category of privity, also known as the doctrine of virtual representation."  *Robertson v.*

*Bartels*, 149 F.Supp.2d at 449.

> "Virtual representation" is a term of art that we have defined as applying "when
> the respective interests are closely aligned *and* the party to the prior litigation
> adequately represented those interests." *Delta Air Lines, Inc. v. McCoy Rests.,*
> *Inc.,* 708 F.2d 582, 587 (11th Cir.1983) (*citing Southwest Airlines Co. v. Texas*
> *Int'l Airlines, Inc.,* 546 F.2d 84, 100 (5th Cir.1977)) (emphasis added).  The
> doctrine of virtual representation provides in essence that "a person may be bound
> by a judgment even though not a party if one of the parties to the suit is so closely
> aligned with his interests as to be his virtual representative." *Aerojet-Gen. Corp.*
> *v. Askew,* 511 F.2d 710, 717 (5th Cir.1975).  Whether a party is a virtual
> representative of another is a question of fact.

*Pemco*, 383 F.3d at 1287 (footnotes omitted) (some citations omitted).

     *Aerojet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir.), *cert. denied,* 423 U.S. 908

(1975), "is generally credited with breathing new life into virtual representation doctrine."

Robert G. Bone, *Rethinking the Day in Court Ideal and Nonparty Preclusion*, 67 N.Y.U. L. REV.

193, 218 (1992).[4]  Virtual representation is now well established in federal jurisprudence, even

though its doctrinal contours cannot be defined with precision.[5]

The doctrine has its strongest and clearest application in the context of public law

litigation.

> The Supreme Court has explicitly distinguished between such generalized public
> law challenges and more individualized cases, suggesting that there is less
> preclusion protection for a plaintiff who "complain[s] about an alleged misuse of
> public funds, or about other public action that has only an indirect impact on his
> interests."  *Richards,* 517 U.S. at 803 (citations omitted).  Indeed, the Supreme
> Court has suggested that in cases involving broad public interest matters, "we may

---

[4]

> Some courts and commentators today treat virtual representation as if it were a
> relatively new doctrine created in response to the contemporary litigation crisis, a
> doctrine incompatible with the system's long-standing commitment to a day in
> court.  This characterization is seriously mistaken. Virtual representation has
> played an important role in nonparty preclusion law for almost three centuries,
> ever since its initial appearance as part of real property litigation in
> eighteenth-century England. Courts and commentators throughout this long period
> have struggled to reconcile virtual representation with the day in court ideal, and
> the lessons of this struggle are critical to understanding the stakes involved in
> precluding nonparties today.

Robert G. Bone at 203-04 (footnote omitted).

[5]

> [W]ith the exception of the Sixth Circuit in *Bittinger v. Tecumseh Products Co.,*
> 123 F.3d 877 (6th Cir.1997), no circuit has entirely rejected the notion that a
> nonparty can be "virtually represented" by another party in a prior case, and thus,
> barred from re-litigating those claims.  Although some courts have criticized the
> doctrine for lacking a consistent scope or a common definition, the majority of
> courts recognize the need, under certain limited circumstances, to bar individuals
> from litigating claims raised and decided in cases to which they were not formally
> parties.  Moreover, although the decisions cited by plaintiffs ultimately concluded
> that the litigants then before them as first-time parties should not be bound by
> prior judgments, those decisions were based on the particular facts of each case
> and did not reflect outright repudiations of the doctrine of virtual representation.

*American Forest Resource Council v. Shea*, 172 F.Supp.2d 24, 32 (D. D.C. 2001).

assume that the States have wide latitude to establish procedures ... to limit the number of judicial proceedings that may be entertained," as opposed to suits in which individual interests are clearly and directly implicated. *Id.*

*Pemco*, 383 F.3d at 1289.

The public law distinction is best understood in the due process context in which the issues were presented in *Richards*. There the Supreme Court held that one set of residents of Jefferson County were not precluded from challenging the constitutionality of the county occupational tax by the judgment against another set of residents in prior litigation. Even though the issues involved public law (a tax law), it was public law that impacted the personal property rights of one county's residents. And because the plaintiffs in the first lawsuit did not purport to represent and provided no notice to other taxpayers, the Court could not conclude that they adequately represented the interests of other Jefferson County residents, who did not have "the opportunity to participate in" the first action. 517 U.S. at 802-03. *Richards* emphasizes that due process might not have been offended if the second set of plaintiffs had been challenging a public law dealing with how to spend public funds or "other public action that has only an indirect impact on [their] interests. . . ." 517 U.S. at 803 (citations omitted).[6]

This due process perspective helps explain why in *NAACP v. Hunt* a second set of African-American legislators and NAACP members was precluded from bringing a second federal lawsuit challenging display of the Confederate flag above the capitol in Montgomery. Even though the claims of Alvin Holmes and the NAACP implicated fundamental, personal,

---

[6] In public law litigation, "[t]he subject matter of the lawsuit is not a dispute between private individuals about private rights, but a grievance about the operation of public policy." Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 HARV. L. REV. 1281, 1302 (1976).

