[RLA]                                                                    [PUBLISH]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LIONEL GUSTAFSON, et al. | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ADRIAN JOHNS, etc., et al., | ) | CIVIL ACTION NO. 05-00352-CG-C |
| | ) | |
| **Defendants,** | ) | |
| | ) | **THREE-JUDGE COURT** |
| **and** | ) | |
| | ) | |
| SETH HAMMETT, LOWELL | ) | |
| BARRON, and HANK SANDERS, | ) | |
| | ) | |
| **Defendant-Intervenors.** | ) | |

## ORDER

This action is the latest chapter in a long history of legal challenges to Alabama's 2001 legislative redistricting. Plaintiffs, nineteen Alabama voters, challenge the redistricting plans, Acts 2001-727 and 2001-729, on several  grounds. They assert that the plans (1) violate the constitutional guarantee of one-person-one-vote; (2) constitute illegal partisan gerrymandering; and (3) violate Plaintiffs' First Amendment right to freedom of association. The issue before this Court[1] is whether this action is barred by earlier challenges to the redistricting plans. We hold that this action is barred under the doctrine of res judicata.

_____

[1]This three-judge federal district court was empaneled pursuant to 28 U.S.C. § 2284.

## I.  BACKGROUND

This story begins with the previous Alabama legislative redistricting plan, created after the 1990 census. In 1993, the Circuit Court of Montgomery County approved a consent decree, adopting a redistricting plan. Sinkfield v. Bennett, CV-93-689-PR (Cir. Ct. Montgomery County Aug. 13, 1993). Mark Montiel, Plaintiffs' attorney in the present case, represented John Rice and Camilla Rice, who intervened in Sinkfield. The state court retained jurisdiction over the 1993 consent decree.

On January 24, 2001, Bert Jordan and Al Agricola joined Montiel as counsel for the Rices in Sinkfield. They petitioned the Montgomery County Circuit Court to vacate the consent decree because the Alabama Legislature soon would be drawing new districts in accordance with the 2000 census data. They also requested that the court relinquish the jurisdiction it had retained over future redistricting efforts. However, the Montgomery Circuit Court denied the Rices' motion and Montiel, Jordan, and Agricola filed an appeal to the Alabama Supreme Court.

Meanwhile, the Alabama Legislature did not pass new redistricting plans during the 2001 Regular Session, which ended on May 21. On June 15, 2001, Barnett v. Alabama was filed in federal court, in the Southern District of Alabama.  The Barnett plaintiffs were Les Barnett, a member of the Republican Party's State Executive Committee; Terry Lathan, who at one time was the treasurer of the Mobile County Republican Party (and is wife of Jerry Lathan, Vice Chairman for the First and Second Congressional districts in the State Republican Party); and Percy Johnson, who testified that he was asked to be a plaintiff because he was "one of the leading African-American Republicans in Mobile."  Johnson was recruited by Representative Chris Pringle.   Initially, the plaintiffs' attorneys in Barnett were Benjamin Ginsburg and Matthew Stowe from Washington, DC and Paul Wesch of Mobile, but they were joined by the

2

time of the most relevant events here by Bert Jordan and Al Agricola.[2]  The <u>Barnett</u> complaint alleged that the Alabama Legislature was unlikely to redraw its districts in time for the 2002 election and asked that a three-judge court assume jurisdiction over the process.

On June 21, 2001, Mark Montiel filed a federal lawsuit, <u>Montiel v. Davis</u>, alleging the failure of the Legislature to redraw the districts of the Legislature, Congress, and the State Board of Education.  Mark Montiel's father, Gonzalo Fitch Montiel, was the sole plaintiff in the original complaint.  <u>Montiel</u> was filed in the same federal court, and was assigned to the same judge, as <u>Barnett</u>.  On June 25, 2001, the Alabama Legislature convened a special session to redraw the legislative districts. On July 2, 2001, Acts 2001-727 (Senate plan) and 2001-729 (House plan) passed the Legislature. The Governor signed the bills on July 3. The redistricting plans were submitted to the Department of Justice ("DOJ") for preclearance, as required under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c. On the same day that the Legislature passed the redistricting statutes, July 2, another state lawsuit was filed in the Circuit Court of Montgomery County. <u>Webb v. Alabama</u> was brought by Democratic interests and sought a declaratory judgment that the new plans were constitutional. On July 12, the Alabama Attorney General moved to dismiss the complaints in <u>Barnett</u> and <u>Montiel</u>, on the grounds that the Legislature had enacted redistricting statutes that had been submitted for preclearance. This Court, acting through Judge Hand as a single judge, ordered the plaintiffs in both cases to respond to the Attorney General's motion to dismiss.

In response to this order, Mark Montiel amended the complaint in <u>Montiel</u> and directly challenged the constitutionality of the new House and Senate redistricting plans. The <u>Barnett</u>

---

[2] Jordan and Agricola filed an appearance in <u>Barnett</u> on September 20, 2001. Jordan, however, testified that he was engaged to represent the <u>Barnett</u> plaintiffs "substantially before July 27."

plaintiffs' response did not directly attack the new statutes but, rather, argued that the new statutes were not yet enforceable under §5 of the Voting Rights Act and noted that the Alabama Supreme Court now had jurisdiction over the redistricting process in the appeal from the Montgomery Circuit Court's refusal to vacate the 1993 consent decree in Sinkfield.

On August 9, 2001, Mark Montiel filed yet another lawsuit. Rice v. English, filed in state court, challenged only the Senate plan. Rice alleged that the Senate plan violated the Alabama Constitution. The plaintiffs were John Rice, William McCall Harris, a former Executive Director of the State Republican Party, and Harris's mother, Patricia Wood.

On September 25, 2001, Judge Hand, still acting as a single judge, held a joint hearing in Barnett and Montiel. Mr. Jordan, now having joined the team of plaintiffs' lawyers in Barnett, reiterated the argument that a three-judge federal court need not take action until the plans had been precleared and the Alabama Supreme Court had resolved questions about whether the plans violated the state constitution. Mr. Jordan – pursuing a strategy to have the Alabama Supreme Court assume responsibility for the redistricting litigation and rule first on the constitutionality of the districts under the Alabama Constitution – requested that Judge Hand certify the state law questions to the Alabama Supreme Court as "one way to help the process along. . . ." Mr. Montiel endorsed Jordan's suggestion that the federal court certify the state law issues to the Alabama Supreme Court.

A few weeks later, on October 9, 2001, Montiel, Jordan, and Agricola filed a petition for writ of prohibition, mandamus, or other extraordinary writ, Ex Parte Rice, in the Alabama Supreme Court. The three lawyers were acting as co-counsel for John and Camilla Rice, and they asked the Alabama Supreme Court to prevent Webb from proceeding in the Montgomery Circuit Court until the Alabama Supreme Court ruled on the appeal in Sinkfield. The Ex Parte Rice

petition referred to <u>Barnett</u>, but not to <u>Montiel</u>.

On October 1, 2001, the same three-judge court was designated to sit in <u>Barnett</u> and

<u>Montiel</u>. Shortly thereafter, the Alabama Attorney General filed notice that the DOJ had

precleared Act 2001-727 (the Senate plan). On October 23, 2001, the court asked the parties to

advise the court on what effect the preclearance of the Senate plan and "possible preclearance"

of the House plan would have on both cases.