6

constitutional rights of equal protection, free speech and freedom from the badges of slavery, they did not implicate interests particular to these plaintiffs.  Rather they were rights and interests shared by all African Americans.  Representative Holmes was a well-known public figure and a member of the NAACP, and his prior challenge of the Confederate flag had been widely publicized.  Given all these circumstances, due process concerns were mitigated in this public law litigation, and the court could conclude: "Alvin Holmes was so closely aligned to the NAACP's interests in the original suit that he was their virtual representative."  891 F.2d at 1561.

School desegregation cases are another type of public law action in which the application of virtual representation may be "particularly appropriate."  *Los Angeles NAACP v. Los Angeles Unified School District*, 750 F.2d 731, 741 (9th 1984); *accord, Niere v. St. Louis County*, 305 F.3d 834, 838 (8th Cir. 2002) ("Virtual representation applies where litigation is public in nature and the plaintiffs barred by res judicata had common interests with the actual litigants.") (citation omitted).  But where the plaintiffs seek to vindicate discrete personal interests not shared by other citizens in common, even public law litigation may not be subject to preclusion under the doctrine of virtual representation.  *E.g., Lindley v. Cisneros*, 74 F.3d 1076, 1078 (11th Cir. 1996) (although plaintiffs in both suits belonged to the same tenants' association, "such an alignment does not alter the fact that appellants' claims are based on their individual leases, that they assert discrete breaches on HUD's part, and that they assert separate injuries.").

Thus the quintessential public law litigation is a redistricting lawsuit.  Voting rights are fundamental, but vote dilution claims entail interests shared by groups of voters, not their individual property interests or even their individual rights to vote.  Any relief a court grants necessarily impacts all voters, not just the named plaintiffs.  As in the instant case, redistricting

lawsuits are attended by wide publicity, bringing it to the attention of all other voters who are sufficiently concerned about their political interests to stay informed about the redistricting process. The three reported cases dealing with litigants attempting to get a second bite at redistricting issues have all concluded that they were precluded by principles of virtual representation. *Robertson v. Bartels*, 149 F.Supp.2d 443, 449 (D. N.J. 2001) (3-judge court), *aff'd summarily*, 534 U.S. 1110 (2002); *Thompson v. Smith*, 52 F.Supp.2d 1364, 1368-69 (M.D. Ala. 1999) (3-judge court); *Tyus v. Schoemehl*, 93 F.3d 449, 454 (8th Cir. 1996), *cert. denied*, 520 U.S. 1166 (1997).

   *Tyus* has the most thorough discussion of virtual representation in the redistricting context. The Eighth Circuit held that a second lawsuit challenging the post-1990 census redrawing of aldermanic districts in St. Louis was precluded, under the principles of virtual representation, by the adverse judgment in an earlier action attacking the same districts. The parties in both suits were different sets of African-American aldermen and voters, and both suits claimed, under somewhat different but overlapping legal theories, that the redistricting plan impermissibly diluted black voting strength.

   *Tyus* begins its discussion of virtual representation by agreeing with the Eleventh Circuit and other circuits that have applied the doctrine expansively as a fact-intensive balancing of relevant equities. 93 F.3d at 454-55 (*citing NAACP v. Hunt*). We will defer discussion of most of the relevant factors to later sections of this brief. But, referring to the Supreme Court's due process principles in *Richards v. Jefferson County*, *Tyus* emphasizes the importance of the public law factor:

   Further, we note that in public law cases, the number of plaintiffs with

8

standing is potentially limitless.   If parties were allowed to continually raise issues already decided, public law claims "would assume immortality." *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.,* 750 F.2d 731, 741 (9th Cir.1984) (applying virtual representation to preclude plaintiff from raising school desegregation claim), *cert. denied,* 474 U.S. 919 (1985).  Concerns of judicial economy and cost to defendants, while present in every suit, are particularly important in this context.  There is another important consideration: in the public law context, if the plaintiff wins, by definition everyone benefits.  Holding preclusion inapplicable in this context would encourage fence-sitting, because nonparties would benefit if the plaintiffs were successful but would not be penalized if the plaintiffs lost.