The <u>Barnett</u> plaintiffs argued that DOJ preclearance changed nothing, and renewed their

request for certified questions to the Alabama Supreme Court. The <u>Barnett</u> plaintiffs also

informed the court that, on October 19, 2001, the Alabama Supreme Court had rejected the

appeal by the Rice intervenor-plaintiffs in <u>Sinkfield v. Bennett</u>, but that <u>Ex Parte Rice</u> was still

pending in the Alabama Supreme Court.  They urged the federal court to continue to stay its

hand and certify questions to the Alabama Supreme Court which still had jurisdiction of the

redistricting issues.

Mark Montiel took a similar position in <u>Montiel v. Davis</u> urging the federal court to stay

its hand and certify the redistricting issues of state law to the Alabama Supreme Court.  In

addition, however, the <u>Montiel</u> briefs made clear that the plaintiffs were also challenging the

new, 2001 redistricting plans on both state and federal grounds.

On November 7, 2001, the Alabama Attorney General notified the court that the House

plan also had been precleared by the DOJ. That same day, the three-judge court dismissed

<u>Barnett</u> as moot, holding that the plaintiffs presented no specific challenge to the 2001

redistricting statutes. The <u>Barnett</u> plaintiffs did not file a motion to reconsider, an appeal, nor did

they ask for leave to file an amended complaint challenging the new statutes.

On November 8, 2001, the Alabama Supreme Court denied the <u>Ex Parte Rice</u> petition for

writ of prohibition. On December 21, 2001, Montiel filed his third amended complaint in

Montiel v. Davis, adding new plaintiffs. The new plaintiffs were John Rice, Camilla Rice,

Sheldon Day, John Lang, and Bobby Humphryes, a Republican member of the Alabama House

of Representatives.

The state trial court granted summary judgment against the plaintiffs in Rice v. English,

and the Alabama Supreme Court affirmed on May 24, 2002. 835 So. 2d 157 (Ala. 2002). On July

8, 2002, this Court, acting through a three-judge panel, granted summary judgment in favor of

the defendants and defendants-intervenors in Montiel. 215 F. Supp. 2d 1279 (S.D. Ala. 2002).

The plaintiffs did not appeal.

The present lawsuit, brought on behalf of nineteen Alabama voters, was filed on June 16,

2005.  Defendants in this case are Alabama probate judges, sued in their official capacity. On

September 30, 2005, the Court allowed Governor Bob Riley to intervene in the suit. On the same

day, Senator Lowell Barron, Senator Hank Sanders, and Representative Seth Hammett

intervened in their individual capacities. We refer to Barron, Sanders, and Hammett as the

Defendants-Intervenors. The Defendants filed a motion for judgment on the pleadings and the

Defendants-Intervenors filed motions to dismiss.  Briefing followed.  Because the issue of res

judicata loomed large over the case,on November 22, 2005, this court ordered a bench trial on

that issue. The parties took numerous depositions and on January 18, 2006 requested that the

court conduct the bench trial on the basis of the depositions as evidence without taking live

testimony.  Trial briefs were filed.

The above history lays out the basic time line of the past litigation, and the posture of the

instant case.  In order to determine whether the present lawsuit is barred by the prior litigation,

we will have to examine closely the details of that history, in particular the connections between

these lawsuits.  Initially, we set out some specific findings of fact, and then we proceed to the analysis, including the legal background and the discussion and further findings of fact.

## II.  SPECIFIC FINDING OF FACT

Upon careful consideration of the evidence, we make the following findings of fact:

• Senator Stephen French and Representative Chris Pringle led the Republican redistricting efforts in the Legislature. Both French and Pringle served on the Joint Reapportionment Committee in the Legislature.

• Marty Connors, Chairman of the Alabama Republican Party, cooperated  with Pringle and French about Republican strategy for the redistricting prior to the Legislature's special session.

• Mark Montiel attended all the public meetings of the Joint Reapportionment Committee.

• The State Executive Committee of the Alabama Republican Party paid between $60,000 and $70,000 to consultants Randy Henneman and David Winston. These consultants worked with Senator Stephen French and Representative Chris Pringle, the legislators who were spearheading the Republicans' redistricting efforts in the Legislature.

• David Winston drew up zero-deviation redistricting plans that French and Pringle introduced in the Legislature during the special session, and which provided support for Mark Montiel's position in Montiel.

Barnett:

• The Barnett lawsuit was financed, at least in significant part, by the State Executive Committee of the Republican Party. Marty Connors, who became State Republican

Chairman in January 2001, paid the <u>Barnett</u> attorneys $75,000.[3] Connors paid this fee at

the request of legislators (i.e., Senator French and Representative Pringle) who "were

really sort of  driving this." We find that Marty Connors was a driving force in the

<u>Barnett</u> case.  For the reasons discussed below (in Part V.C. and n.9), we also find that

Senator French played an active role in support of Republican interests in <u>Barnett</u>.

•       Marty Connors played a key role in the decision to abandon the <u>Barnett</u> lawsuit.  He

testified that he never considered amending the <u>Barnett</u> complaint to challenge the 2001

redistricting plans because he wanted to focus the Party's money on operational politics,

not litigation. Senator French provided further support for this view when he testified that

Connors "pulled the plug" on the <u>Barnett</u> case.

•       We find that participants in <u>Barnett</u> can be presumed to be aware of <u>Montiel</u>. Both cases

were pending in the same federal district court, before the same three-judge panel, at the

same time, on the same schedule, were consolidated for some hearings, and were subject

to some joint orders. They both pursued similar claims.

<u>Montiel</u>:

•       Although Marty Connors generally refused to offer significant financial support for the

<u>Montiel</u> litigation, he did pay Mark Montiel $1500 in Party funds in appreciation of work

on behalf of the Party in the <u>Montiel</u> and <u>Rice</u> litigation.

•       John Rice, plaintiff in <u>Montiel</u> and <u>Rice</u>, tried to obtain financial support from

Republican supporters for his two lawsuits. He was unsuccessful.

•       Senator French and Representative Pringle provided Mark Montiel with affidavits that he

_____

[3] This money was paid to Al Agricola and Bert Jordan, who filed appearances in Barnett
on September 20, 2001. They signed an engagement letter with Marty Connors on July 27, 2001.

filed in <u>Montiel</u> and <u>Rice</u>. These affidavits constituted evidence central to the <u>Montiel</u>

plaintiffs' challenge to the legislative districts.

• The plaintiffs in <u>Montiel</u> identified themselves as Republicans, and several of them

testified that they believed that the legislative districts favored Democrats and disfavored

Republicans.

• Mark Montiel was the driving force in <u>Montiel</u>. The case was originally filed with

Montiel's father as the only plaintiff. After additional plaintiffs were added, the plaintiffs

never met to plan or discuss the case. For example, Montiel contacted Sheldon Day about

being a plaintiff in <u>Montiel</u>. Day reports that he "may have had one or two phone calls"

from Montiel about the case from the time he joined until the court issued its decision.

John Lang testified that Montiel called him and asked if Lang would be interested in

participating in the lawsuit. Humphryes claimed attorney-client privilege when asked

how he became involved in the <u>Montiel</u> case. Only John Rice was an "active" plaintiff in

<u>Montiel</u>. In addition to Mark Montiel as the driving force in <u>Montiel</u>, for the reasons

discussed below (in Part V.C), we find that Connors and French participated in not

insignificant ways in the 2001 redistricting litigation which ended in the final, preclusive

judgment in <u>Montiel</u>.