93 F.3d at 456.  The *Tyus* court explained why these public law principles required preclusion of the second vote dilution action challenging the St. Louis aldermanic districts:

The Miller plaintiffs do not allege that they have been denied the individual right to vote.   Rather, they allege that the strength of the black vote in general has been diluted.  Because the plaintiffs do not allege that they "have a different private right not shared in common with the public," *Stromberg v. Board of Educ. of Bratenahl,* 64 Ohio St.2d 98, 18 O.O.3d 343, 413 N.E.2d 1184, 1186 (1980) (cited approvingly by *Richards,* 517 U.S. at 803), the plaintiffs raise an issue of public law, and thus the due process concerns attendant with a broad application of preclusion are lessened.   *See Richards,* 517 U.S. at 803.   Further, given the public nature of this case, if we held preclusion inapplicable, this case could "assume immortality," *Los Angeles Branch NAACP,* 750 F.2d at 741, and fence-sitting would be encouraged.   *See supra,* Op. at 456.

93 F.3d at 457.

*Thompson v. Smith*, 52 F.Supp.2d 1364 (M.D. Ala. 1999) (3-judge court), applied virtual representation principles to preclude statewide claims against the post-1990 census Alabama House and Senate redistricting plans after a state court had dismissed the same claims brought by other parties.[7]  Because the federal court plaintiffs passed up the opportunity to intervene in the

---

[7] The *Thompson* court allowed certain district-specific racial gerrymandering claims to go forward because the state court plaintiffs lived in different districts and thus lacked standing to challenge the districts in which the surviving federal court plaintiffs resided.  52 F.Supp.2d at 1371.  A subsequent judgment for plaintiffs was reversed by the Supreme Court on standing grounds.  *Kelley v. Bennett,* 96 F.Supp.2d 1301 (M.D. Ala.) (3-judge court), *rev'd sub nom.*

9

state court action, because the plaintiffs in both courts were represented by the same lawyer

(Mark Montiel, who is also counsel for the Gustafson plaintiffs), and because the state court

complaint alleged a statewide plaintiff class, *Thompson* held that the interests of the federal court

plaintiffs had been adequately represented in the state court action, based on the principle that a

second action is precluded "if one of the parties to the suit is so closely aligned with [the non-

party's] interests as to be his virtual representative."  52 F.Supp.2d at 1369 (*quoting Aerojet-

General Corp. v. Askew*, 511 F.2d at 719).

     *Robertson v. Bartels*, 149 F.Supp.2d 443 (D. N.J. 2001) (3-judge court), *aff'd summarily*,

534 U.S. 1110 (2002), applied the principles of virtual representation to hold that a second

federal court challenge to New Jersey's House (Assembly) and Senate plans by Republican

plaintiffs was precluded by a previous federal court action attacking the same redistricting plans

brought by African Americans, Hispanics and Republicans.  Because plaintiffs in the second suit

"do not claim they 'have a different private right not shared in common with the public,'"

*Robertson* concluded they were virtually represented by the plaintiffs in the first suit, even

though the complaint in the first suit alleged racial vote dilution claims (i.e., the drafters should

have been more race-conscious), while the complaint in the second suit made the opposite

allegation of unconstitutional racial gerrymandering under the *Shaw v. Reno,* 509 U.S. 630

(1993), line of cases (i.e., the drafters should have been less race-conscious).  149 F.Supp.2d at

452 (*quoting Tyus,* 93 F.3d at 457).  The public law concern expressed in this holding was the

need finally to lay to rest the question "whether the redistricting plan is valid. . . ."  *Robertson*,

---

*Sinkfield v. Kelley*, 531 U.S. 28 (2000).  All of the Gustafson plaintiffs' claims in the instant
action are effectively statewide claims that are barred by earlier federal and state court judgments
upholding the same post-2000 census Alabama House and Senate plans.

149 F.Supp.2d at 452 (*citing Los Angeles Branch NAACP,* 750 F.2d at 741).

> 2.    The extent to which the *Montiel v. Davis* litigation was, in substance, a class action, and the relevance thereof.  See *Doe v. Bush*, 261 F.3d 1037 (11th Cir. 2001), and cases cited therein.

In Hammett's brief supporting his motion to dismiss, Doc. 122 at 9, we discuss the class allegations in the *Montiel* complaint.  The Montiel plaintiffs sought to represent all voters residing in allegedly overpopulated House and Senate districts, the same putative class the Gustafson plaintiffs seek to represent and of which each of them is a member.  But this Court granted summary judgment against all the Montiel plaintiffs' claims without certifying a plaintiff class pursuant to Rule 23(c), Fed. R. Civ. P.  Thus the absent putative class members in *Montiel* were never formally made parties to that litigation.  The Gustafson plaintiffs are precluded from relitigating the claims that were raised or that could have been raised in *Montiel v. Davis* not because they were present as class member parties in the earlier lawsuit and thus are formally bound by its judgment, but because they were non-parties virtually represented by the Montiel plaintiffs.