<u>Gustafson</u>:

• After <u>Larios v. Cox</u>, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (three-judge court), <u>aff'd</u>, 542

U.S. 947 (2004) was decided, Senator French "got excited." Sometime during the

summer of 2004, Senator French asked Mark Montiel to investigate whether the <u>Larios</u>

decision could be used to aid a legal challenge to Alabama's districts.

• Marty Connors testified that he felt "vindicated" when he learned about the several

million dollars that the Georgia Republican Party spent pursuing the <u>Larios</u> case. Connors reported thinking "Well, thank goodness Georgia paid for the research and development and we didn't."

- Marty Connors was the Chairman of the Alabama Republican Executive Committee from 2001 until 2005.

- After <u>Larios</u>, in 2004, Connors began speaking with members of the Alabama business community about raising funds for the present lawsuit.

- Jerry Lathan, Vice Chairman of the Alabama Republican Party, began discussing with Senator French the possibility of bringing this case in the summer of 2004.

- The present lawsuit is being managed by a Litigation Management Committee composed of Jerry Lathan, Senator Stephen French, and Marty Connors.

- Senator French played a leading role in recruiting plaintiffs for the present lawsuit. French hired Leland Whaley to recruit the plaintiffs.  According to Connors' testimony, the names of potential plaintiffs were filtered, passed on to Mark Montiel, and contacted by Whaley.

- Senator French testified that Bert Jordan, Al Agricola, and Mark Montiel were the best lawyers in Alabama who dealt with redistricting issues on the Republican side.

- Lathan contacted Frank Strickland and Anne Lewis, the plaintiffs' attorneys in <u>Larios</u>, and paid them $5000 out of his personal funds to compare the  situation in Alabama with that of Georgia.

- Lathan became the head fundraiser for the new litigation project. He set up the Alabama 21st Century Foundation to fund the litigation.

- Connors also played a role in raising funds for the present suit. In 2004, Connors began

trying to interest business groups in supporting this case. He is also an officer in the Alabama 21st Century Foundation, the 501(c)(4) corporation set up to fund the litigation.

- Lathan hired lawyers for this case, recruited plaintiffs, raised funds, and made litigation decisions.
- Lathan hired the lawyers, Frank Strickland, Anne Lewis, and Mark Montiel. Strickland and Lewis had brought the successful Georgia redistricting case, <u>Larios v. Cox</u>. After the suit was filed, Strickland and Lewis withdrew as counsel, leaving Mark Montiel as the lead lawyer. Montiel was soon joined by James McLemore and Christopher Weller, who represent plaintiffs Joe Sanders and Elaine Little.
- We find that Marty Connors, Senator French, and Jerry Lathan are driving forces in the instant litigation. In addition, for the reasons discussed below (Part V.B. n.8), we find that Mark Montiel is a force influencing the instant litigation.

## III.  JURISDICTION

We have jurisdiction pursuant to 28 U.S.C. §1331, as the Plaintiffs have raised claims under the United States Constitution. Because the Plaintiffs' claims challenge the constitutionality of the apportionment of a statewide legislative body, pursuant to 28 U.S.C. §2284, this case is properly heard before a district court of three judges.

## IV.  ANALYSIS

The Defendants and Defendants-Intervenors contend that Plaintiffs are barred from bringing this action because of prior cases, particularly the decisions in <u>Montiel v. Davis</u>, 215 F.

Supp. 2d 1279 (S.D. Ala. 2002) and <u>Rice v. English</u>, 835 So.2d 157 (Ala. 2002). We find that the Plaintiffs in this case were virtually represented by prior plaintiffs. Accordingly, the present action is barred by res judicata.

    A.  <u>The Legal Background: General</u>

Res judicata prevents a party from raising a claim that has already been decided. Res judicata can be applied only if four elements are present: "(1) there must be a final judgment on the merits; (2) the decision must be rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same causes of action must be involved in both cases." <u>Jaffree v. Wallace, 837 F.2d 1461, 1466</u> (11th Cir. 1988) (quoting <u>I.A. Durbin, Inc. v. Jefferson Nat'l Bank</u>, 793 F.2d 1541, 1549 (11th Cir. 1986)). The Plaintiffs do not contest (1) or (2); both <u>Montiel</u> and <u>Rice</u> were rendered by competent courts and are final judgments on the merits.  We will first address the fourth requirement – the same cause of action – and then address the real issue in this case, <u>i.e.</u>, privity.

Plaintiffs argue that the causes of action are different in this case than the causes of action in <u>Montiel</u>.[4] Causes of action in a second suit are barred if they could have been raised in the first suit. <u>See</u> <u>Davila v.  Delta Airlines, Inc., 326 F.3d 1183, 1187 (11th Cir. 2003)</u>; <u>Olmstead v. Amoco Oil Co.</u>, 725 F.2d 627, 629 (11th Cir. 1984) (Res judicata "extends not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same 'operative nucleus of fact.'").

The <u>Montiel</u> plaintiffs brought one-person-one-vote claims and racial gerrymandering claims based on the Equal Protection Clause and Section 2 of the Voting Rights Act. Plaintiffs in

---

[4] The Plaintiffs do not make this argument in their trial brief; they do, however, make this argument in earlier briefs.

this case bring: (1) a one-person-one-vote claim; (2) a partisan gerrymandering claim; and (3) a First Amendment freedom of association claim. All of these claims arise out of a common nucleus of fact – i.e,  the 2001 redistricting. The <u>Montiel</u> plaintiffs could have brought any of these claims and, in fact, did bring the one-person-one-vote claim.

The Plaintiffs claim that several of their partisan gerrymandering claims could not have been raised in the <u>Montiel</u> suit because they involve different districts than the ones in <u>Montiel</u>.[5] Because there was no <u>Montiel</u> plaintiff residing in some of the districts in which <u>Gustafson</u> Plaintiffs reside, the Plaintiffs argue that the <u>Montiel</u> plaintiffs would have lacked standing to bring these claims. We reject this argument because the Plaintiffs bring essentially the same, state-wide one-person-one-vote challenge as in <u>Montiel</u>. Both complaints challenge the redistricting plans – in their entirety – as violating the constitutional guarantee of one-person-one-vote. As for Plaintiffs' partisan gerrymandering claims, they are based entirely on the alleged population deviations, <u>i.e.</u>, that the challenged districts have populations larger than an ideal district. In this sense, Plaintiffs' partisan gerrymandering claim is not significantly different from the one-person-one-vote claims in either this case or <u>Montiel</u>.