That is the reasoning of *Thompson v. Smith*, where non-parties to the prior state court action were precluded from prosecuting similar claims in federal court even though the state court never certified a class action.  The *Thompson* court took account of the class pleadings as one factor supporting the conclusion that John Rice and his lawyer had adequately represented the interests of the Thompson plaintiffs sufficiently to be their virtual representative.[8]  52

---

[8] However, the fact that plaintiffs in the first suit sought to represent a class does not absolutely compel the conclusion that they virtually represented similarly situated non-parties, particularly if the court denied a motion to certify the class or certified a class only for purposes of other, unrelated claims.  *E.g., Lindley v. Cisneros*, 74 F.3d at 1078 ("HUD and the Secretary

F.Supp.2d at 1369-70 ("The Rice plaintiffs . . . expressly sought to represent a class that clearly includes the Thompson plaintiffs, and there is every reason to conclude that the state court took care to protect the interests of *non-party* class members.") (emphasis added)); *accord, e.g.*, *Jaffree v. Wallace*, 837 F.2d 1461, 1468 and n.17 (11th Cir. 1988) (Jaffree's unsuccessful motion to certify a plaintiff class in the prior action was one important factor for concluding that he adequately represented the non-parties in the second action and thus was their virtual representative).

The "implied" class actions found to exist in *Doe v. Bush*, 261 F.3d 1037, 1049 (11th Cir. 2001), and cases cited therein were based on conclusions that a plaintiff class actually had been certified, notwithstanding the absence of an explicit Rule 23(c) certification order. This deficiency was found to be merely a "technical failure" that was controverted and cured by the way the parties, the district court and even the court of appeals treated the case as a class action.

---

argue that appellants were virtually represented in the prior litigation by the Association. For a number of years, they point out, the tenants, including appellants, had voluntarily aligned themselves with and supported the goals of the Association. That may well be so, but such an alignment does not alter the fact that appellants' claims are based on their individual leases, that they assert discrete breaches on HUD's part, and that they assert separate injuries. After all, this is why HUD and the Secretary opposed class certification in *Mann [v. City of Albany*, 883 F.2d 999 (11th Cir.1989)], and this is why the district court denied class certification."); *Shuford v. Alabama State Bd. of Education*, 920 F.Supp. 1233, 1239 (M.D. Ala. 1996) (3-judge court) ("Although Shuford initially brought his § 2 voting rights claim on behalf of a class, the § 2 claim was not included among the claims for which class-wide relief was being sought. The claim was dropped in both his motion for class certification and brief in support of the motion. The class which was certified makes no mention of voting rights and refers only to employment and promotion opportunities in the Alabama's postsecondary education system. Because a class was never certified in *Shuford* with regard to a § 2 claim, McClammy was never represented on a voting rights claim in that case, and, thus, McClammy's later § 5 claim is not precluded by res judicata.") (footnotes omitted)).

*Johnson v. General Motors Corp.*, 598 F.2d 432, 435 (5th Cir. 1979)[9].  So these precedents held that the formal requirements of Rule 23 effectively had been satisfied, and they do not involve the doctrine of virtual representation.

> **3.      The identity of interests between the present parties and the parties in *Montiel*.**

The identity of interests between the parties in the two suits is a necessary but not sufficient condition for precluding the claims in the second action under the doctrine of virtual representation.  *Tyus*, 93 F.3d at 455 (*citing Mann v. City of Albany*, 883 F.2d 999, 1003 (11th Cir.1989)).   However, it is important to keep in mind that "[i]t is the identity of *interests* that determines the due process question, not ... the identity of *issues*."  *Robertson v. Bartels*, 149 F.Supp.2d at 450 (*quoting Moldovan v. Great Atlantic & Pacific Tea Co.*, 790 F.2d 894, 899 (3d Cir.1986)) (emphasis in original).

The common interests of the Montiel and Gustafson plaintiffs are public and notorious.  See Attachment A to this brief.[10]  Like the Montiel plaintiffs, the Gustafson plaintiffs are

_____

[9] However, even though the Eleventh Circuit held that Johnson was bound by the declaratory and injunctive relief ordered in the earlier action that impliedly certified a plaintiff class of employees including Johnson, it concluded that Johnson's claim for monetary relief was not precluded, because no notice was provided in the Rule 23(b)(2) class action that class members could seek damages.  598 F.2d at 436-38.