To be sure, the Plaintiffs here allege that the overpopulation occurred for partisan, rather than racial, reasons, but the <u>Montiel</u> plaintiffs could have brought this partisan claim. Although no plaintiff in <u>Montiel</u> lived in several of the districts represented here, the <u>Montiel</u> plaintiffs brought the same challenge to the redistricting plans and the alleged improper overpopulation of districts.  The Plaintiffs present no particular evidence of partisan gerrymandering other than the overpopulation. They do not point to specific boundary lines, or other facts that might raise a

---

[5] The <u>Montiel</u> plaintiffs lived in House Districts 15, 68, 70, 79, 83, and 101 and Alabama Senate Districts 5, 22, 24, 28, and 34. The <u>Gustafson</u> Plaintiffs live in House District 1, 15, 18, 24, 27, 41, 43, 46, 47, 49, 51, 79, and 95, and Senate Districts 2, 3, 7, 8, 9, 14, 16, and 22.

new, district-specific claim that the <u>Montiel</u> plaintiffs could not have brought. The partisan

gerrymandering claim is against "the state legislative redistricting plans and the individual

districts contained therein."   The complaint makes no allegation about any specific district, nor

have the briefs focused on any specific district.  Moreover, the present Plaintiffs do not seek any

district-specific relief; rather they call for this Court to invalidate the redistricting plans in their

entirety because of the population deviations. In short, the <u>Montiel</u> plaintiffs mounted a

statewide challenge to the population deviations; the <u>Gustafson</u> Plaintiffs are bringing the same

claim.

Accordingly, we hold that all of Plaintiffs' claims could have been brought by the

plaintiffs in <u>Montiel</u>, and we hold that <u>Gustafson</u> and <u>Montiel</u> involve the same cause of action.

We turn next to the privity issue.  Privity is a relationship between parties and non-

parties. The Eleventh Circuit has recognized three types of relationships that will establish

privity between parties in the first action and parties in succeeding actions:

> (1) where the non-party shares or legally succeeds to the interest of the prior
> party, particularly an interest in property;
>
> (2) where the non-party effectively controlled the prior litigation; and
>
> (3) where the non-party's interests were so similar to the interests of the party to
> the prior action, that the prior party acted as the non-party's virtual representative.

<u>Equal Employment Opportunity Comm'n v.  Pemco Aeroplex</u>, 483 F.3d, 1280, 1286-87 (11th

Cir. 2004). The third form of privity is called virtual representation. The Defendants and

Defendants-Intervenors argue that the Plaintiffs are in privity with the <u>Montiel</u> plaintiffs under

(2) the control theory and (3) virtual representation. The facts in evidence establish privity

between the <u>Gustafson</u> Plaintiffs and the <u>Montiel</u> plaintiffs under the theory of virtual

representation.[6]  We need not reach the control theory.

B.  Legal Background: Virtual Representation

According to the Eleventh Circuit, virtual representation is a doctrine that applies "when the respective interests are closely aligned and the party to the prior litigation adequately represented those interests." Jaffree, 837 F.2d at 1467 (quoting Delta Airlines, Inc. v. McCoy Restaurants, Inc., 708 F.2d 582, 587 (11th Cir. 1983)).

Jaffree proceeds to identify four factors that have been employed to establish the "closely aligned interests" needed for virtual representation: "participation in the first litigation, apparent consent to be bound, apparent tactical maneuvering, [and] close relationships between the parties and non-parties." Id.  None of these factors is either necessary or sufficient; rather the court examines them in concert to determine whether the parties have closely aligned interests. We will consider all of these factors. First, however, we will consider how the existence of a public law issue affects the application of virtual representation.

C.  Legal Background: Virtual Representation in Public Law Cases

A number of courts have determined that virtual representation is "particularly appropriate for public law issues." Tyus v. Shoemehl, 93 F.3d 449, 456 (8th Cir. 1996); see also Robertson v. Bartels, 148 F. Supp. 2d 443, 452 (D.N.J. 2001) (barring a redistricting lawsuit because of res judicata); American Forest Resource Council v. Shea, 172 F. Supp. 2d 24, 34 (D.D.C. 2001) ("aside from the 'identity of interests' factor . . . perhaps the most important consideration in this case militating in favor of preclusion is the fact that the suit raises public

---

[6] The Defendants and Defendants-Intervenors also argue that the Plaintiffs in the present case are in privity with the plaintiffs in Rice v. English, 835 So. 2d 157 (Ala. 2002). Because Rice challenged only the Senate districts, privity with the Rice plaintiffs would only bar the present Plaintiffs' challenge to the Senate Plan (Act 2001-727), not to the House Plan (Act 2001-729). Therefore, we focus on the connections between Montiel and the present lawsuit.

15

law issues."); McNeil v. Legislative Apportionment Comm'n, 828 A.2d 840, 860-62 (N.J. 2003) (barring a redistricting lawsuit because of res judicata).

The Supreme Court has noted that the due process limitations on res judicata are less restrictive in the public law context. Richards v. Jefferson County, 116 S. Ct. 1761, 1768-69 (1996). In Richards, the Supreme Court held that a class of taxpayers could proceed with their suit against the county, even though another court had upheld the county's occupation tax in a suit brought by several individual taxpayers. 116 S. Ct. at 1768. The Court held that the two sets of litigants were "strangers" to one another, and that due process concerns prevented the Court from barring the second lawsuit. Id. In Richards, the county argued that due process concerns are less significant in a "public law" case.  In dicta, the Supreme Court suggested that due process would not prevent the application of res judicata in certain public law cases, particularly those that can be brought "only on behalf of the public at large." Id. at 1769. The Court held, however, that the Richards case was not such a situation because it involved the state's attempt to levy personal funds. Id. at 1768.

When plaintiffs have raised an issue of public law, they do not allege that they "have a different private right not shared in common with the public." Tyus, 93 F.3d at 457. Virtual representation is particularly appropriate for public law issues because the number of plaintiffs with standing is "potentially limitless." Id. at 456. If successive plaintiffs could continually challenge a public law, such claims "would assume immortality." Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist., 750 F.2d 731, 741 (9th Cir. 1984).

Redistricting lawsuits are precisely the type of public law issue to which virtual representation should be applied. While the Eleventh Circuit has adopted a rather strict standard for the application of virtual representation in private law cases, it also has noted that there is

16

less preclusion protection for a plaintiff who complains of a public action that "has only an indirect impact on his interests." Equal Employment Opportunity Comm'n v. Pemco Aeroplex, Inc., 383 F.3d 1280, 1289 (11 th Cir. 2004) (quoting Richards, 116 S. Ct at 1768).[7]

Redistricting is a public action that has only an indirect impact on a plaintiff's interest. The present lawsuit does not involve the denial of an individual's right to vote. Rather, the lawsuit argues that votes are given unequal weight when they are aggregated by district. The remedy for any individual voter's claim of unequal weighting necessarily affects the rights of all other voters. Indeed, when statewide relief is sought, the rights of all voters are potentially affected. The victory of any plaintiff's lawsuit would deliver the relief sought by all the potential plaintiffs.

Because one plaintiff's case will resolve the issue for all similarly-situated voters, fence-siting should be discouraged; all parties aggrieved by the redistricting should be encouraged to join in one action. Without virtual representation, there is no limit to the number of potential plaintiffs who could bring successive lawsuits against a state for redistricting. A state should not face an endless stream of lawsuits after each redistricting. Virtual representation is particularly appropriate for a public law issue like legislative redistricting. See, e.g., Tyus, 93 F.3d at 456 (barring a redistricting lawsuit because of res judicata); Robertson v. Bartels, 148 F. Supp. 2d at

---

[7] We note that Pemco Aeroplex employed the same standard and the same four factors set out in Jaffree. However, in the private law context of Pemco Aeroplex, the court developed a much stricter construction of the standard. According to Pemco Aeropex, "if the party to the prior litigation was not legally accountable to the party in the latter, then virtual representation cannot be present, regardless of any other factor." Pemco Aeroplex, 383 F.3d at 1289. We distinguish our case from Pemco Aeroplex on the ground that Pemco did not involve a public law issue. Pemco Aeroplex itself acknowledges this distinction as the basis of distinguishing that case from prior precedent. Id. at 1289. We hold that, in this redistricting public law context, a plaintiff need not have had a legally accountable relationship with the prior plaintiff in order to be barred from bringing a new suit.