[10] Pursuant to Fed.R.Evid. 201, Hammett requests this Court to take judicial notice of the extensive publicity surrounding the redistricting process, the pendency of *Montiel v. Davis* and other actions challenging the House and Senate plans, and the political maneuvering leading up to the filing of the instant action.  *Ball v. Union Carbide Corp.*, 385 F.3d 713, 721 (6th Cir. 2004) (district court property took judicial notice of "the fact that it has been publicly debated since the early 1980s that toxins are present in the Oak Ridge community"); *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) ("the kinds of things about which courts ordinarily take judicial notice [include] matters of political history"); *Nationalist Movement v. City of Cumming*, 913 F.2d 885, 893 (11th Cir. 1990) (Trial court properly took judicial notice that parade permit applicant's rallies

pursuing the interests of those Republican legislators who did not support the House and Senate plans adopted by overwhelming majorities in both houses and the interests of other Republican candidates, party officials and supporters who believe that the courts are likely to draw redistricting plans more favorable to Republican interests.

Republican legislators forecast that lawsuits would be filed challenging any redistricting statutes even before the Governor had called a special session to address redistricting.  Before any redistricting bills passed the Legislature, two lawsuits, *Barnett v. Alabama* and *Montiel v. Davis* were filed in this Court by plaintiffs identified in the press as Republicans.  See Attachment A.  Alabama Republican Chairman Marty Connors was quoted as saying "the smart thing is to make sure we have some federal supervision of this whole process."  Attachment A, Bham News Editorial, 6/22/01, "Republicans jump the gun in redistricting lawsuit."  From the beginning, these Republicans announced that they would pursue their interests through the proxy of racial politics, just as they had done in their legal challenge to the 1990s redistricting plans in the cases culminating with *Sinkfield v. Kelley*.

---

and marches were often loud and attracted boisterous and sometimes violent counter-demonstrators, where marches and countermarches in county had been subject of national publicity and attention and had implicated sharp racial tensions, and where at least two federal cases involving prior marches had occurred in same judicial district as present case, each with considerable fanfare); *Smith v. First Century Bank*, __ F.Supp.2d __, 2005 WL 1840251 (E.D. Tenn., Aug. 3, 2005) at *8 ("the court takes judicial notice of the fact that *The Knoxville News Sentinel* published an article on this very lawsuit on the front page of its Business Section (Section C) on July 21, 2005"); *Pettway v. Barnhart*, 233 F.Supp.2d 1354, 1360 n.13 (S.D. Ala. 2002) ("the massive and relentless flood of reports from dozens of respected media outlets renders the facts noted in text 'not subject to reasonable dispute' within the meaning of Federal Rule of Evidence 201(b)") (citations omitted).

The Court may take judicial notice of such facts when considering a motion for judgment on the pleadings.  *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

> Sen. Steve French, R-Mountain Brook, complained that lawmakers could create nine majority-black Senate districts if they wanted, but white Democrats want to divide black voters among Democratic-leaning districts to protect incumbent whites.  French predicted that if Democrats pass their plans, they'll face legal challenges.

Attachment A, David White, Bham News, 6/23/01, "Democrats pledge quick work on districts."

Their somewhat schizophrenic legal strategy was, on one hand, to hitch their partisan interests to majority-white districts they would contend were being overpopulated in favor of underpopulated majority-black districts, Attachment A, Mike Cason, Montgomery Advertiser, 6/24/01, "Redistricting returns," and, on the other hand, to be the "strange defenders" of African Americans: "What is good for blacks in Alabama in regards to reapportionment is also good for Republicans," said Marty Connors, Alabama Republican Party Chairman.  Attachment A, Jeff Amy, Mobile Register, 6/24/01, "Race looms as key issue in makeover of districts."  Republican leaders in the Legislature reconciled these otherwise competing interests by introducing "zero deviation" plans that increased the number of majority-black districts:

> Federal courts have ruled in the past that state legislative districts can vary from 5 percent less to 5 percent greater than the ideal population. But Rep. Chris Pringle, R-Mobile, and other Republicans want to fight that in court anyway.

> Pringle introduced a House plan late Tuesday that is the counterpart of a Republican Senate plan produced by Sen. Steve French, R-Birmingham. Both plans, drawn by a Washington, D.C. consultant, have exactly ideal populations in every district and both would put as many black voters in majority black districts as possible, leaving neighboring areas whiter and more GOP-inclined.

Attachment A, Jeff Amy, Mobile Register, 6/27/01, "Trouble on the horizon for white Democrats."  The Republican legislators had no expectations that these plans would be enacted; they were designed to set up later legal challenges:

> "We feel that it's important to give minority interests a say in the Senate in

15

> proportion to the makeup of the population," French said.  Blacks make up 26
> percent of the state's population of 4.4 million people.  "I think we're headed down
> the track to go to court," French said later.