452 (same); <u>Thompson v. Smith</u>, 52 F. Supp. 2d 1364, 1370 (M.D. Ala. 1999) (barring several of plaintiff's redistricting claims because of res judicata); <u>McNeil</u>, 828 A.2d at 860-62 (barring a redistricting lawsuit because of res judicata).


## V.  DISCUSSION AND FURTHER FINDINGS OF FACT

### A.  Closely-Aligned Interests

As noted above, the Eleventh Circuit permits res judicata when the two parties' interests are closely aligned and the first party adequately represented the second party's interests. <u>Jaffree</u>, 837 F.2d at 1467. The Eleventh Circuit has set forth four factors that may suggest the required alignment of interests. Before discussing these four factors, however, we first wish to consider, as other courts have, whether there is a general identity of interests between the two sets of plaintiffs. <u>See Robertson</u>, 148 F. Supp. 2d at 450; <u>Tyus</u>, 93 F. 3d at 457.

The current Plaintiffs share the same interests as the plaintiffs in <u>Montiel</u>. First, both parties share an interest in proving that the Alabama House and Senate plans are legally and constitutionally invalid. <u>See Robertson</u>, 148 F. Supp. 2d at 451.[8] Second, both parties are concerned with whether residents of overpopulated districts are injured by population deviations within plus or minus 5% of the ideal population. All of the plaintiffs base their claims on the disparities in district population. The complaints ascribe the population discrepancy to different motives, but they are based on the same perceived problem. The <u>Montiel</u> plaintiffs argued that the discrepancy was discrimination against suburban residents or white voters. Now the

---

[8] The <u>Robertson</u> court found a "clear commonality of interests" even though the two sets of plaintiffs challenged the redistricting statute from opposing sides. One set of plaintiffs argued that the districts were racially gerrymandered; the other set argued that the districts diluted African-American votes. <u>Robertson</u>, 148 F. Supp. 2d at 451-52. Both, however, sought a declaration that the redistricting plan was unlawful.

Gustafson Plaintiffs argue that the population discrepancy discriminates against Republicans. All plaintiffs were concerned about overpopulated districts. Had the Montiel plaintiffs succeeded, the Gustafson Plaintiffs would have benefitted from the remedy.

Third, the identity of interests is even closer than the mere identity of the Montiel and Gustafson claims.  The Gustafson Plaintiffs expressly identify themselves as Republicans and are pursuing Republican interests. Although the Montiel complaint made no express partisan claims, the Montiel plaintiffs also were pursuing Republican interests. State Republican Chairman Marty Connors gave Mark Montiel $1500 for the Montiel litigation. The plaintiffs in Montiel and Gustafson worked with the same Republican legislators.  Both sets of plaintiffs rely on the same zero-deviation plans drawn up by Republican consultant David Winston.

The Montiel case may not have had the official backing of the Republican Party (other than the $1500 fee), but the Montiel plaintiffs were all active Republicans, who were pursuing Republican interests. Barry Humphyres was a Republican legislator. Sheldon Day ran for the Alabama Senate as a Republican in 2002. John Lang paid dues to the Republican Party. John Rice ran for Congress as a Republican and was a plaintiff in a 1997 challenge to the previous redistricting plans.  John Rice, Bobby Humphryes, and Sheldon Day, plaintiffs in Montiel, all testified that they believed the 2001 districts were drawn to favor Democrats and disfavor Republicans.  For example, John Rice, one of the plaintiffs in Montiel, stated that his primary concern was that the redistricting plan violated one-person-one-vote by systematically overpopulating Republican districts and underpopulating Democratic districts. In other words, plaintiff John Rice, as a Republican, explicitly shared the Gustafson Plaintiffs' concerns about the redistricting statutes. He had a clear "identity of interests" with the Gustafson Plaintiffs, who seek to protect Republican interests.

19

Having determined that there is a general identity of interests between the plaintiffs, we now turn to the four factors laid out in Jaffree: close relationship; participation in the prior litigation, consent to be bound, and tactical maneuvering. Jaffree, 837 F.2d at 1467.

B.  Close Relationships

Throughout the briefs, Plaintiffs try to minimize connections between the cases by insisting that the named plaintiffs were not parties to the prior case and, in most instances, did not even know of the prior litigation. We reject this limitation on our analysis. In determining the relationship between this litigation and prior cases, we will consider not only the named plaintiffs, but those individuals who are truly driving the litigation.  There is ample evidence, and we so find, that most of the plaintiffs in all these cases are not active decision-makers but, rather, were recruited by others to serve as names on a complaint.

In this case, we find that the three members of the Litigation Management Committee are driving this case and making all the relevant decisions. The three members of the Litigation Management Committee are Stephen French, Jerry Lathan, and Marty Connors. Likewise, we will consider the role of Mark Montiel, who litigated Montiel and Rice, in addition to this case.

The named plaintiffs have played no substantial role in this case. After Larios v. Cox was decided, the members of the Litigation Management Committee began organizing this lawsuit. With the exception of George Oldroyd, all the plaintiffs were recruited to join this lawsuit. Jerry Lathan took it upon himself to recruit plaintiffs for this challenge, and Leland Whaley was hired to find plaintiffs from allegedly overpopulated districts. The named plaintiffs did not select the lawyers, do not pay fees, and have delegated all management of the lawsuit to the Litigation Management Committee. We pierce this veil; we find that the named plaintiffs do not represent all of the real parties in interest; and we find that the real parties in interest include Connors,

20

French, and Lathan.  We will consider connections between these other "parties" to the lawsuit and prior, possibly preclusive litigation.

As detailed in Part V.A, the instant parties and the <u>Montiel</u> parties were pursuing the same Republican interests.  Moreover, as we develop in Part V.C, both Marty Connors and Senator French, are driving forces in the instant litigation, and were closely related to those driving the prior litigation which resulted in the final, preclusive <u>Montiel</u> decision.