Attachment A, Mike Cason, Montgomery Advertiser, 6/27/01, "Demos' districts curry favor."

This was exactly the legal strategy adopted by counsel for plaintiffs in *Montiel v. Davis* when he

amended his complaint to attack the House and Senate plans once they had been enacted as law.

See Attachment A, Garry Mitchell, AP, 11/28/01, "GOP lawyer says redistricting plan is racial

gerrymandering."  There was never any doubt that, even though the Montiel plaintiffs sought to

represent whites residing in allegedly overpopulated districts, they actually were representing the

interests of Republicans.

      First and foremost, commonality of interests here lies in challenging the same House and

Senate plans enacted by the Alabama Legislature.  *Robertson v. Bartels*, 149 F.Supp.2d at 451.

Moreover, like the Montiel plaintiffs, the Gustafson plaintiffs share the same interests in seeking

judicial redesign of the House and Senate districts in hopes of increasing the likelihood that more

Republicans will be elected to the Legislature.  The Montiel plaintiffs used racial gerrymandering

claims as proxies for those partisan interests.  The only difference in the instant action is that the

Gustafson plaintiffs make their partisan interests explicit.  Formally or informally, as Republican

elected officials or as their supporters, they share the same "organizational commonality" that

precluded the redistricting claims of African-American aldermen and voters in *Tyus* and that

precluded the second Confederate flag claims of African-American state legislators and NAACP

members in *NAACP v. Hunt*.  *Tyus*, 93 F.3d at 456 (*citing Hunt*, 891 F.2d at 1561).

      **4.**    **Factors relevant to whether there is a close relationship between the parties
in the present case and the parties in *Montiel*, including, inter alia: any**

> parties in common, any attorneys in common, any supporters in common
> (financial or otherwise); publicity attending the *Montiel* litigation, or other
> evidence of awareness thereof or acquiescence therein by present parties.

Wright and Miller summarizes most of these factors, most of which have already been mentioned:

> To justify preclusion by virtual representation on this broad view, there
> must be "some special relationship between the parties justifying preclusion."  The
> factors considered in evaluating the relationship include identity of interests, a
> close relationship in fact, participation in the prior litigation, apparent
> acquiescence, and deliberate maneuvering to avoid the effects of the first action.
> In addition, "adequacy of representation" is to be considered.  Adequate
> representation is better viewed not in terms of actually adequate representation,
> but "in terms of incentive to litigate."  Incentive should be the test, not actual
> adequacy, because considerations of trial strategy and trial error are "external" to
> the inquiry whether the parties' interests are aligned. In addition, the sins of the
> lawyer are routinely visited on the client in civil litigation; there is no reason to
> treat differently a nonparty who is virtually represented by a party.  To deny
> preclusion because of inadequate representation would encourage nonparties to
> hold aloof from the first action.  Finally, the nature of the issue is important.
> Virtual representation is more readily found in public law cases. Resolution of
> public issues has only an indirect impact on individual interests, and there is a
> potentially limitless supply of plaintiffs--"[c]oncerns of judicial economy and cost
> to defendants * * * are particularly important in this context."

WRIGHT AND MILLER, 18A FED. PRAC. & PROC. JURIS.2d § 4457 (*quoting Tyus*); *accord, Pemco*, 383 F.3d at 1287 (citations omitted); *Jaffree*, 837 F.2d at 1467 (citations omitted); *Robertson v. Bartels*, 149 F.Supp.2d at 450 (citations omitted).  "All of these factors need not be found to meet the virtual representation standard, nor is it necessarily enough that one of them is found; rather, we examine them in concert to determine whether there is virtual representation." *Pemco*, 383 F.3d at 1287.

There are no parties in common between the instant action and *Montiel v. Davis* and the other federal and state court suits challenging the House and Senate plans.  Mark Montiel, of

course, is the attorney in common.  As the cases already cited show, "[c]ourts have been especially willing to bind nonparties represented by the same lawyer who represented the parties to the prior action."   Howard M. Erichson, *Informal Aggregation: Procedural and Ethical Implications of Coordination Among Counsel in Related Lawsuits*, 50 DUKE L.J. 381, 453 and n.295 (2000).

Whether or not Republican Party officials, elected officials, candidates or supporters provided financial support for *Montiel v. Davis*, other forms of encouragement and support by Republican legislators and party officials were widely publicized.  See Attachment A.  Published reports say that Republicans have raised $450,000 to finance the instant suit.  See Attachment A: Phillip Rawls, AP, 4/20/05, "Legislative majority is '06 goal of GOP."  A Republican Party official was quoted in the press saying that "plaintiffs [were] recruited from the affected Republican districts."  Attachment A, Bill Barrow, Mobile Register, 2/13/05, "Republicans to challenge district lines."