Mark Montiel's presence in both lawsuits is further evidence of a close relationship and an identity of interest between the two sets of plaintiffs. He clearly was the driving force in the two previous lawsuits which were tried to final judgment,  <u>Montiel</u> and <u>Rice</u>.  Although he may not be one of the primary driving forces behind the present lawsuit, the record does indicate that Mark Montiel has played an active role and can properly be considered one of the several forces influencing the instant litigation.[9]

Thus, the circumstances before us reveal not only the actual overlap of at least one person

---

[9] Mark Montiel was consulted by Senator French at the very beginning of the process that launched the instant suit.  As soon as Senator French heard about the <u>Larios</u> case, he contacted Mark Montiel seeking advice as to whether the <u>Larios</u> case might warrant another challenge to the Alabama legislative districts. When Senator French was asked during his deposition why he called Montiel, Senator French answered that Montiel was one of the three attorneys who do redistricting cases on the Republican side.  Mark Montiel brought to the instant litigation not only his legal expertise, but also he was in possession of documents and other factual information which would be necessary or appropriate in efficiently developing and litigating the case. Although the record does not reveal precisely when Mark Montiel was formally hired as counsel in the instant litigation, it does indicate that he played a role in the recruitment of the named plaintiffs. The record is also clear that Mark Montiel has served as lead counsel for all or part of the duration of this lawsuit.  Although the use of the same attorney is not considered of great significance in some of the cases, <u>see</u> <u>South Central Bell Telephone Co. v. Alabama</u>, 119 S. Ct. 1180, 1185 (1999), other cases recognize this as a factor to be considered. <u>See</u> <u>Tyus</u>, 93 F.3d at 457.  Moreover, in this case, the evidence shows that the named plaintiffs are inactive, and, as above noted, the record indicates that Mark Montiel's role in the instant case has reached beyond merely providing legal expertise; he has played an active role as a source of information and in the organization and development of the instant litigation.  We find that it is appropriate to consider that he has been one of the several forces influencing the instant litigation.

playing an active role in influencing both the instant suit and the prior preclusive suit, Mark Montiel, but also that Connors and French, driving forces in the instant case, are closely related to those driving the 2001 redistricting litigation.

C.   Participation in the Previous Litigation

By focusing solely on the named plaintiffs in the several cases, the instant Plaintiffs argue that there is no such participation at all.  As noted, however, we look to the substance of the circumstances and consider the persons who have been forces driving or influencing the several cases.  Doing so, we see a dimension of participation which is not insignificant.

As we have noted, Mark Montiel was the primary driving force in the two previous lawsuits which were tried to final judgment, Montiel and Rice.  With respect to the instant litigation, as our findings of fact note, he may not be the primary driving force, but we have found he is at least a force influencing the instant litigation.

In addition, we have found that Connors, as Chairman of the Alabama Republican Party, was a driving force in the Barnett litigation in 2001, and is a driving force in the instant litigation.  Also, we have found that Senator French is one of the driving forces in the instant litigation, and we find that he played an active role in support of Republican interests in both Barnett and Montiel.[10]  Moreover, Jerry Lathan's wife, Terry, was a named plaintiff in Barnett,

_____

[10] Senator French, along with Representative Pringle, had primary responsibility in advancing the Republican interests in the Legislature during the 2001 redistricting process. According to Connors, the legislators (referring to Senator French and Representative Pringle) were the ones driving the Republican redistricting efforts and they asked Connors to have the party pay the Jordan firm for representation of the party's interests in the Barnett case. According to Representative Pringle, before recruiting Johnson to be a plaintiff in the Barnett case, he discussed the matter with Senator French and Connors.   The Party's attorney, Jordan, was not sure in his testimony whether or not Senator French was included within the scope of his attorney-client engagement with Connors for the Party.   Finally, Senator French himself said at one point during his deposition that Jordan represented "us" in the Barnett case. Although

and Jerry is one of the three members of the Litigation Management Committee directing the instant suit.  The direct participation of Connors and French in the <u>Montiel</u> case (which reached final decision and has preclusive effect) is limited to Connors' contribution of $1500 of Republican Party funds and his appreciation of Mark Montiel's efforts on behalf of the Party, and Senator French's cooperation and filing of an affidavit which constituted an important element supporting the <u>Montiel</u> plaintiffs' position.

However, there was substantial participation of Connors and French in the <u>Barnett</u> case which was pending in the same federal district court as <u>Montiel</u>, before the same three-judge panel, at the same time, on the same schedule, and was consolidated for some hearings and with respect to some joint orders.  We also find that the attorneys in the two companion cases pursued the same interests and, to a considerable degree, the same strategies.  Even more significant, the two sets of attorneys, after urging the federal district court to stay its hand and certify questions to the Alabama Supreme Court, jointly filed a petition for extraordinary writ in the Alabama Supreme Court, <u>Ex Parte Rice</u>, urging the Alabama Supreme Court to assume responsibility for deciding the validity of the 2001 House and Senate redistricting statutes under the Alabama Constitution.  We find that the <u>Barnett</u> parties and the <u>Montiel</u> parties pursued their mutual strategy in the two cases by the joint action of their attorneys before the Alabama Supreme

---

Senator French disavowed being a driving force in <u>Barnett</u> and disavowed involvement in paying the <u>Barnett</u> lawyers, he acknowledged knowing about the suits immediately after their filing, acknowledged stating publicly his opinion that the 2001 Plans were unconstitutional and that the Republicans would challenge them in court, acknowledged having at least one telephone conference call with the attorneys in <u>Barnett</u> discussing the status of the redistricting process and the response of the Democrats to his zero deviation plan, acknowledged filing an amicus brief supporting Rice's position in <u>Rice v. English</u>, and finally acknowledged filing an affidavit supporting Montiel's position in <u>Montiel v. Davis</u>.  We find that Senator French played an active role in support of Republican interests in both <u>Barnett</u> and <u>Montiel</u>.

23

Court.  Through their attorneys, we thus find that the <u>Barnett</u> and <u>Montiel</u> parties (including Connors and French) actually engaged in the joint action in pursuit of their strategy to have the federal district court stay its hand, and urge the Alabama Supreme Court to assume responsibility for deciding the validity of the legislative districts.  Only after the Alabama Supreme Court denied that relief did the <u>Barnett</u> parties abandon their efforts in federal district court to challenge the 2001 redistricting statutes, leaving Mark Montiel to pursue their mutual interest in challenging the 2001 statutes in the remaining companion case of <u>Montiel</u>.  Thus, as we find below, the persons driving the <u>Barnett</u> case acquiesced in the resolution of that issue in <u>Montiel</u>, thereby agreeing to be bound by it.

Accordingly, for the foregoing reasons, we find that parties who are driving forces or at least influential forces in the instant case (<u>i.e.</u>, Connors, French, and Mark Montiel) also participated in not insignificant ways in the 2001 redistricting litigation which ended in a final, preclusive judgment.

D.  <u>Consent to be Bound</u>

We find that the individuals and entities driving this litigation – the Litigation Management Committee and other Republican supporters – knew of the 2001 litigation, yet failed to intervene.  As discussed more fully above, they had significant involvement in the litigation effort, especially in <u>Barnett</u>; through their attorneys they were intimately aware of the <u>Montiel</u> litigation and also involved in it via both parallel and joint actions; and then they abandoned <u>Barnett</u> leaving the  <u>Montiel</u> parties to pursue their mutual interest.  We thus find that they acquiesced in the judgment thereafter rendered in <u>Montiel</u>.  In addition, Senator French provided cooperation and a crucial affidavit in <u>Montiel</u>; Connors contributed $1500 toward <u>Montiel</u>; and Jerry Lathan's wife Terry was a plaintiff in <u>Barnett</u>.  Under these circumstances,

we find that the persons driving this litigation were fully aware of <u>Montiel</u>, participated in it either directly or in parallel and jointly, and to the extent their participation ended, that was with full knowledge that <u>Montiel</u> would continue to final judgment.  Under these circumstances, we find that they have acquiesced in the final judgment in <u>Montiel</u>.