Only four of the nineteen Gustafson plaintiffs, Elaine Little, Pat Moore, Joe Sanders and Lowell Moore, were aware of the pendency of *Montiel v. Davis*, according to affidavits filed in opposition to the Attorney General's motion for judgment on the pleadings.  These four either read about the case in the newspaper or heard about it from others (John Rice informed Lowell Moore).  None of the plaintiffs' affidavits says he or she was unaware of the events leading up to and including the enactment of redistricting statutes in the Alabama Legislature, the widely publicized opposition of some Republican legislators and party officials to the plans that passed, their announced strategy of challenging the plans in court or the several state and federal lawsuits that ensued back in 2001-02.  Any such admission would undermine the genuineness of the

18

plaintiff's claims of being injured by the alleged vote dilution.  And if any plaintiff truly was unaware of the larger redistricting controversy until he or she was recruited to be a party in 2005, he or she should be precluded by his or her indifference to the massive publicity from relying on lack of notice as an alleged basis for not being adequately represented by the Montiel plaintiffs. In short, all the Gustafson plaintiffs had ample opportunity to join *Montiel v. Davis* or any one of the other lawsuits challenging the validity of the House and Senate plans, and their failure to do so amounts to acquiescence in representation by the prior plaintiffs.

## 5.   The adequacy of legal representation of plaintiffs in *Montiel*.

In their response to this Court's questions, the Gustafson plaintiffs may say that Mark Montiel did not adequately represent their interests because he pursued legal theories of one-person, one-vote and gerrymandering that focused on race rather than on partisan politics.  But, as already noted, for purposes of virtual representation, adequacy of representation refers not to legal theories or lawyer miscalculations but to the incentive of the first plaintiffs to protect the interests of the second plaintiffs.

> In concluding that adequacy of representation refers to incentive to litigate rather than to actual trial strategy and possible trial errors, as some commentators have argued, *see, e.g.,* 18 Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction § 4457, we are influenced by two observations.  First, in applying virtual representation, courts must perform a preliminary relationship inquiry: whether one party's interests are so aligned with those of another that one party can be considered a proxy for the other party.  While incentive to litigate may have some bearing on whether the two parties' interests are aligned, considerations of trial strategy and possible trial errors, because they have little bearing on the *relationship* between the parties, are external to this inquiry. Second, we note that "in civil litigation, the sins of the lawyer routinely are visited upon the client."

*Tyus*, 383 F.3d at 455 n.7 (citation omitted) (emphasis in original); *accord, Robertson v. Bartels*,

148 F.Supp.2d at 452.  The interests the Montiel plaintiffs had an incentive to litigate were virtually identical with the interests of the Gustafson plaintiffs.  Those interests were vigorously and ably advocated in the first action, and the Gustafson plaintiffs were virtually represented by the Montiel plaintiffs.

      **6.**      **Any evidence of tactical maneuvering or efforts to avoid the preclusive effect of Montiel, and the relevance thereof.**

There is abundant evidence of tactical maneuvering to avoid the preclusive effect of *Montiel v. Davis* and *Rice v. English*.  First and foremost are the same circumstances that constituted tactical maneuvering in the other redistricting cases, *Robertson v. Bartels*, *Tyus v. Schoemehl*, and *Thompson v. Smith*, where virtual representation was invoked to preclude second bites at the apple, namely, the device employed by office-holders and their supporters sharing common interests and employing the same lawyer simply to file a second civil action and adding new plaintiffs.  *E.g., Tyus*, 383 F.3d at 457 ("there is tactical maneuvering [when] [i]n an effort to circumvent trial strategy disagreements, the Aldermen plaintiffs filed the *Miller* suit, simply adding new plaintiffs"); *Robertson v. Bartels*, 148 F.Supp.2d at 451 (Like the plaintiffs in *Tyus*, "we find that the *Robertson* plaintiffs engaged in tactical maneuvering.").  As shown in the previous sections of this brief, the Gustafson plaintiffs were fence-sitters who either purposefully or through indifference passed up the opportunity to assert their current claims in the earlier litigation.  *Cf. Pemco*, 383 F.3d at 1288 ("[I]t would be truly anomalous to find tactical maneuvering when a party vigorously sought but was prevented from being included in the earlier litigation.").

But the open and notorious tactical maneuvering leading up to the filing of the instant

action is even more egregious than the maneuvering in the reported cases. We have noted the publicized strategy of certain Republicans back in 2001 to rely on the courts to achieve their political objectives. After the initial wave of court challenges failed, as early as February 2004, counsel for the Gustafson plaintiffs and the state GOP chairman were announcing in the press their new strategy of using the *Larios* precedent in Georgia to avoid the preclusive effects of their prior unsuccessful court attacks on the House and Senate plans. See Attachment A, Phillip Rawls, AP, 2/23/04, "Republican lawyer readies challenge of legislative districts." Thereafter, the news was full of their fundraising and plaintiff recruitment efforts, and they waited as close as possible to the upcoming 2006 elections to commence this action.