      E.  <u>Apparent Tactical Maneuvering</u>

      Another factor in determining whether a plaintiff was virtually represented in a previous suit is whether there is evidence that the plaintiff maneuvered to avoid preclusion. <u>Jaffree</u>, 837 F. 2d at 1467. The case law suggests that adding new planitffs in a second or successive challenge in a public law context is evidence of tactical maneuvering.  <u>Tyus</u>, 937 F.3d at 457; <u>Robertson</u>, 148 F.2d at 452, <u>see also</u> <u>Jaffree</u>, 837 F.3d at 1465, 1468 n.18.  In <u>Gustafson</u>, the evidence reveals not only the mere presence of new plaintiffs, but also that the persons driving the instant litigation – who also participated in and were closely related to the 2001 litigation – actually decided who would become plaintiffs and recruited them.

      Although this recruitment of new plaintiffs is significant, the strongest evidence of tactical maneuvering in this case comes from the actions of former Republican State Chairman Marty Connors. When the <u>Barnett</u> court demanded that the plaintiffs specify their claims against the new redistricting plans, Connors ordered the <u>Barnett</u> lawyers, Bert Jordan and Al Agricola, to abandon the lawsuit.[11] Connors also refused Mark Montiel's requests for significant funding for <u>Montiel</u>. Connors testified that he believed that Republican funds would be better spent on things other than risky litigation. Connors remains proud of this strategy. He was delighted that Georgia Republicans were the ones who invested millions of dollars in winning <u>Larios v. Cox</u>, rather than

---

[11] The Republican Party paid the <u>Barnett</u> attorneys $75,000. Connors reported that he paid the funds at the request of the legislators who "were really sort of driving this."

Alabama Republicans. Connors led the Republican Party in abandoning <u>Barnett</u> and  refusing to significantly fund <u>Montiel</u>.[12] The Republican Party then sat on the fence until Georgia developed what they considered a favorable precedent with <u>Larios</u>. At that point, Connors, along with many other prominent Alabama Republicans, became interested in launching another legal challenge to the Alabama districts. Connors eventually started the effort to raise funds for the current challenge by Plaintiffs.

The instant case is very similar in this regard to <u>Jaffree</u>.  There the Eleventh Circuit applied virtual representation in a public law context and found that the subsequent suit was barred notwithstanding the presence of new plaintiffs.    In finding privity, the court relied heavily on the fact that Jaffree participated in the prior case, but voluntarily withdrew.  837 F.2d at 1468. The instant case is also very similar to <u>Thompson v. Smith</u>.  There, the three-judge federal court, in the context of an attempted second bite at the apple of redistricting litigation, applied res judicata.  Very similar to the <u>Barnett</u> parties in the instant case, the <u>Thompson</u> parties were parties in a pending federal case and were fully aware of and invited to intervene in a pending state claim litigating the same issues.  The state court reached final judgment first.   The <u>Thompson</u> court, relying heavily upon the fact that the <u>Thompson</u> parties had every opportunity to intervene in the state litigation, held that there was an identity of interests and that the <u>Thompson</u> parties were barred by res judicata.

Connors was well-aware of all the previous lawsuits, particularly <u>Barnett</u> and <u>Montiel</u>. As leader of the Republican Party, he opted not to further pursue the Republican Party's interests, and thus abandoned <u>Barnett</u>.   Now, however, Connors wishes to pursue the same challenge. If <u>Montiel</u> had been successful, Connors and other Republicans would have achieved their goals.

---

[12] Connors did contribute $1500 for <u>Montiel</u>.

The parties in the instant case now seek another bite at the apple.  They have tactically

maneuvered to avoid preclusion by recruiting new plaintiffs for this lawsuit. See Robertson, 148

F. Supp. 2d at 452 (adding new plaintiffs was evidence of tactical maneuvering). The Barnett

plaintiffs, their lawyers, and their financial backers consciously chose not to pursue their claims

against the new redistricting plans, despite the court's invitation.  We find that they acquiesced

to be bound by the decision in Montiel, of which they were aware. The backers of Barnett could

have pursued their own claims or tried to enter the Montiel litigation. Rather, they backed away

altogether. Of course, they would have benefitted greatly if Montiel had succeeded. They cannot

now try to avoid preclusion when they consciously, for tactical reasons, did not pursue their own

claims and deferred to other ongoing legal challenges.

Having examined the four factors employed by the cases in evaluating closely aligned

interests, we find that all four factors are present in this case.  We find that the interests of the

persons driving the instant litigation are closely aligned with those of the persons driving the

2001 redistricting litigation which resulted in a final preclusive judgment.

F.  Adequate Representation

As noted previously, virtual representation is a term of art that applies "when the

respective interests are closely aligned and the party to the prior litigation adequately represented

those interests." Jaffree, 837 F.2d at 1467.  We now turn to the question of whether the Montiel

plaintiffs adequately represented the Gustafson Plaintiffs' interests.

First, at least one court has determined that "[a]dequate representation is better viewed

not in terms of actually adequate representation, but 'in terms of incentive to litigate.'" Tyus, 93

F.3d at 458. We have already established that the plaintiffs in Montiel had the same incentive to

litigate as the Plaintiffs here; their interests were closely aligned. All parties sought to advance

Republican interests. Therefore, under this analysis, the Montiel plaintiffs are adequate representatives for the Gustafson Plaintiffs.

However, we need not rely upon mere incentive, because there is ample evidence here that there was actual adequate representation in the Montiel suit. The Montiel plaintiffs brought their lawsuit on behalf of a plaintiff class of all Alabama citizens residing in overpopulated districts.  Plaintiffs here are members of that proposed class.  Although the Montiel court never certified the class, the Montiel plaintiffs continued to act as if they represented a class of all similarly-situated voters. See Thompson v. Smith, 52 F.Supp.2d at 1370 ("There is every reason to conclude that the state court took care to protect the interests of the non-party class members"); see also Jaffree, 837 F.2d at 1463 n.2 (11th Cir. 1988) (district court declined to certify a class noting that there would be no systemic value in that public law context).  Until the court denied class certification, the Montiel plaintiffs had a duty to pursue the interests of the entire class. See Armstrong v. Martin Marietta Corp., 138 F.3d 1374, 1381 (11th Cir. 1998) ("When the district court denies class certification, the named plaintiffs no longer have a duty to advance the interests of the excluded putative class members."). There is no evidence that the Montiel plaintiffs failed in this duty.

Finally, attorney Mark Montiel led the Montiel lawsuit. If the Gustafson Plaintiffs (or the Litigation Management Committee that runs this litigation) believed that Montiel had performed inadequately as an attorney, they presumably would not have hired him as an attorney for this lawsuit.

We readily find that the parties to the prior litigation adequately represented the present parties.

G.  Conclusion: privity

28

Based upon the foregoing evidence, we find that the <u>Gustafson</u> parties and interests were virtually represented in the 2001 redistricting litigation because their interests were closely aligned and adequately represented, and because there is a close relationship between the parties, and significant participation in the prior litigation, and because we find that the parties driving the instant litigation engaged in tactical maneuvering and acquiesced and consented to be bound in the prior litigation.  Our findings in this regard find strong support in the case law.  Every redistricting case is consistent with our findings.  <u>Tyus</u>, 93 F.3d 449; <u>Robertson</u>, 148 F. Supp. 2d 443; <u>Thompson</u>, 1364 F. Supp. 2d 1364; <u>see also</u> <u>McNeil</u>, 828 A.2d at 857-62 (N.J. 2003).