This lawsuit is only one component of a much publicized larger political strategy to capture a Republican majority in the Legislature. The lawsuit has been called by one Republican legislator "a 350-pound lineman and star tailback to win the game in 2006." Attachment A, Tom Gordon, Birmingham News, 4/19/05, "Republicans working for majorities in 2006." Political pressure has even been exerted on the Alabama Attorney General in both the earlier litigation and in this action not to defend the redistricting statutes and to side with the Republican plaintiffs by publicly threatening the incumbent with Republican opposition if he did not support the plaintiffs. See Attachment A, Phillip Rawls, AP, 11/28/01, "Republican DA Whetstone declares AG candidacy;" Phillip Rawls, AP, 6/17/05, "AG King weighing legislative suit as both sides watch." Mark Montiel himself has been publicly named a potential opponent of AG Troy King. The Republican Governor, who also has stiff opposition in the 2006 Republican primary, has intervened in the instant action to support all but one of the Gustafson plaintiffs' claims. Mr. Montiel did not oppose intervention by the House Majority Leader in *Montiel v. Davis*, but he did

oppose the motions to intervene of the Legislature's leadership in the instant action, obviously hoping to limit the parties to persons beholden to the Republican electorate.

In short, the evidence publicly available and the pleadings in the prior lawsuits and this action reveal tactical maneuvering on the part of the Gustafson plaintiffs, their counsel and their political supporters both to avoid the preclusive effects of the prior judgments and to manipulate electoral politics. This is an additional reason for applying the doctrine of virtual representation and to dismiss this action.

### Conclusion.

For the foregoing reasons and for reasons set out in the previously filed briefs, the Attorney General's motion for judgment on the pleadings and Hammett's motion to dismiss should be granted.

Respectfully submitted this 18th day of October, 2005,

Edward Still
Edward Still Bar No. ASB-4786-I 47W
2112 11th Avenue South
Suite 201
Birmingham, AL 35205
        205-320-2882
        fax toll free 877-264-5513
E-mail: still@votelaw.com

s/James U. Blacksher
James U. Blacksher Bar No. ASB-2381-S82J
P.O. Box 636
Birmingham AL 35201
        205-591-7238
        Fax: 866-845-4395
E-mail: jblacksher@ns.sympatico.ca

Attorneys for defendant-intervenor Hammett

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LIONEL GUSTAFSON et al.,                     )
                                             )
            Plaintiffs,                      )
                                             )
V.                                           )  CIVIL ACTION NO.
                                             )  1:05-cv-00352-CG-L
ADRIAN JOHNS, et al.,                        )
                                             )
            Defendants,                      )


CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2005, I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF system, which will send notification of such filing to the
following:

Mark Montiel
6752 Taylor Circle
Montgomery, AL 36117
Email: mgmontielpc@aol.com

Anne Ware Lewis
1170 Peachtree Street
Suite 2000
Atlanta, GA 30309
Email: awl@sbllaw.net

LARRY T. MENEFEE
407 S. McDonough Street
Montgomery, AL 36104
Email: lmenefee@knology.net

Jeffrey M. Sewell
Asst. County Attorney
280 Jefferson County Courthouse
716 Richard Arrington, Jr., Blvd. North
Birmingham, AL. 35203

Frank B. Strickland
1170 Peachtree Street
Suite 2000
Atlanta, GA 30309
Email: FBS@sbllaw.net

Troy R. King
John J. Park, Jr.
Charles B. Campbell
Attorney General's Office
Alabama State House
11 South Union Street
Montgomery, AL 36130-0152
Email: jpark@ago.state.al.us
             ccampbell@ago.state.al.us

ROBERT D. SEGALL
SHANNON L. HOLLIDAY
444 South Perry Street
P. O. Box 347
Montgomery, AL 36101-0347

23

Email: sewellj@jccal.org

Algert S. Agricola, Jr.
Winter Loeb Building
105 Tallapoosa Street, Suite 101
Montgomery, AL 36104
Email: aagricola@slatenlaw.com

Email: segall@copelandfranco.com
     holliday@copelandfranco.com

Respectfully submitted,

s/James U. Blacksher
James U. Blacksher Bar No. ASB-2381-S82J
P.O. Box 636
Birmingham AL 35201
    205-591-7238
    Fax: 866-845-4395
E-mail: jblacksher@ns.sympatico.ca