Furthermore, our finding of virtual representation in this case finds strong support in the Eleventh Circuit precedent of <u>Jaffree</u>, 837 F.2d 1461.  In that case, plaintiff Jaffree filed case number one on behalf of himself and three of his minor children challenging classroom prayer activities as a violation of the Establishment Clause and the Free Exercise Clause.  He tried to represent a class, but the district court ruled that there would be no systemic value in certifying a class.  After apparently achieving partial victory, Jaffree withdrew (apparently in order to receive attorney's fees).  <u>Id.</u> at 1464.  Thus, Jaffree abandoned the case in mid-stream, leaving other parties to pursue his interests.  Later, when Jaffree apparently perceived that the parties he left in the original case were either not pursuing his interests or not doing so successfully, Jaffree filed a second suit on behalf of himself, his wife, and all five of his minor children, <u>id.</u> at 1464, asserting basically the same or closely related claims.  <u>Id.</u> at 1468.  Thus, there were three new plaintiffs.  In this public law context, the Eleventh Circuit applied virtual representation and the standard which we conclude is governing in this case, <u>i.e.</u>, closely aligned interests (and its four relevant factors) and adequate representation of those interests.  <u>Id.</u>  at 1467.  In finding privity and identity of interests, the court relied heavily upon Jaffree's decision to withdraw in mid-

stream from the original case.  Id. at 1468.  The court also noted that Jaffree himself had control

over whether or not the parties in the two cases would be the same.  Id. at 1468 n.18.  Although

there was overlap of some of the parties, with respect to the new parties, the court noted that the

familial relationship was an important factor.  Id. at 1467.  The Jaffree facts are stronger in that

Jaffree was not only the common attorney in both of those cases, but also a common plaintiff.  In

the instant case, the common attorney, Mark Montiel, is not a named plaintiff in either the prior

or current cases, although we have found that he was the primary driving force in the prior case,

and is at least a force influencing the instant case.   Also, other persons driving the instant

litigation (Connors and French), while not actual parties in the prior litigation, did participate in

a not insignificant manner.  The instant case and Jaffree are comparable with respect to

recruitment of new plaintiffs.   They are also comparable with respect to the withdrawal in mid-

stream in both situations.   Thus, the instant case and Jaffree are comparable with respect to

tactical maneuvering and consent to be bound.  See also NAACP v. Hunt, 891 F.2d 1555 (11th

Cir. 1990).

Our case presents facts stronger for the application of virtual representation and res

judicata than do the facts in Thompson, 52 F.Supp.2d 1364.  That three-judge district court case

involved multiple challenges to the same legislative redistricting plans.  The original suit was in

state court.  Id. at 1366.  When the Rice plaintiffs filed the federal lawsuit, the district court

directed that they intervene in the state lawsuit.  Id.  Thereafter, the Thompson plaintiffs were

added to the federal lawsuit.  Although they were invited by the state court to intervene in that

action, they declined.  Id. at 1367.  After judgment in the state case rejecting the plaintiffs' one-

person-one-vote dilution claims, the federal district court dismissed the Thompson plaintiffs'

one-person-one-vote dilution claim, applying res judicata.  Id.  The court found an identity of the

parties, noting that the Thompson plaintiffs sought to represent the same interests and the same class as the losing parties in the state case had.  Id. at 1369.   Thus, the court found that the interests were closely aligned.  Id.  The court relied heavily upon the fact that the Thompson plaintiffs had participated in the prior federal suit, and had declined to intervene in the pending state suit.  Id. at 1370.  Noting that there was every reason to believe that the state court took care to protect the interest of non-party class members, the court found that the interests of the Thompson plaintiffs were adequately represented.  Id.

Our case presents considerably stronger facts for several reasons.  There is stronger evidence of a close alignment of the respective interests, in that there is clear evidence of the fact that both the current and prior suits were pursuing the interests of a particular political party.  In addition, there is much stronger evidence here of close relationships among the respective parties.  Indeed, in the instant case, several of the persons either driving or influencing the current case actually participated in the 2001 redistricting litigation which ended in a final preclusive judgment.  Also, the evidence of tactical maneuvering and consent to be bound are stronger here than in Thompson.   In our situation, persons driving the instant litigation participated in the previous litigation, and then abandoned their participation and efforts in the prior litigation, leaving the 2001 redistricting litigation to be decided by other parties driving the Montiel case.  In addition, the evidence of tactical maneuvering with respect to recruitment of new and different plaintiffs is stronger in this case than in Thompson.

Our case also presents stronger facts for the application of virtual representation than those in Robertson v. Bartels, 148 F.Supp.2d 443.   Like our case, that case also involved a redistricting public law context.  There, the first case was filed by African-American and Hispanic voters and certain Republican members of the state legislature.  Id. at 446.  Before

31

judgment in the first case, a second case was filed by persons the <u>Robertson</u> court referred to as a different set of plaintiffs.  <u>Id.</u>  Relying upon the same doctrine of virtual representation, <u>id.</u> at 448, and employing the same standard and the same four factors called for by established Eleventh Circuit law, <u>id.</u> at 450, the court found identity of interests in the parties' association with the same political party, <u>id.</u> at 451, and found tactical maneuvering in that the second plaintiffs elected to file a new complaint with new plaintiffs rather than intervene in the pending case.  <u>Id.</u> at 451-52.

Our case presents stronger facts.  First, while the only participation in the prior case addressed in <u>Robertson</u> was by association with the same political party, <u>id.</u> at 451, the instant case involves actual participation in the 2001 redistricting litigation by some of the same persons who are driving forces or forces influencing the instant litigation.  In addition, our case is stronger than <u>Robertson</u> with respect to the factors of tactical maneuvering and consent to be bound.  While <u>Robertson</u> involved mere knowledge of the pendency of case number one and a choice to file a new suit rather than intervene; in our case, persons driving or influencing the instant litigation either actually participated in the prior case, <u>Montiel</u>, or were actual participants in the companion case, <u>Barnett</u>, which was tried in parallel and jointly with <u>Montiel</u>, until <u>Barnett</u> was abandoned in favor of <u>Montiel</u>.  In both the instant case and in <u>Robertson</u>, tactical maneuvering is further evidenced by the presence of new plaintiffs in the second case; however, again the instant case is stronger in that here there is actual evidence of recruitment of the new plaintiffs and control as to whom should serve as new plaintiffs.

For all the foregoing reasons, we find that the <u>Gustafson</u> parties are in privity with the <u>Montiel</u> parties.

32

## VI.  CONCLUSION: RES JUDICATA

Having held that <u>Gustafson</u> and <u>Montiel</u> involve the same cause of action and having found that the parties are in privity, and Plaintiffs having conceded the other requirements, we hold that the instant suit is barred by res judicata.  Accordingly, judgment is due to be entered against Plaintiffs and in favor of all Defendants.

It is therefore **ORDERED** that Plaintiffs' complaint is **DISMISSED WITH PREJUDICE.**

**DONE** and **ORDERED** this 22nd day of May, 2006.


/s/ R. Lanier Anderson, III
UNITED STATES CIRCUIT JUDGE


/s/ Mark Fuller
CHIEF UNITED STATES DISTRICT JUDGE


/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE

33